| | |
|---|---|
| JAMES BECKLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **PLAINTIFF'S MEMORANDUM** |
| | ) **IN OPPOSITION TO PRIORITY** |
| PRIORITY AUTO GROUP, INC., | ) **AUTO GROUP, INC., DENNIS** |
| | ) **ELLMER AND MATTHEW** |
| PRIORITY AUTOMOTIVE | ) **ELLMER'S MOTION TO** |
| HUNTERSVILLE, INC., | ) **DISMISS FOR LACK OF** |
| | ) **PERSONAL JURISDICTION** |
| DENNIS ELLMER and | ) **OR, IN THE ALTERNATIVE,** |
| | ) **TRANSFER OF VENUE** |
| MATTHEW ELLMER | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

Plaintiff, James Beckley (hereafter "Beckley" or "Plaintiff"), by and through counsel, opposes Priority Auto Group, Inc., Dennis Ellmer and Matthew Ellmer's Motion to Dismiss for Lack of Personal Jurisdiction Or, in the Alternative, Transfer of Venue. As set forth below, the Court should deny Defendants' Motion.[1]

## I. STATEMENT OF FACTS

### A. Priority Auto Group ("PAG") Begins Recruiting Beckley

Beckley has worked in the automobile sales industry for approximately 24 years

---

[1] Plaintiff contemporaneously files his opposition memorandum to Defendants' Motion to Dismiss for Failure to State a Claim. (ECF No. 16.)

(Beckley Decl. ¶ 3.)[2] Beckley moved to the Charlotte, North Carolina area in 2013 and has become well-known and admired for producing high sales numbers and increasing employee morale as the General Manager ("GM") of several Charlotte, North Carolina automobile dealerships (*Id.* at ¶ 4.) As of June 2019, Beckley was employed as GM of Keffer Mazda, a Charlotte-based automobile dealership, and was on track to become an equity shareholder or "partner" of Keffer Mazda (*Id.* at ¶ 5.)

On or about June 14, 2019, Matthew Pennell ("Pennell") a PAG executive in the position of Digital Performance & Marketing Director, began recruiting Beckley to become GM of Priority Automotive Huntersville, Inc. ("PAH"). (*Id.* at ¶ 6.; *see also* Beckley Decl. Ex. 1.) During the period June 14 through July 2020, Beckley and Pennell communicated via text and telephone regarding Beckley's interest in the PAH GM position. (Beckley Decl. ¶ 6; Beckley Decl. Ex. 2.) During these discussions, Beckley informed Pennell that Beckley was on track to become an equity owner of Keffer Mazda and that a similar agreement would be necessary to lure him away to PAH. (Beckley Decl. ¶ 6.) Beckley also asked Pennell whether PAG intended to hire Beckley for the purpose of fixing problems at the dealership and maximizing PAH's value so PAG could sell it. (*Id.*) Pennell assured Beckley that PAG did not intend to sell PAH. (*Id.*) Pennell also informed Beckley that Dennis Ellmer "allows partners" and that Pennell believed that Dennis Ellmer would be "open" to the idea of Beckley obtaining an equity stake in PAH. (*Id.*)

On July 2, 2019, Matt Ellmer traveled from Virginia to Charlotte, NC to discuss hiring Beckley as GM of PAH. (*Id.* at ¶ 7.) This meeting occurred at a restaurant in Huntersville, NC called "131 Main." (*Id.*) During this meeting, Beckley and Matt Ellmer discussed Beckley's

[2] The Declaration of Plaintiff James Beckley ("Beckley Decl.") is filed herewith in support of Plaintiff's Memorandum.

Case 3:21-cv-00072-RJC-DSC   Document 23   Filed 04/26/21   Page 2 of 25

current employment with Keffer Mazda, including Beckley's future equity position in the dealership (*Id.*)  Matt Ellmer told Beckley that a similar equity arrangement could be provided to Beckley if he accepted the GM position at PAH.  (Beckley Decl. ¶ 7.)

Beckley impressed Matt Ellmer during the July 2 meeting, which resulted in Dennis Ellmer flying from Virginia to Charlotte, North Carolina on his private plane to meet with Beckley that same day.  (*Id.* at ¶ 8.)  On July 2, 2019, Beckley met with Dennis Ellmer and Matt Ellmer for approximately two hours at the Concord Airport in Concord North Carolina in a private conference room.  (*Id.*)  Dennis Ellmer discussed the employment opportunity as GM of PAH, which included a discussion and comparison of the GM equity position Defendants could offered Beckley versus Beckley's equity ownership track at Keffer Mazda.  (*Id.*)  Dennis Ellmer told Beckley that the offer of employment as General Manager of Priority Huntersville was "more substantial" than Beckley's current employment with Keffer Mazda.  (*Id.*)  Dennis Ellmer referred to Beckley's equity ownership track at Keffer Mazda as one of "Keffer's ghost handshake partnerships."  (*Id.*)

During this same meeting, Beckley told Dennis Ellmer and Matt Ellmer that he was aware of rumors that PAH was for sale and that he was "not interested in fixing a dealership to be sold."  (*Id.* at ¶ 9.)  Dennis Ellmer assured Beckley that PAG intended to remain in the Charlotte market and that PAH would not be sold.  (*Id.*)  To ease Beckley's concerns, Dennis Ellmer invited Beckley to travel to Virginia so Beckley could meet some of PAG's GMs who held equity positions in their respective dealerships (a/k/a "Managing Partner").  (*Id.*)  Dennis Ellmer made sure to emphasize that many of these GMs had been with PAG for more than 20 years.  (*Id.*)

On July 8, 2019, Beckley traveled to Virginia to meet with Robert Chen ("Chen"),

PAG's Managing Partner of Chesapeake Honda, and Nick Moonjohn ("Moonjohn"), PAG's Managing Partner of Chesapeake Toyota. (*Id.* at ¶ 10.) Beckley met individually with Chen and Moonjohn, with each providing a tour of his respective dealership (Beckley Decl. ¶ 10.). Chen and Moonjohn each described their equity arrangements with PAG and discussed the benefits of being a PAG equity partner. (*Id.*)

After meeting with Chen and Moonjohn, Beckley attended PAG's monthly General Manager dinner. (*Id.* at ¶ 11.) The following morning, on July 9, Beckley attended PAG's GM monthly status meeting. (*Id.*) Following the status meeting, Beckley met with Dennis Ellmer and Matt Ellmer. (*Id.*) Dennis Ellmer again assured Beckley that PAH would not be sold. (*Id.*) Dennis Ellmer disclosed to Beckley that if he wanted to sell PAH he would have done so already, as he had rejected an offer of "$15 million dollars from the AMSI group." (*Id.*) Dennis Ellmer told Beckley: "Give me a 9-month commitment and I'll go myself to the bank with you in Charlotte and co-sign the deal of partnership with PAH." (*Id.*) Beckley informed Dennis Ellmer and Matt Ellmer that he needed to discuss the opportunity with his wife and make the best decision for his family. (*Id.*) Defendants did not make a job offer to Beckley while Beckley was present in Virginia. (*Id.*) The purpose of the Virginia trip was for Beckley to meet with PAG's equity partners Chen and Moonjohn to learn the benefits of being a PAG equity partner and to attend the PAG's monthly GM dinner. (*Id.*)

Later that day, on July 9, after Beckley returned home to North Carolina, Matt Ellmer sent a text message to Beckley stating: "Thanks for the time today. Talked with my father just now and we are putting together an offer for you which I will send your way tomorrow. We are going to be aggressive . . . you will not be able to turn it down brother. We want you and we are coming after you. Tomorrow the proof will be in the pudding! (*Id.* at ¶ 12; Beckley Decl.

4

Ex. 3.)"

B. <u>Defendants Offer Beckley Employment as GM of PAH</u>

On July 10, 2019, Matt Ellmer emailed Beckley an offer of employment as GM of PAH in North Carolina. (Beckley Decl. ¶ 13; Beckley Decl. Ex. 4.) Beckley was physically located in North Carolina when he received Matt Ellmer's offer of employment. (Beckley Decl. ¶ 13) Attached to the email was a "Pay Plan" that guaranteed Beckley minimum compensation of $40,000 per month during the first year of his employment. (*Id.*; Beckley Decl. Ex. 5.) Beckley accepted and signed the "Pay Plan" on July 19, 2019 in North Carolina. (Beckley Decl. ¶ 15.) Beckley was not provided a fully executed copy of the Pay Plan. (*Id.*)[3]

On or about July 15, 2019, Beckley telephoned Matt Ellmer and verbally accepted the job offer. (*Id.* at ¶ 14.) Beckley was physically located in North Carolina when he accepted the job offer. (*Id.*) Beckley, however, informed Matt Ellmer that Beckley's wife still had concerns about the PAH GM position. (*Id.*) On July 18, 2020, Matt Ellmer traveled to Charlotte to meet for dinner with Beckley and Beckley's wife. (*Id.*) Matt Ellmer met Beckley and Beckley's wife in North Carolina. (*Id.*) During dinner, Matt Ellmer reassured Beckley's wife that PAG was making a long-term commitment to Beckley and PAH. (*Id.*)

Upon information and belief, Matt Ellmer and Dennis Ellmer knew at all times that PAH would be sold in the near future and that Beckley would not be offered equity ownership prior to the sale. (*Id.* at ¶ 16.) Upon information and belief, Defendants began making preparations to sell PAH prior to hiring Beckley and continued with their plans to sell PAH during negotiations with Beckley and during Beckley's employment as GM of PAH. (*Id.*) Matt Ellmer and Dennis Ellmer made negligent or fraudulent representations and promises regarding

---

[3] A copy of the Pay Plan is attached to Plaintiff's Amended Complaint *see* ECF No. 11-001 (hereinafter "Pay Plan").

Defendants' intent and plans to not sell PAH and to provide Beckley with an equity stake in PAH for the purpose of inducing Beckley to accept the GM position and turnaround an underperforming dealership. (Beckley Decl. at ¶ 16.)

Matt Ellmer and Dennis Ellmer knew that Beckley would not accept an offer of employment as GM of PAH without a promise of equity ownership or if Matt Ellmer and Dennis Ellmer intended to sell PAH because Beckley was gainfully employed at Keffer Mazda as GM and would soon be made an equity partner in that dealership. (*Id.* at ¶ 17.) Despite having no intention to follow through with their promises, Matt Ellmer and Dennis Ellmer told Beckley what he needed to hear to secure Beckley's acceptance of their job offer. (*Id.*) As Matt Ellmer stated in his text, "We are going to be aggressive . . . you will not be able to turn it down brother. We want you and we are coming after you." (*Id.* at ¶ 12; Beckley Decl. Ex. 3.)

### C. Defendants Continue Marketing PAH For Sale After Beckley Accepts Employment

Almost immediately after accepting employment as GM of PAH, Beckley heard from several industry sources that PAG was continuing to search for a buyer for PAH. (Beckley Decl. ¶ 16.) Beckley estimates that between August 2019 and April 2020 at least four different individuals told Beckley that PAH was being sold. (*Id.*) In April 2020, Beckley learned from a source he knew to be very reliable that PAG had found a buyer for PAH. (*Id*) On April 3, 2019, Beckley texted Matt Ellmer: "We're not being sold out, are we? Priority Honda." Matt Ellmer replied: "No why would u [sic] say that." Beckley responded: "Rumors, right?" Matt Ellmer responded: "Definitely rumors. Call you later my Brother." (*Id.* at ¶ 19; Beckley Decl. Ex. 6.)

### D. Beckley's Compensation as GM of PAH

Pursuant to Beckley's compensation agreement, Beckley was paid a $5,000 monthly

6

salary, plus "10% of Net Profit" each month.  (Beckley Decl. ¶ 21.)  Beckley was also entitled to earn other monthly performance-based bonuses.  (*Id.*)  Beckley's compensation agreement "guaranteed" Beckley would be paid a minimum of $40,000 per month during the first year of his employment, if Beckley's $5,000 salary and "10% of Net Profit" did not equal $40,000.  (*Id.*; s*ee* Pay Plan.)  In March 2020, PAG arbitrarily reduced the amount of this guarantee from $40,000 per month to $30,000 per month, in breach of Beckley's compensation agreement.  (*Id.*) Beckley is owed $50,000 (February 2020 – July 2020) because Defendants failed to pay him a minimum of $40,000/month during this period.  (*Id.*)  Beckley's pay reduction was communicated to him verbally by Dennis Ellmer via telephone.  (*Id.*)  The pay reduction included Beckley's February 2020 wages, which Beckley had already earned at the time Dennis Ellmer spoke with Beckley on the telephone.  (*Id.*)  Beckley was physically located in North Carolina when Dennis Ellmer breached his employment Pay Plan.  (*Id*)  Neither Dennis Ellmer, Matt Ellmer, PAG, nor PAH provided Beckley with 24-hours written notice of a pay reduction as required by the NCWHA § 95-25.13(3).  (Beckley Decl. ¶ 21.)

     E.   <u>Defendants Sell PAH for $31 Million Dollars After Beckley Leads PAH to Record Sales</u>

Under Beckley's supervision and leadership, the interior and exterior of PAH was immediately cleaned and organized.  (*Id.* at ¶ 18.)  Prior to Beckley's arrival, PAH had not been maintained, including but not limited to: damage to the vehicle inventory because of rat infestation, discarded cigarette butts on the ground near all of the entrances to the dealership, unused computer and office equipment piled in offices, stains on the carpets, and stacks of paper and trash piled throughout the interior of the dealership.  (*Id.* at ¶ 18.)

Beckley installed a new sales and management team and worked with existing PAH staff to improve morale and sales skills.  (*Id.*)  During Beckley's first year as GM of PAH, Dennis

Ellmer and Matt Ellmer consistently praised and recognized Beckley's job performance and the results he achieved at PAH. (*Id.*) Beckley was responsible for increasing sales volume and market share for PAH. (Beckley Decl. ¶ 18.) During Beckley's tenure, PAH set all-time records for sales. (*Id.*)

After nine months of employment with PAH as GM, Beckley was not offered an equity stake in PAH. (*Id.* at ¶ 20.) In or about June or July 2020, Beckley contacted Matt Ellmer to inquire about the status of Beckley's opportunity to become an equity shareholder in PAH. (*Id.*) Matt Ellmer responded that Beckley needed to speak with his father, Dennis Ellmer. Beckley expected to speak with Dennis Ellmer at PAG's monthly meeting in Virginia, but each month the meeting was cancelled due to the Covid-19 pandemic. (*Id.*)

On or about September 9, 2020, Dennis Ellmer and Matt Ellmer arrived at PAH and requested to meet in private with Beckley. (*Id.* at ¶ 22.) Dennis Ellmer informed Beckley that PAG entered into an agreement to sell PAH to large automotive dealership called "MileOne" and that the sale would close on October 11, 2020. (*Id.*) Dennis Ellmer informed Beckley that MileOne had agreed to retain him in his respective position and salary "because of the success" of the dealership. (*Id.*) Matt Ellmer then stated to Beckley: "I know this is not what you want to hear – I know you had that other opportunity." (*Id.*) Matt Ellmer also told Beckley that pursuant to the sales agreement with MileOne, PAG could not employ Beckley for two years. (*Id.*; Beckley Decl. Ex. 7.)

F. <u>Beckley's Claims Against Defendants</u>

Beckley filed his First Amended Complaint, alleging (1) violations of the North Carolina Wage and Hour Act ("NCWHA"); (2) breach of contract; (3) fraudulent inducement and

misrepresentation; and (4) negligent misrepresentation.[4]

## II. ARGUMENT

### A. The Court Has Personal Jurisdiction Over All Defendants

#### 1. Applicable Legal Standard

Beckley ultimately bears the burden of proving the existence of personal jurisdiction by a preponderance of the evidence, "but where the Court relies on the pleadings, affidavits, and other papers to determine whether personal jurisdiction exists in the early stages of a matter, plaintiff must only make a prima facie showing of jurisdiction." *Keener v. Universal Companies, Inc.*, 128 F.Supp.3d 902, 908 (M.D.N.C. 2015) (citing *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 1997)). In adjudicating the motion, this Court is to construe all disputed facts and draw all reasonable inferences from the proof in favor of jurisdiction. *Keener*, 128 F.Supp.3d at 908 (citing *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.2d 390, 396 (4th Cir. 2003)). Defendants' arguments against personal jurisdiction consist almost entirely of disputing Beckley's allegations regarding the activities, representations and promises that occurred in North Carolina. Under the applicable legal standard, this is insufficient for the Court to grant Defendants' Rule 12(b)(2) motions because the Court must construe all disputed facts and draw all reasonable inferences in favor of jurisdiction.

"[F]or a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process

---

[4] Beckley abandons Count II of his FAC and is no longer pursuing breach of contract claims against Defendants. The Court should treat Plaintiffs' breach of contract claims (Count II) as voluntarily dismissed for purposes of Defendants' Motions.

requirements of the Fourteenth Amendment." *Id.* Yet "[b]ecause North Carolina's long-arm statute is construed to extend jurisdiction to the full extent permitted by the Due Process Clause, "the Court "need only inquire into whether 'defendant has such minimal contacts with the forum state [of North Carolina] that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

There are two different types of personal jurisdiction, each with a different scope and with different standards that are required. General jurisdiction allows for a defendant to be sued in a state for any reason, regardless of where the relevant conduct occurred, but the plaintiff must show that the defendant has "continuous and systematic" contacts with the forum state. *See Daimler AG v. Bauman*, 134 S.Ct. 746, 761 (2014); *Goodyear Dunlop Tires Operations, S.A., v. Brown*, 131 S.Ct. 2846, 2851 (2011). Specific jurisdiction, on the other hand, "requires only that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend itself in that state." *See Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472-73, (1985); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

### 2. The Court Has Specific Personal Jurisdiction Over Defendants Matt Ellmer, Dennis Ellmer, and PAG on Beckley's claims for fraudulent inducement and negligent misrepresentation.

Beckley claims injury in North Carolina resulting from (1) Defendants' fraudulent inducement and misrepresentation and (2) Defendants' negligent misrepresentation arising from promises and representations made by Dennis Ellmer, Matt Ellmer and PAG during their recruitment of Beckley for the PAH GM position.

Beckley alleges that Matt Ellmer, Dennis Ellmer, and PAG committed the North Carolina tort of fraudulent inducement. To assert a cause of action for fraudulent inducement, Beckley must

establish the following elements: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).

In the alternative, Beckley alleges that Matt Ellmer, Dennis Ellmer, and PAG committed the North Carolina tort of negligent misrepresentation. Negligent misrepresentation "occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care." *Jordan v. Earthgrains Companies, Inc.*, 155 N.C. App. 762, 576 S.E.2d 336, 339 (2003); RESTATEMENT (THIRD) OF EMPLOYMENT LAW §6.06 (AM. LAW INST. 2015) ("employer has duty to current or prospective employee to exercise reasonable care not to provide false information on a topic about which the employer has special knowledge and that the employee may reasonably rely on in deciding whether to enter into or remain in the employment, and will be subject to liability for the employee's pecuniary losses if the employer intentionally induced the employee to enter into or remain in the employment by breaching this duty.") "Liability arises from the employer's failure to exercise reasonable care in providing information that the employer knows may be material to the employee's decision about the employment relationship." *Id.* at cmt. a.

Beckley alleges that Matt Ellmer, Dennis Ellmer, and PAG fraudulently induced him to accept employment as GM of PAH by (1) falsely representing: that PAG intended to maintain its presence in the Charlotte, North Carolina market; that PAH was not for sale; and that PAH would not be sold; and (2) promising Beckley "partnership," i.e., an equity stake, in PAH within nine months of accepting the GM position. These were two conditions that Beckley insisted upon from the time PAG began recruiting him for the PAH GM position, and both conditions were known by

11

Dennis Ellmer, Matt Ellmer and PAG.

Defendants' arguments regarding specific personal jurisdiction consist almost entirely of their denials that the fraudulent promises and misrepresentations occurred within North Carolina. (ECF No. 19, pp. 3-5.) Defendants ignore the reach of North Carolina's long-arm statute, which broadly confers jurisdiction over this matter. N.C. Gen. Stat. §1-75.4(1)-(12). Regardless of where Defendants made their misrepresentations and promises, their purpose is undisputed: to solicit and pay for Beckley's services to be performed in North Carolina. Under Beckley's version of the facts, Dennis Ellmer and Matt Ellmer, both individually and on behalf of PAG and PAH, made fraudulent promises and misrepresentations on July 2, 2019 when they met with Beckley in North Carolina. Under this version of the facts, the North Carolina long-arm statute confers jurisdiction on any action that arises "out of an act or omission within this State by the defendant." *Id.* § 1-75.4(3). Defendants dispute Beckley's allegations and contend that the misrepresentations and promises were made in Virginia. Even under Defendants' version of the facts, the North Carolina long-arm statute confers jurisdiction on any action that arises "out of an act or omission outside this State by the defendant, provided in addition that at or about the time of the injury either: (a) solicitation … activities were carried on within this State by or on behalf of the defendant." *Id.* §1-75.4(4). The North Carolina long-arm statute also confers jurisdiction on any action that "arises out of a promise, made anywhere to the plaintiff . . . by the defendant … to pay for services to be performed in this State by the plaintiff. *Id.* §1-75.4(5)(a). For purposes of Defendants' Motions, however, the Court should credit Beckley's allegations that Defendants made their fraudulent comments, promises, and representations while Defendants were present in North Carolina and thus find that N.C. Gen. Stat. §1-75.4(3) confers personal jurisdiction.

In *Calder v. Jones*, the Supreme Court held that a court may exercise specific personal

jurisdiction over a non-resident defendant acting outside the forum when the defendant has intentionally directed his conduct towards the forum state, knowing the conduct would cause harm to a forum resident. 465 U.S. 783 (1984). In *Calder*, the Supreme Court articulated the "effects test," which requires Beckley to establish: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity. *Id.* at 789.

Here, Beckley alleges that Dennis Ellmer, Matt Ellmer and PAG committed the intentional tort of fraudulent inducement. (ECF No. 11, ¶ 68.) Beckley felt the "brunt of harm in this forum" because he was gainfully employed in North Carolina when Defendants induced him to accept employment at PAH, which was also located in North Carolina based on promises and representations Defendants knew to be untrue when they were made. Finally, Defendants "expressly aimed [their] tortious conduct" at North Carolina by having PAG executive Matt Pennell recruit Beckley and having Dennis Ellmer and Matt Ellmer travel to North Carolina to make the fraudulent representations and promises at issue in this case. As discussed below, the Court should infer that Dennis Ellmer and Matt Ellmer were acting individually and as agents of PAG and PAH when meeting with Beckley.

The Court should reject Defendants' attempts to distance PAG from this action. Beckley's fraudulent inducement and negligent misrepresentation claims arise from promises and misrepresentations made during Defendants' recruitment of Beckley. Defendants' recruitment efforts began with PAG executive Matt Pennell communicating with Beckley via text and telephone. Pennell was not employed by PAH, so his recruitment efforts necessarily were made on behalf of PAG. This is not surprising, however, because Defendants concede that PAG provides

human resources services for PAG's family of dealerships. Beckley alleges that in this role, PAG "controls and approves the terms and conditions for recruiting, onboarding, disciplining, and terminating employees who work at PAG's family of dealerships in North Carolina, Virginia, and Maryland, including PAH." For this reason, the Court should infer that in addition to the comments made by Pennell, the promises and representations made by Dennis Ellmer and Matt Ellmer during the recruitment process should also be attributed to PAG because they fall squarely within PAG's human resource role. Finally, Dennis Ellmer and Matt Ellmer are President and COO, respectively, of PAG, which is the entity that marketed and sold PAH. As a result, the Court should reasonably infer that their representations regarding PAG's intentions regarding the sale of PAH and PAG's commitment to remaining in the Charlotte market be attributed to PAG. (*See* Beckley Decl. Ex. 7.)[5]

Beckley's Amended Complaint, supported by the Declaration of Beckley, alleges the following facts that support a finding of specific personal jurisdiction over Defendants Matt Ellmer, Dennis Ellmer and PAG on Beckley's claims for fraudulent inducement and negligent misrepresentation. As shown below, the conduct attributed to Dennis Ellmer, Matt Ellmer and PAG is sufficiently connected with North Carolina to establish personal jurisdiction over Beckley's claims:

- In June 2019, PAG initiated contact with Beckley for the PAH GM position. PAG, through its Digital Performance and Marketing Director Matthew S. Pennell, began recruiting Beckley for the PAH GM position on or about June 14, 2019. Pennell, acting an agent of PAG, solicited Beckley's services in North Carolina via text messages and telephone calls. These initial communications with Priority Auto Group are documented in Exhibit ___. At all times, these communications were directed from PAG to Beckley in North Carolina to solicit Beckley's services for the GM position located in North Carolina. (Beckley Decl. ¶ 6.)
- On July 2, 2019, Matt Ellmer traveled from Virginia to Charlotte, North Carolina to discuss hiring Beckley as GM of PAH. Beckley and Ellmer met at a restaurant called

---

[5] The quotes attributed to Dennis Ellmer are made in his official capacity as "CEO" of PAG and the press release announces: "The Presidio Group Advises Priority Automotive Group on Sale of Honda Dealership."

"131 Main," located in Huntersville, North Carolina. During this meeting, Beckley and Matt Ellmer discussed Beckley's employment with Keffer Mazda, including the fact that Beckley would soon be made an equity shareholder in the dealership. Matt Ellmer told Beckley that a similar equity arrangement could be provided to Beckley if he accepted the GM position at PAH. (*Id.* at ¶ 7.)

- Beckley impressed Matt Ellmer during the July 2 meeting, which resulted in Dennis Ellmer flying from Virginia to Charlotte on his private plane to meet with Beckley that same day. Upon Dennis Ellmer's arrival in North Carolina, Beckley met with him and Matt Ellmer for approximately two hours at the Concord, North Carolina Airport in a private conference room. Dennis Ellmer discussed the employment opportunity as GM of PAH, which included the promise of a long-term relationship, which Beckley understood to include equity in PAH. Dennis Ellmer told Beckley that employment as GM of PAH was more substantial than Beckley's current employment with Keffer, referring to Beckley's current promise of equity as one of "Keffer's ghost handshake partnerships." (*Id.* at ¶ 8.)

- During this same meeting, Beckley told Dennis Ellmer and Matt Ellmer that he was aware of rumors that PAH was for sale and that he was "not interested in fixing a dealership to be sold." Dennis Ellmer assured Beckley that PAG intended to remain in the Charlotte market and that PAH would not be sold. To ease Beckley's concerns, Dennis Ellmer invited Beckley to travel to Virginia so Beckley could meet some of PAG's General Managers who held equity positions in their respective dealerships. Dennis Ellmer made sure to emphasize that many of these GMs had been with PAG for more than 20 years. (*Id.* at ¶ 9.)

- On July 8, 2019, Beckley travelled to Virginia to meet with Robert Chen ("Chen"), PAG's Managing Partner of Chesapeake Honda, and Nick Moonjohn ("Moonjohn"), PAG's Managing Partner of Chesapeake Toyota. Beckley met individually with Chen and Moonjohn, with each providing a tour of his respective dealership. Chen and Moonjohn each described their equity arrangements with PAG and discussed the benefits of being a PAG equity partner. Although these meetings occurred in Virginia, the sole purpose of these meetings was to solicit Beckley's services in North Carolina and inform Beckley of the terms, perks, and benefits of being a PAG equity shareholder. (*Id.* at ¶ 10.)

- The following morning, on July 9, Beckley attended PAG's GM monthly status meeting. Following the status meeting, Beckley met privately with Dennis Ellmer and Matt Ellmer. Dennis Ellmer again assured Beckley that PAH would not be sold. Dennis Ellmer disclosed to Beckley that if he wanted to sell Priority Huntersville he would have done so already, as he had "rejected an offer of $15 million dollars from the AMSI group." Dennis Ellmer told Beckley: "Give me a 9-month commitment and I'll go myself to the bank with you in Charlotte and co-sign the deal of partnership with PAH." Again, although this conversation occurred in Virginia, the promises and representations were made to solicit Beckley's services to be performed in North Carolina. (*Id.* at ¶ 11.)

- Later that day, on July 9, after Beckley had returned home to North Carolina, Matt Ellmer sent a text message to Beckley stating: "Thanks for the time today. Talked with my father just now and we are putting together an offer for you which I will send your way tomorrow. We are going to be aggressive . . . you will not be able to turn it down

brother. We want you and we are coming after you. Tomorrow the proof will be in the pudding! Beckley was physically located in North Carolina on July 9, 2019 when Dennis Ellmer informed him that a job offer was forthcoming. (Beckley Decl. ¶ 12.)

- On July 10, 2019, Matt Ellmer emailed Beckley an offer of employment as GM of Priority Huntersville. Attached to the email was an offer of employment that addressed the terms of compensation for the PAH GM position. Beckley was physically located in North Carolina when he received the offer of employment and contract. (*Id.* at ¶ 13.)

Defendants incorrectly rely on *Fidrych v. Marriott Int'l, Inc.* 952 F.3d 124 (4th Cir. 2020), for the proposition that Defendants' fraudulent conduct has no connection to North Carolina. In *Fidrych*, a South Carolina husband and wife sued Marriott International in South Carolina District Court for injuries they sustained at a Marriott-affiliated hotel in Milan, Italy. *Id.* at 129. The Fourth Circuit found that personal jurisdiction over Marriott International did not exist for purposes of the plaintiffs' claims because, although Marriott International did business in South Carolina, the plaintiffs' injuries did not arise out of or relate to Marriott International's connections to any of its hotels in South Carolina. *Id.* at 139-40. Here, in comparison, Beckley alleges that Dennis Ellmer and Matt Ellmer, both in their individual capacity and as officers of PAG, traveled to North Carolina for the express purpose of soliciting services to be performed by Beckley in North Carolina. In making this solicitation, Beckley alleges that Dennis Ellmer and Matt Ellmer, both individually and as officers of PAG, fraudulently induced Beckley to accept the GM position. It is difficult to comprehend how or why Defendants believe their alleged actions "do not arise out of any North Carolina activities." (ECF No. 19, p.12.)

### 3. The Court Has Specific Personal Jurisdiction Over Defendants Matt Ellmer, Dennis Ellmer, and PAG on Beckley's claims for violations of the NCWHA.

Beckley alleges three violations of the NCWHA: (1) Defendants failed to pay his guaranteed monthly compensation of $40,000/month between February 2020 and July 2020; (2) Defendants failed to provide Beckley written notice at least 24 hours prior to reducing his

guaranteed compensation from $40,000/month to $30,000/month; and (3) Defendants unlawfully withheld or deducted approximately $32,000 from Beckley's earned wages during his employment. The NCWHA provides for the recovery of an employee's unpaid wages from the "employer." NC Gen. Stat. §95-25.22(a). An "employer," for purposes of the NCWHA, includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." NC Gen. Stat. §95-25.2(5). In interpreting the NCWHA, North Carolina courts look to the FLSA for guidance. *Garcia v. Frog Island Seafood, Inc.* 644 F.Supp.2d 696, 707 (E.D.N.C. 2009). The term "person" includes an "individual," as well as corporations. Under North Carolina law, it is well established that, under certain conditions, individuals may be subjected to liability for unpaid wages under the NCWHA. To determine whether an individual is an "employer" and, thus subject to liability under the NCWHA, courts apply an "economic reality" test, which examines "the totality of the circumstances to determine whether the individual has sufficient operational control over the worker in question and the allegedly violative actions to be held liable for unpaid wages and other damages." *Miller v. Colorcrat Printing Co.*, No. 3:03 CV 51-T 2003 WL 22717592, at *3 (W.D.N.C. Oct. 16, 2003).

Beckley alleges that for purposes of his NCWHA claims, Dennis Ellmer, Matt Ellmer and PAG are his "employer", and the Court has personal jurisdiction over Dennis Ellmer, Matt Ellmer, and PAG. As discussed above, the North Carolina long-arm statute broadly confers jurisdiction. Included within this jurisdiction are claims that "arise out of a promise, made anywhere to the plaintiff … by the defendant … to pay for services to be performed in this State by the plaintiff." N.C. Gen. Stat. §1-75.4(5)(a). The North Carolina long-arm statute also confers jurisdiction over claims that "arise out of … services actually performed for the defendant by the plaintiff within this State is such performance within this State was authorized or ratified by the defendant." *Id.*

¶1-75.4(5)(b).

Beckley's NCWHA claims arise from Defendants' promises regarding the compensation Beckley would be paid as GM of PAH for his services in North Carolina and Defendants' failure to pay Beckley's earned wages in compliance with the NCWHA for the services he performed for Defendants as GM of PAH in North Carolina. As discussed above, Dennis Ellmer and Matt Ellmer, individually and on behalf of PAG and PAH, recruited Beckley and formulated the compensation plan that forms the basis of Beckley's NCWHA claims. On July 9, 2019, Matt Ellmer sent a text message to Beckley stating: "Thanks for the time today. Talked with my father just now and we are putting together an offer for you which I will send your way tomorrow. We are going to be aggressive . . . you will not be able to turn it down brother. We want you and we are coming after you. Tomorrow the proof will be in the pudding!" On July 10, 2019, Matt Ellmer emailed Beckley an offer of employment as GM of Priority Huntersville. Attached to the email was a contract was an offer of employment that addressed the terms of compensation for the PAH GM position. (*See* Beckley Decl. Ex. 4.) Beckley reported directly to Dennis Ellmer. By way of example, Beckley's Declaration includes an email Beckley received from Matt Ellmer that confirms Matt Ellmer directed Beckley's day-to-day job duties at PAH on issues including pay, hiring and firing, and employee supervision. In addition to formulating the terms of Beckley's compensation in consultation with Matt Ellmer, Dennis Ellmer made the decision to reduce Beckley's wages and communicated this decision to Beckley. As discussed above, PAG's human resource role included the recruitment of potential employees, which Matt Pennell, Dennis Elmer and Matt Ellmer personally participated in. The offer of employment Matt Ellmer emailed to Beckley was sent from a PAG email address. In addition, PAG performed the "financial, accounting, and payroll services" for PAH, which included payroll and compensation issues that

form the basis for Beckley's NCWHA claims.

As shown above, Dennis Ellmer, Matt Ellmer, and PAG purposefully availed themselves of the privilege of conducting activities in North Carolina by initiating contact with Beckley to recruit him as GM of PAH and offering to Beckley for services to be performed in North Carolina. Beckley's tort and statutory claims arise out of the same activities Defendants directed at North Carolina, including the promises and representations made to induce Beckley to accept employment, the formulation and terms of compensation paid to Beckley for the services he performed in North Carolina, and the failure to pay all wages due and owing to Beckley for the services he performed in North Carolina.

**B. The Court Should Decline to Transfer this Matter to Virginia Pursuant to 28 U.S.C. §1404(a)**

1. <u>Applicable Legal Standard</u>

Defendants request that if the Court holds it has personal jurisdiction over Dennis Ellmer, Matt Ellmer, and PAG, the Court should transfer this matter to the Eastern District of Virginia pursuant to 28 U.S.C. §1404(a). When considering a motion to transfer, courts should consider, among other things, eleven factors: 1) the plaintiff's choice of forum, 2) the residence of the parties, 3) access to evidence, 4) the availability of compulsory process for witnesses and the costs of transporting and obtaining those witnesses, 5) the possibility of a view by the jury, 6) the enforceability of a judgment, 7) the relative advantages and obstacles to a fair trial, 8) practical issues affecting trial expediency and efficiency, 9) the relative congestion between the districts, 10) the interest of resolving localized controversies at home and the appropriateness of having the trial of a diversity case in a forum that is at home with the state law that must govern the action, and 11) the avoidance of conflict of laws. *Landstar Ranger, Inc. v. Glob. Experience Specialists, Inc.*, No. 5:14-CV-193-RLV-DCK, 2015 WL 5714556, at *2 (W.D.N.C. Sept. 29, 2015), *aff'd,* No.

5:14-CV-193-RLV-DCK, 2016 WL 3636941, at * 3 (W.D.N.C. July 6, 2016) (citing *Nutrition & Fitness, Inc. v. Blue Stuff, Inc.*, 264 F.Supp.2d 357, 362 (W.D.N.C. 2003). The factors are accorded different weights based on the court's discretion.

The moving party bears the burden of proving the factors favor transfer. Here, Defendants provide the Court only conclusory statements, but no analysis addressing how the factors apply to this case. (ECF No 19, pp 31-32.) For this reason alone, the Court should deny Defendants' request for transfer because Defendants have not met their burden. Moreover, "[i]t is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned." *Harris v. Colvin*, No. 3:14-CV-143-RJC, 2015 WL 4921180, at *5 (W.D.N.C. Aug. 18, 2015) (citing *A Helping Hand, LLC v. Baltimore County, Md.*, 515 F.3d 356,369 (4th Cir. 2008)). Here, the Court should not permit Defendants to provide arguments and analysis on this issue in its reply brief because Defendants failed to develop this argument in their opening brief.

As shown below, Defendants' conclusory statements fail to satisfy Defendants' burden of proof on the issue of transfer.

1.  <u>Plaintiffs' initial choice of forum</u>. Defendant's memorandum fails to address this issue. Nonetheless, as a general rule, Plaintiff's choice of forum is typically given substantial weight and should "rarely be disturbed." *Landstar Ranger, Inc.*, 2016 WL 3636941, at *3 (citing *IHFC Properties, LLC v. APA Mktg., Inc.*, 850 F. Supp. 2d 604, 622 (M.D.N.C. 2012)). Here, Beckley chose the Western District of North Carolina because he resides here, his witnesses (who are non-parties) reside here, Defendants' actions were directed at soliciting Beckley to perform services in North Carolina and compensating Beckley for services he performed in North Carolina, and the harm Beckley suffered occurred in this district. (Beckley Decl. ¶¶ 2, 6 – 15, 18, 35 – 37.)

This factor weighs against transfer.

2. <u>Residence of the Parties</u>.   Defendants state that Defendants are "located" in Virginia. (ECF No. 19, pp 31-32.) Defendants provide no analysis regarding this factor. Beckley is a resident of North Carolina.  This factor is neutral.

3. <u>Access to evidence</u>.  Defendants state "all documents and sources of proof are located in Virginia."  (ECF No. 19, pp 31-32.)   Again, Defendants provide no analysis regarding this factor.   Moreover, Defendants ignore that Beckley's evidence, including text messages, emails, and other documentation in support of his claims and within his possession, custody, and control, is located in North Carolina.  (Beckley Decl. ¶ 2.)  This factor is neutral.

4. <u>Availability of compulsory process for witnesses and the costs of transporting and obtaining those witnesses</u>.  Defendants state that "the location of the parties and witnesses outside this district raises serious concerns as . . . this Court's power to secure such witnesses and the adequacy of deposition testimony."  (ECF No. 19, pp 31-32.)   Defendants provide no analysis or authority for this assertion.   (*Id.*) Defendants recognize, however, that "this dispute also concerns alleged conduct of Defendants' employees and/or agents in Virginia . . ."  (*Id.*)  Presumably, these individuals would appear at Defendants' request, which weighs against any issues with compulsory process.   Defendants also state in conclusory fashion: "the convenience of the witnesses militates in favor of transfer."  (*Id.*)  The irony of this comment should not be lost on the Court.   In opposing personal jurisdiction, Defendant Dennis Ellmer admits he traveled to North Carolina on his private jet airplane to meet with Beckley on July 2, 2019, but Dennis Ellmer asserts "there was

21

no discussion of any terms or conditions of Plaintiff's employment." (ECF No. 19-002, ¶ 14.) Instead, Dennis Ellmer claims he traveled to North Carolina via private jet for a "brief meeting" to merely "introduce" himself to Beckley. (*Id.*) If nothing else, this assertion confirms that travel to North Carolina is not an obstacle for Defendants. Defendants do not provide any evidence of any difficulty they would face having its witnesses testify in North Carolina. Defendants also ignore that (1) Beckley's wife, who is a North Carolina resident, is a non-party witness in this action who Beckley alleges attended a dinner meeting with him and Matt Ellmer in North Carolina, during which Matt Ellmer made promises and representations regarding Beckley's employment; (Beckley Decl. ¶ 35,) (2) Lolli Cornelius, the former Service Director for PAH, who is also a North Carolina resident, was present with Dennis Ellmer in North Carolina in August 2019 when Dennis Ellmer discussed Beckley's entitlement to an equity ownership position in PAH; (*Id.* at ¶ 36,) and (3) witnesses affiliated with Keffer Mazda, all of whom are located in North Carolina, who will provide testimony and evidence concerning the terms and conditions of Beckley's employment with Keffer Mazda. (*Id.* at ¶ 37.) "The convenience of non-party witnesses weighs most heavily on the Court in deciding on a motion to transfer venue." *Landstar Ranger, Inc.*, 2016 WL 3636941, at *4 (citing *Volvo Road Mach., Inc. v. J.D. Evans, Inc.,* 1:08–CV–156–LHT, 2008 WL 4610045, at *4 (W.D.N.C. Oct. 16, 2008)). Defendants' witnesses are employed by Defendant and under Defendants' control. Beckley's witnesses are true non-party witnesses and all are located in North Carolina. (Beckley Decl. ¶¶ 35-37.) This factor weighs against transfer.

5. <u>Possibility of a view by the jury</u>. Defendant's memorandum fails to address this issue. (ECF No. 19, pp 31-32.) This issue is neutral because it is unlikely that a view will be necessary.

6. <u>Enforceability of a judgment</u>. Defendant's memorandum fails to address this issue. (ECF No. 19, pp 31-32.) This issue is also neutral because there are no concerns about enforcement of a judgment by this Court.

7. <u>Relative advantages and obstacles to a fair trial</u>. Defendant's memorandum fails to address this issue. (ECF No. 19, pp 31-32.) This issue is neutral because there are no concerns regarding whether the parties will obtain a fair trial in North Carolina or Virginia.

8. <u>Practical issues affecting trial expediency and efficiency</u>. Defendant's memorandum fails to address this issue. (ECF No. 19, pp 31-32.) "Trials are never easy, expeditious, or inexpensive." *Landstar Ranger, Inc.*, 2016 WL 3636941, at *5 (citing *Century Furniture, LLC v. C & C Imports, Inc.*, 1:07-cv-179–DLH, 2007 WL 2712955, at * 5 (W.D.N.C. Sept. 14, 2007) Whatever the Court decides, there will be travel and inconvenience. Plaintiff and at least two non-party witnesses reside in North Carolina. (Beckley Decl. ¶¶ 35-37.) All of the witnesses referenced by Defendants are "Defendants' employees and/or agents in Virginia," which weighs against travel because any participation by these individuals will be within the scope of their employment. This factor weighs against transfer.

9. <u>Relative court congestion between the districts</u>. Defendant's memorandum fails to address this issue. (ECF No. 19, pp 31-32.)

10. <u>The interest of resolving localized controversies at home and the appropriateness of</u>

23

23

having the trial of a diversity case in a forum that is at home with the state law that must govern the action.  Defendant's memorandum fails to address this issue.  (ECF No. 19, pp 31-32.)  Plaintiff notes, however, that this is a diversity case, and it will be decided based on North Carolina common and statutory law.  This factor weighs against transfer.

11. Avoidance of conflict of laws.  Defendant's memorandum fails to address this issue. (ECF No. 19, pp 31-32.)  It is unlikely that there will be any issue with a conflict of laws in this matter. This factor is neutral.

As discussed above, Defendants failed to meaningfully address or analyze the factors applicable to transfer under 28 U.S.C. §1404(a) and have therefore waived this issue before the Court.  To the extent the Court considers the limited arguments and analysis provided by Defendants, the Court should conclude the factors weigh against transfer of this action to Virginia and deny Defendants' motion of this issue.

## III. CONCLUSION

For the reasons stated above, the Court should deny Defendants' Motion and permit Beckley to litigate his claims in this Court.

Respectfully submitted this day, April 26, 2021.

 /s/ Philip J. Gibbons, Jr.
Philip J. Gibbons, Jr., NCSB #50276
GIBBONS LAW GROUP, PLLC
14045 Ballantyne Corporate Pl., Suite 325
Charlotte, NC  28277
Telephone: (704)-612-0038
Facsimile: (704) 612-0038
phil@gibbonslg.com

*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on April 26, 2021, the undersigned filed the foregoing usingthe

Court's CM/ECF system which will send notification of such filing to the appropriate

CM/ECF participants.

/s/ Philip J. Gibbons, Jr.
*Attorney for Plaintiff*
