# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

JAMES BECKLEY,

      **Plaintiff,**

v.

PRIORITY AUTO GROUP, INC.,

PRIORITY AUTOMOTIVE
HUNTERSVILLE, INC.,

DENNIS ELLMER and

MATTHEW ELLMER

      **Defendants.**

_____

PRIORITY AUTOMOTIVE
HUNTERSVILLE, INC.,

      **Counterclaimant**

v.

JAMES BECKLEY and

TANISHA BECKLEY

      **Counterclaim Defendants**

Case No. 3:21-cv-00072-RJC-DSC

## DEFENDANTS' ANSWER AND AFFIRMATIVE AND OTHER DEFENSES TO JAMES BECKLEY'S FIRST AMENDED COMPLAINT (DOC. 11) AND PRIORITY AUTOMOTIVE HUNTERSVILLE, INC.'S COUNTERCLAIMS AGAINST JAMES BECKLEY AND TANISHA BECKLEY

Defendants Priority Auto Group, Inc. ("PAG"), Priority Automotive Huntersville, Inc.

("PAH"), Dennis Ellmer ("D. Ellmer") and Matthew Ellmer ("M. Ellmer"), (together,

"Defendants") by counsel, submit this Answer and Affirmative and other Defenses to the First

Amended Complaint (Doc. 11) ("FAC") of Plaintiff James Beckley ("J. Beckley"), and Counterclaimant PAH, by counsel, submits these Counterclaims against Counterclaim Defendants J. Beckley and Tanisha Beckley ("T. Beckley"), (together the "Beckleys"), as follows:

**DEFENDANTS' ANSWER**

Defendants deny all allegations in the FAC that are not specifically and expressly admitted herein. To the extent any heading or section in the FAC alleges facts, those facts are denied unless expressly admitted herein.

Defendants, in response to the correspondingly-numbered paragraphs of the FAC, state as follows:

1.      The allegations in paragraph 1 of the FAC are admitted on information and belief.

2.      The allegations in paragraph 2 of the FAC are denied.

3.      The allegations in paragraph 3 of the FAC are denied.

4.      The allegations in paragraph 4 of the FAC are admitted.

5.      The allegations in paragraph 5 of the FAC are admitted.

6.      The allegations in paragraph 6 of the FAC are denied.

7.      The allegations in paragraph 7 of the FAC are denied.

8.      The allegations in paragraph 8 of the FAC are denied.

9.      The allegations in paragraph 9 of the FAC are denied.

10.     The allegations in paragraph 10 of the FAC are denied.

11.     The allegations in paragraph 11 of the FAC are denied.

12.     The allegations in paragraph 12 of the FAC are denied.

13.     The allegations in paragraph 13 of the FAC are denied.

14.     The allegations in paragraph 14 of the FAC are denied.

15.      The allegations in paragraph 15 of the FAC are denied.

16.      The allegations in paragraph 16 of the FAC are denied.

17.      The allegations in paragraph 17 of the FAC are denied.

18.      The allegations in paragraph 18 of the FAC are denied.

19.      The allegations in paragraph 19 of the FAC are denied.

20.      The allegations in paragraph 20 of the FAC are denied.

21.      The allegations in paragraph 21 of the FAC are denied.

22.      The allegations in paragraph 22 of the FAC are denied.

23.      The allegations in paragraph 23 of the FAC are denied.

24.      The allegations in paragraph 24 of the FAC are denied.

25.      The allegations in paragraph 25 of the FAC are denied.

26.      The allegations in paragraph 26 of the FAC are denied.

27.      The allegations in paragraph 27 of the FAC are denied.

28.      The allegations in paragraph 28 of the FAC are denied.

29.      The allegations in paragraph 29 of the FAC are denied.

30.      The allegations in paragraph 30 of the FAC are denied.

31.      The allegations in paragraph 31 of the FAC are denied.

32.      The allegations in paragraph 32 of the FAC are denied.

33.      The allegations in paragraph 33 of the FAC are denied.

34.      The allegations in paragraph 34 of the FAC are denied.

35.      The allegations in paragraph 35 of the FAC are denied.

36.      The allegations in paragraph 36 of the FAC are denied.

37.      The allegations in paragraph 37 of the FAC are denied.

38. The allegations in paragraph 38 of the FAC are denied.

39. The allegations in paragraph 39 of the FAC are denied.

40. The allegations in paragraph 40 of the FAC are denied.

41. The allegations in paragraph 41 of the FAC are denied.

42. The allegations in paragraph 42 of the FAC are denied.

43. The allegations in paragraph 43 of the FAC are denied.

44. The allegations in paragraph 44 of the FAC are admitted.

45. The allegations in paragraph 45 of the FAC are denied.

46. The allegations in paragraph 46 of the FAC are denied.

47. The allegations in paragraph 47 of the FAC are denied.

48. Defendants do not have sufficient information or knowledge to admit or deny the allegations in paragraph 48 of the FAC and, therefore, deny the same.

49. Defendants do not have sufficient information or knowledge to admit or deny the allegations in paragraph 49 of the FAC and, therefore, deny the same.

50. Defendants do not have sufficient information or knowledge to admit or deny the allegations in paragraph 50 of the FAC and, therefore, deny the same.

51. The allegations in paragraph 51 of the FAC are denied.

52. The allegations in paragraph 52 of the FAC are denied.

53. The allegations in paragraph 53 of the FAC are denied.

54. The allegations in paragraph 54 of the FAC are denied.

55. The allegations in paragraph 55 of the FAC are denied.

56. The allegations in paragraph 56 of the FAC are denied.

57. The allegations in paragraph 57 of the FAC are denied.

58.     The allegations in paragraph 58 of the FAC are denied.

59.     The allegations in paragraph 59 of the FAC are denied.

60.     The allegations in paragraph 60 of the FAC are denied.

61.     Defendants deny the allegations in paragraph 61 of the FAC to the extent they are inconsistent with, contrary to or mischaracterize any alleged text messages.

62.     The allegations in paragraph 62 of the FAC are denied.

63.     The allegations in paragraph 63 of the FAC are denied.

64.     The allegations in paragraph 64 of the FAC are denied.

65.     The allegation in the first sentence of paragraph 65 of the FAC that J. Beckley's first day was July 19, 2019 is admitted. Defendants do not have sufficient information or knowledge to admit or deny the remaining allegations in paragraph 65 of the FAC and, therefore, deny the same.

66.     The allegations in paragraph 66 of the FAC are denied.

67.     The allegations in paragraph 67 of the FAC are denied.

68.     The allegations in paragraph 68 of the FAC are denied.

69.     The allegations in paragraph 69 of the FAC are denied.

70.     The allegations in paragraph 70 of the FAC are denied.

71.     The allegations in paragraph 71 of the FAC are denied.

72.     No response is required to paragraph 72 of the FAC because J. Beckley's claims relying on alleged misrepresentations made to J. Beckley regarding his ability to obtain equity partnership in PAH have been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) (the "Order") adopting in part the Court's Amended Memorandum and Recommendation dated

June 21, 2021 (Doc. 27) (the "M&R"). To the extent a response is required, the allegations in paragraph 72 of the FAC are denied.

73.     The allegations in paragraph 73 of the FAC are denied.

74.     The allegations in paragraph 74 of the FAC are denied.

75.     Defendants do not have sufficient information or knowledge to admit or deny the allegations in paragraph 75 of the FAC and, therefore, deny the same.

76.     The allegations in paragraph 76 of the FAC are denied.

77.     No response is required to paragraph 77 of the FAC because J. Beckley's claims relying on alleged misrepresentations made to J. Beckley regarding his ability to obtain equity partnership in PAH have been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27). To the extent a response is required, the allegations in paragraph 77 of the FAC are denied.

78.     No response is required to paragraph 78 of the FAC because J. Beckley's claims relying on alleged misrepresentations made to J. Beckley regarding his ability to obtain equity partnership in PAH have been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27). To the extent a response is required, the allegations in paragraph 78 of the FAC are denied.

79.     No response is required to paragraph 79 of the FAC because J. Beckley's claims relying on alleged misrepresentations made to J. Beckley regarding his ability to obtain equity partnership in PAH have been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27). To the extent a response is required, the allegations in paragraph 79 of the FAC are denied.

80.     The allegations in paragraph 80 of the FAC are denied.

81.     The allegations in paragraph 81 of the FAC are denied.

82.     No response is required to paragraph 82 of the FAC because J. Beckley's NCWHA claim for unlawfully withholding wages has been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27).  To the extent a response is required, the allegations in paragraph 82 of the FAC are denied.

83.     The allegations in paragraph 83 of the FAC are denied.

84.     Defendants do not have sufficient information or knowledge to admit or deny the allegations in paragraph 84 of the FAC and, therefore, deny the same.

85.     Defendants reallege and incorporate all prior paragraphs of this Answer as though fully set forth herein.

86.     The allegations in paragraph 86 of the FAC are denied.

87.     The allegations in paragraph 87 of the FAC are denied.

88.     The allegations in paragraph 88 of the FAC are denied.

89.     No response is required to paragraph 89 of the FAC because J. Beckley's NCWHA claim for unlawfully withholding wages has been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27).  To the extent a response is required, the allegations in paragraph 89 of the FAC are denied.

90.     The allegations in paragraph 90 of the FAC are denied.

91.     Defendants reallege and incorporate all prior paragraphs of this Answer as though fully set forth herein.

92.     The allegations in paragraph 92 of the FAC are denied.

93.     No response is required to paragraph 93 of the FAC because J. Beckley's claims relying on alleged misrepresentations made to J. Beckley regarding his ability to obtain equity

partnership in PAH have been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27).  To the extent a response is required, the allegations in paragraph 93 of the FAC are denied.

94.     The allegations in paragraph 94 of the FAC are denied.

95.     Defendants reallege and incorporate all prior paragraphs of this Answer as though fully set forth herein.

96.     No response is required to paragraph 96 of the FAC because J. Beckley's claims relying on alleged misrepresentations made to J. Beckley regarding his ability to obtain equity partnership in PAH have been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27).  To the extent a response is required, the allegations in paragraph 96 of the FAC are denied.

97.     No response is required to paragraph 97 of the FAC because J. Beckley's claims relying on alleged misrepresentations made to J. Beckley regarding his ability to obtain equity partnership in PAH have been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27).  To the extent a response is required, the allegations in paragraph 97 of the FAC are denied.

98.     The allegations in paragraph 98 of the FAC are denied.

99.     The allegations in paragraph 99 of the FAC are denied.

100.     Defendants reallege and incorporate all prior paragraphs of this Answer as though fully set forth herein.

101.     The allegations in paragraph 101 of the FAC are denied.

102.     No response is required to paragraph 102 of the FAC because J. Beckley's claims relying on alleged misrepresentations made to J. Beckley regarding his ability to obtain equity

partnership in PAH have been dismissed pursuant to the Court's Order dated March 28, 2022 (Doc. 31) adopting in part the Court's M&R dated June 21, 2021 (Doc. 27). To the extent a response is required, the allegations in paragraph 102 of the FAC are denied.

103. The allegations in paragraph 103 of the FAC are denied.

The allegations contained in the Prayer for Relief at the conclusion of the FAC ("WHEREFORE" paragraph and its subparts a – j) are denied. (See Doc. 11 at p. 21-22).

The Jury Trial Demand at the conclusion of the FAC requires no response. (See Doc. 11 at p. 22). Defendants also demand trial by jury on any issue so triable.

All allegations in the FAC not expressly and specifically admitted herein are denied.

## DEFENDANTS' AFFIRMATIVE AND OTHER DEFENSES

Without any admission as to the burden of proof, Defendants assert the following affirmative and other defenses. Defendants expressly reserve the right to amend their Answer and/or raise additional defenses as additional information becomes available through further investigation and discovery. Defendants also expressly reserve their right to offer all facts and evidence showing that Defendants are not liable for J. Beckley's claims. As and for their affirmative and other defenses, Defendants state as follows:

1. The FAC fails to states a claim upon which relief can be granted.

2. The FAC is barred by the doctrine of unclean hands.

3. J. Beckley is estopped from asserting his claims as a result of his conduct.

4. J. Beckley's claims are barred by the doctrine of laches.

5. J. Beckley's claims are barred by the doctrines of waiver and ratification.

6. Defendants deny that they are indebted to J. Beckley for the amounts alleged in the FAC or any sum whatsoever, and call for strict proof of J. Beckley's alleged damages.

7.      Any alleged loss or damage sustained by J. Beckley was occasioned by the acts or omissions of J. Beckley and/or third parties.

8.      J. Beckley is not entitled to recover from Defendants because Defendants have satisfied and fully performed all of their alleged obligations under the "Pay Plan" and applicable law and J. Beckley has received everything to which he is entitled.

9.      J. Beckley is not entitled to recover from Defendants because J. Beckley has failed to perform his obligations under the "Pay Plan" and applicable law.

10.     J. Beckley is not entitled to recover from Defendants because J. Beckley has materially breached and repudiated his obligations under the "Pay Plan" and applicable law.

11.     J. Beckley cannot recover attorneys' fees from Defendants pursuant to the NCWHA or otherwise.

12.     To the extent that Defendants have any alleged duties, which Defendants deny, such duties are discharged due to J. Beckley's actions.

13.     To the extent that J. Beckley has incurred any damages, which Defendants deny, Defendants' conduct was not the legal or proximate cause of those damages.

14.     To the extent that J. Beckley has incurred any damages, which Defendants deny, J. Beckley has failed to mitigate his damages and is barred from recovering any such damages from Defendants.

15.     To the extent that J. Beckley has incurred any damages, which Defendants deny, such amounts of recovery should be offset against or reduced by any and all amounts owed by J. Beckley to Defendants, including, but not limited to, damages set forth in PAH's Counterclaims.

16.     J. Beckley's claims are contrary to the terms and conditions of the "Pay Plan" and applicable law.  J. Beckley was paid correctly under the terms and conditions of the "Pay Plan."

17.     J. Beckley is not entitled to any compensation or other payments from Defendants under the "Pay Plan," the NCWHA, common law or otherwise.

18.     Defendants deny breaching any legal duty owed to J. Beckley.

19.     Defendants reserve the right to assert any other defense that comes to light during the discovery of this action and to amend this Answer upon the discovery of a factual basis for any such defense.

20.     Defendants reserve all defenses under Rule 8(c) of the Federal Rules of Civil Procedure and any other defenses, at law or in equity, which may now exist or in the future be available based on investigation or discovery.

WHEREFORE, Defendants, by counsel, have fully answered and set forth their affirmative and other defenses and respectfully move the Court to enter final judgment in their favor, to dismiss this action from the Court's docket, to award Defendants their attorneys' fees, costs and expenses, and to grant Defendants such further and other relief as the Court deems proper.

### Rule 38(b)(1) Jury Demand

Pursuant to Rule 38(b)(1), Defendants demand trial by jury on any and all issues so triable.

Dated:  April 11, 2022

Respectfully submitted,

**PRIORITY AUTO GROUP, INC., PRIORITY AUTOMOTIVE HUNTERSVILLE, INC., DENNIS ELLMER and MATTHEW ELLMER**

By      /s/   Joshua F. P. Long

Joshua F. P. Long (N.C. Bar No. 26497)
WOODS ROGERS PLC
Wells Fargo Tower, Suite 1800
10 S. Jefferson Street
Roanoke, Virginia  24011
Telephone: (540) 983-7725
Facsimile: (540) 983-7711
jlong@woodsrogers.com

*Counsel for Defendants and Counterclaimant Priority Automotive Huntersville, Inc.*

*[2929914-3, 120373-00036-01]*

11

## PAH'S COUNTERCLAIMS AGAINST THE BECKLEYS

Counterclaimant Priority Automotive Huntersville, Inc. ("PAH"), by counsel, for its Counterclaims against Counterclaim Defendants James Beckley ("J. Beckley") and Tanisha Beckley ("T. Beckley"),[1] (together, the "Beckleys"), alleges as follows:

## PARTIES

1.        PAH is a Virginia corporation with its principal place of business in Chesapeake, Virginia.  PAH operated a Honda dealership in Huntersville, North Carolina (the "Dealership") from June 16, 2009, until the Dealership was sold to MileOne AutoGroup ("MileOne") on October 11, 2020.

2.        J. Beckley formerly was employed by PAH as the General Manager ("GM") of the Dealership.  J. Beckley is married to T. Beckley.  J. Beckley allowed T. Beckley to work at the Dealership from July 19, 2019 until May 29, 2020 without T. Beckley being an employee of the Dealership. J. Beckley ultimately hired his wife T. Beckley to work for the Dealership.

3.        T. Beckley formerly was employed by PAH as the Sales Assistant of the Dealership.  T. Beckley is married to J. Beckley.  T. Beckley was hired by her husband J. Beckley to work for the Dealership.

4.        Following the sale of the Dealership to MileOne, PAH discovered that the Beckleys had defrauded, converted and misappropriated property and funds from PAH and enriched themselves at the expense of and to the detriment of PAH in breach of their fiduciary duties to PAH and in violation of applicable law.

---

[1] PAH has contemporaneously moved to join T. Beckley as a Counterclaim Defendant pursuant to Federal Rules of Civil Procedure 13(h) and 20(a).

5.     Through an investigation, PAH has uncovered numerous "smoking guns" confirming the Beckleys' unlawful actions during their employment with PAH, including, without limitation, credit card statements, receipts, bank records, check images, accounting records, work and personal emails, text messages, and other documents and information.

## NATURE OF THE ACTION

6.     This action arises out of the Beckleys': (a) breaches of their fiduciary duties to PAH (Counts 1-2); (b) aiding and abetting each other's breaches of their fiduciary duties (Counts 3-4); (c) fraud (Count 5); (d) conversion (Count 6); (e) common law civil conspiracy (Count 7); (f) conspiratorial and tortious conduct aimed at injuring PAH in its business, trade and reputation in violation of the Virginia Business Conspiracy Act ("VBCA"), Virginia Code §§ 18.2-499 and 500 ("Business Conspiracy"), (Count 8); (f) unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C.G.S. § 75-1.1, et seq. ("Unfair and Deceptive Trade Practices"), (Count 9); and (g) unjust enrichment (Count 10).

7.     PAH seeks monetary damages from the Beckleys to compensate for actual injury to PAH in its business, trade and reputation arising from their breaches of fiduciary duties (Counts 1-2); aiding and abetting (Counts 3-4); fraud (Count 5); conversion (Count 6); civil conspiracy (Count 7); Business Conspiracy in violation of the VBCA (Count 8); Unfair and Deceptive Trade Practices in violation of the NCUDTPA (Count 9); and unjust enrichment (Count 10).

8.     In addition to compensatory damages (Counts 1-10), PAH also seeks from the Beckleys punitive damages (Counts 1-9), recoupment of employment compensation (Count 10), disgorgement of wrongful gains (Count 10), treble damages (Counts 8-9), and reimbursement of attorneys' fees, costs and expenses (Count 8-9).

## FACTS

### PAH Hires J. Beckley as the GM of the Dealership

9.      On or about July 19, 2019, PAH hired and employed J. Beckley as the GM of the Dealership.

10.     During his employment with PAH, J. Beckley was responsible for, among other things, overseeing and managing the Dealership's operations and supervising the Dealership's employees.

11.     PAH entrusted J. Beckley with the oversight and management of the Dealership's operations and the supervision of the Dealership's employees.  Unbeknownst to PAH, PAH's trust in J. Beckley was misplaced.

12.     Unbeknownst to PAH, at the time PAH hired J. Beckley as the GM of the Dealership, J. Beckley was involved in a legal dispute with his former employer, Lake Normal Auto Mall, LLC d/b/a/ Keffer Mazda ("Keffer Mazda"), and incurring substantial legal fees to his lawyer Philip J. Gibbons, Jr. ("Gibbons") and his firm Gibbons Law Group, PLLC f/k/a Gibbons Leis, PLLC (the "Gibbons Firm").

13.     Keefer Mazda filed a lawsuit against J. Beckley for breach of contract on July 29, 2019 (the "Keffer Mazda Lawsuit"), and the Court entered a Temporary Restraining Order against J. Beckley on August 1, 2019 (the "TRO").  A copy of the TRO is attached hereto as **Exhibit 1**.

14.     J. Beckley incurred substantial legal fees to Gibbons and the Gibbons Firm in the defense of the Keffer Mazda Lawsuit.  Unwilling or unable to pay Gibbons and the Gibbons Firm, J. Beckley exploited his position as the GM of the Dealership and engaged in fraudulent transactions and self-dealing to resolve his debt to Gibbons and the Gibbons Firm for unpaid legal services.

15. In August 2019, Beckley orchestrated Gibbons' and the Gibbons Firm's inflated trade in of an old Jeep Wrangler, VIN No. 1C4BJWFG1FL572165 (the "Trade-In Jeep") and materially discounted "purchase" of a non-street legal 2015 Jeep Wrangler Unlimited, VIN No. 1C4AJWAG4FL744577 (the "Non-Street Legal Jeep") as part of a scheme to resolve his debt to Gibbons and the Gibbons Firm for unpaid legal services (the "Jeep Transaction").

16. The Jeep Transaction benefited and enriched Beckley, Gibbons and the Gibbons Firm at the expense of and to the detriment of PAH.

17. J. Beckley was paid generously for his services as the GM of the Dealership. In fact, J. Beckley was paid $643,160.29 in his first year. Despite this, J. Beckley is now suing PAH (and other persons and entities who were not his employer) for even more money to which he is not entitled after biting the hand that fed him by defrauding, converting and misappropriating property and funds from PAH estimated to be far in excess of $200,000, with an exact amount to be determined at trial.

18. Shortly after the commencement of his employment with PAH, on July 25, 2019, J. Beckley moved and relocated the Comptroller of the Dealership into a separate building about 100 yards away from the main Dealership building where J. Beckley and his team worked.

19. Unbeknownst to PAH, J. Beckley orchestrated this move to facilitate his unlawful activities and avoid financial oversight.

**J. Beckley Hires his Wife, T. Beckley, to Work for PAH**

20. Prior to her employment with PAH, T. Beckley spent a substantial amount of time hanging around the Dealership.

21.     Prior to her employment with PAH, T. Beckley was constantly in the Dealership, and was performing J. Beckley's job duties on a daily basis without being licensed by the State of North Carolina to sell automobiles.

22.     Prior to her employment with PAH, T. Beckley inserted herself into roles and duties for which J. Beckley was responsible, even though T. Beckley was not an employee of PAH or properly licensed.

23.     Prior to her employment with PAH, T. Beckley:

  i.     Attended and ran manager meetings of the Dealership;

  ii.    Instructed J. Beckley as to which employees to terminate;

  iii.   Purchased items for PAH (and personal items for herself and J. Beckley) using the Credit Card issued to J. Beckley;

  iv.    Filled out cost sheets related to vehicle purchase transactions (a manager responsibility); and

  v.     Performed other duties for which J. Beckley was responsible as the GM of the Dealership.

24.     Prior to her employment with PAH, T. Beckley conducted these and other activities in J. Beckley's presence and absence.

25.     Prior to her employment with PAH, J. Beckley gave T. Beckley unrestricted access to the Dealership's confidential and proprietary information, funds and property which T. Beckley used to make decisions for the Dealership and to benefit herself and J. Beckley all without the knowledge or approval of PAH's management and without T. Beckley having proper licensure.

26.     On or about May 29, 2020, J. Beckley hired his wife T. Beckley as the Sales Assistant of the Dealership without the approval or authority of PAH's management. A copy of T. Beckley's onboarding packet is attached hereto as **Exhibit 2**.

27.     T. Beckley's onboarding packet contained a hiring checklist enumerating certain requirements that had to be met before she could begin her employ with PAH.

28.     Items on the onboarding checklist include "Background Report" and "Drug Screen Completed."

29.     T. Beckley's onboarding checklist has "N/A" handwritten next to only two entries - those entries are "Background Report" and "Drug Screen Completed." These items are required of all other PAH employees.

30.     J. Beckley impermissibly waived the onboarding requirements of a background report and drug screening for his wife, T. Beckley.

31.     T. Beckley signed a number of documents in her onboarding packet including: (1) an employee handbook; (2) an Acknowledgment of Basic Rules for Auto Dealers; (3) an Acknowledgement of Hazard Communication orientation; (4) an Employee acknowledgment form agreeing to the terms of the handbook; (5) a Wage Deduction Authorization; (6) a Vehicle Damage Agreement; and (7) a "Statement of Responsibility."

32.     During her employment with PAH, T. Beckley assumed more responsibilities of the GM of the Dealership (without the knowledge or approval of PAH and without proper licensure), and J. Beckley was frequently absent from work while T. Beckley covered the GM duties for J. Beckley.

33.     Unbeknownst to PAH, T. Beckley and J. Beckley conspired to harm PAH throughout their time at the Dealership.

**PAH Discovers the Beckleys' Unlawful Actions**

34.     After the sale of the Dealership to MileOne on October 11, 2020, PAH received reports from former PAH employees regarding J. Beckley's unusual and suspicious conduct during his tenure as the GM of the Dealership.

35.     Multiple former PAH employees reported that J. Beckley was habitually absent from work, often leaving the Dealership up to ten times in one day, and coming back exhibiting erratic and bizarre behavior and symptoms.

36.     These former PAH employees reported that J. Beckley exhibited a variety of troubling symptoms, including inability to keep his eyes open during meetings, profuse sweating, inability to remain still during meetings, inability to remain focused on tasks, and frequent unexplained work absences. Further, PAH employees were fearful to report J. Beckley's symptoms due to fear of being fired by J. Beckley.

37.     Unbeknownst to PAH, J. Beckley's behavior was not only indicative of poor leadership and work performance but also something far more nefarious.

38.     Through an investigation, PAH discovered that the Beckleys had defrauded, converted and misappropriated property and funds from PAH and enriched themselves at the expense of and to the detriment of PAH.

39.     PAH has uncovered numerous "smoking guns" confirming the Beckleys' unlawful actions during their employment with PAH, including, without limitation, credit card statements, receipts, bank records, check images, accounting records, work and personal emails, text messages, and other documents and information.

**The Beckleys Misuse PAH's Credit Card for over $100,000 in Personal Purchases**

40.    PAH issued J. Beckley a company credit card[2] to use only for certain approved business expenses incurred in his role as the GM of the Dealership (the "Credit Card").

41.    No other employee of PAH was issued a credit card.

42.    Any expenses charged on the Credit Card would be paid by PAH.

43.    Typical approved business expenses that could be charged on the Credit Card were Dealership operational expense items that could not be paid by company check or through PAH's vendors.

44.    J. Beckley was informed by Diane Ullmer , PAH's Comptroller, and M. Ellmer that these were the only approved uses for the Credit Card.

45.    Unbeknownst to PAH, J. Beckley routinely abused the use of his Credit Card for personal benefit, and took affirmative actions to conceal his misconduct from PAH.

46.    During his employment with PAH, J. Beckley used his Credit Card for unauthorized charges that were for his and his wife T. Beckley's personal benefit.

47.    Throughout his employment with PAH, J. Beckley was required to provide receipts to substantiate his purchases on the Credit Card, but J. Beckley frequently failed to do so. As the GM of the Dealership, J. Beckley was responsible for validating the propriety of and approving Credit Card charges. Instead, J. Beckley concealed his own Credit Card fraud.

48.    PAH has reviewed J. Beckley's Credit Card charges and uncovered a litany of improper charges made to J. Beckley's Credit Card.

---

[2] J. Beckley had a total of three credit cards during his employment with PAH. Card number x1668 was cancelled when J. Beckley took over as the GM of the Dealership, card number x6283 was cancelled when it was allegedly lost by J. Beckley, and card number x7911 remained in effect until the Dealership was sold to MileOne on October 11, 2020.

49.     A comprehensive summary of improper charges that J. Beckley made to the Credit Card is attached hereto as **Exhibit 3**. Below is a partial summary of some of the many improper charges that J. Beckley made to the Credit Card. Unfortunately, J. Beckley's below fraudulent Credit Card charges[3] are just the tip of the iceberg:

| | | |
|---|---|---|
| i. | CVS & Walgreens: | $2,084.83; |
| ii. | Amazon: | $4,684.11; |
| iii. | Marshalls: | $2,228.74; |
| iv. | Target: | $5,719.53; |
| v. | Princess Kool: | $673.16; |
| vi. | eBay: | $151.03; |
| vii. | Best Buy: | $12,723.68; |
| viii. | Ikea: | $2,363.54; |
| ix. | Publix: | $3,705.86; |
| x. | Harris Teeter: | $1,238.67; |
| xi. | Halal International: | $419.94; |
| xii. | Instacart: | $2,336.22; |
| xiii. | Food Lion: | $961.61; |
| xiv. | Various hotels: | $5,450.90; |
| xv. | Bail bond: | $4,000.00; |
| xvi. | Home Improvement: | $2,906.39; |
| xvii. | Northern Tool: | $209.47; |
| xviii. | LA Vapors: | $300.26; |
| xix. | PF Chang's: | $323.10; |
| xx. | City Barbecue: | $316.54; |
| xxi. | Zaxby's: | $394.54; |
| xxii. | Doordash: | $682.85; |
| xxiii. | Uber Eats: | $1,288.88; |
| xxiv. | Postmates: | $1,171.41; |
| xxv. | Chili's: | $146.70; |
| xxvi. | Margaritaville: | $333.24; |
| xxvii. | The Ballantyne (hotel): | $245.61; |
| xxviii. | Einstein Bros Bagels: | $50.37; |
| xxix. | Panera: | $218.18; |
| xxx. | Futobuta: | $119.97; |
| xxxi. | Firebirds: | $37.45; |
| xxxii. | Jack In the Box: | $24.51; |
| xxxiii. | Jimmy Johns: | $37.70; |
| xxxiv. | McDonalds: | $18.55; |
| xxxv. | Chick-Fil-A: | $862.95; |

---

[3] The investigation regarding J. Beckley and T. Beckley's malfeasance with the Credit Card is ongoing, so while these figures constitute best estimates at this time, there may be certain variances in the exact amounts improperly charged to each vendor to be determined at trial.

| xxxvi. | Olive Garden: | $83.26; |
| xxxvii. | Subway: | $35.33; |
| xxxviii. | PDQ: | $133.64; |
| xxxix. | 131 Main: | $17.99; |
| xl. | Wendy's: | $25.72; |
| xli. | Starbucks: | $45.31; |
| xlii. | Dunkin': | $293.16; |
| xliii. | Bojangles: | $9.94; |
| xliv. | Famous Toastery: | $445.00; |
| xlv. | Vending Machines: | $41.80; |
| xlvi. | Hardees: | $19.78; |
| xlvii. | Wendy's: | $129.79; |
| xlviii. | Carrabba's: | $583.80; |
| xlix. | Longhorn Steak: | $145.39; |
| l. | Fusion Sushi: | $159.93; |
| li. | Cook Out: | $3.24; |
| lii. | Mamas Pizza: | $28.96; |
| liii. | Nothing Bundt Cake: | $417.76; |
| liv. | Smallcakes: | $260.45; |
| lv. | Dick's Sporting: | $2,792.87; |
| lvi. | Academy Sports: | $352.98; |
| lvii. | Bed Bath and Bey.: | $2,090.36; |
| lviii. | Tuesday Morning: | $247.07; |
| lix. | That Daily Deal: | $599.60; |
| lx. | FB Pay, Fundraiser: | $200.00; |
| lxi. | Massages: | $680.00; |
| lxii. | Imprint Logo: | $589.99; |
| lxiii. | Gasoline: | $8,754.14; |
| lxiv. | Florists: | $342.44; |
| lxv. | VRBO: | $3,920.00. |

50.     In total, J. Beckley and T. Beckley conspired to charge **at least** One Hundred Thousand Dollars ($100,000) of improper charges on the Credit Card.  PAH's investigation continues.

51.     After the Dealership was sold to MileOne, J. Beckley admitted to improper charges on the Credit Card totaling $5,887.25. J. Beckley never took action to reimburse PAH for any of other charges.

52.     J. Beckley and T. Beckley conspired to use the Credit Card for their own benefit and to the expense of and the detriment of PAH.

53.     J. Beckley made a litany of improper charges that were not and could not have been for the Dealership, much less qualified as approved business expenses incurred in his role as the GM.

54.     As an example of some of J. Beckley's improper charges, upon review of the receipts associated with charges made on the Credit Card at Target, it was discovered that, among a multitude of other inappropriate items, J. Beckley purchased: bath towels; socks; men's suit pants; men's athletic pants; four pairs of men's golf pants; men's short sleeve shirts; men's long sleeve shirts; basketballs; a basketball hoop; various snacks and drinks; gardening supplies; aromatherapy supplies; Spanx (women's shapewear); body wash; bubble gum; a prepaid cell phone; men's shoes; shaving razors; fitness equipment; gift cards; light bulbs; a step stool; and other inappropriate personal items having nothing to do with the business of PAH.

55.     A comprehensive summary of J. Beckley's charges at Target on the Credit Card is attached hereto as **Exhibit 4**.

56.     Many of the Target purchases were made near J. Beckley's home as opposed to near the Dealership. A map demonstrating where J. Beckley lived, and where the Target purchases on the Credit Card were made is attached hereto as **Exhibit 5**.

57.     Upon review of the receipts associated with charges made on the Credit Card at Walgreens, it also was discovered that, among a multitude of other inappropriate items, J. Beckley purchased multiple sexual lubricants as well as other personal items having nothing to do with the Dealership.

58.     J. Beckley also used his Credit Card to purchase gasoline for friends and family despite his pay plan specifying that "Gas for [the] General Manager Only." See **Exhibit 6**.

59.     J. Beckley also charged on the Credit Card a personal vacation for T. Beckley and others from August 15, 2020 through August 18, 2020.  A Credit Card statement with a $3,920 charge to VRBO, a vacation home rental company, is attached hereto as **Exhibit 7**.  Photos of the vacation rental are attached hereto as **Exhibit 8**.

60.     J. Beckley booked this luxury vacation property in Jacksonville, Florida through VRBO using the Credit Card.

61.     On the trip to Jacksonville, T. Beckley charged her gas expenses on PAH's Credit Card.

62.     The Beckleys knew that these purchases were not Dealership related expenses.

63.     The Beckleys knew that these purchases were not for a Dealership purpose.

64.     The Beckleys knew that these purchases were not approved by PAH. In fact, J. Beckley and T. Beckley attempted to hide the purchases by not producing receipts when asked for them.

65.     The Beckleys intentionally concealed from PAH that they were using the Credit Card for personal use.

66.     PAH continues to uncover numerous other emails, documents, and text messages both confirming and expanding the scope of what is known about J. Beckley's Credit Card fraud and other misconduct.

**J. Beckley Hosts an Excessive PAH Holiday Party in excess of $40,000**

67.     PAH's General Managers are allowed to host one financially reasonable winter holiday party for PAH's employees each year to allow for the celebration of the holidays.

68.     On or about December 22, 2019, J. Beckley hosted a decadent holiday party for the employees of the Dealership that was inappropriate and unauthorized in size and scope.

69.     J. Beckley knew that any large expenses outside of the ordinary operations of the Dealership were required to be approved by PAH.

70.     J. Beckley ignored and violated PAH's holiday and expense approval requirements, and instead spent nearly $26,000 in renting a bowling alley and the VIP room, and buying thousands of dollars of electronics from Best Buy that were shipped to the Beckleys' home, vastly exceeding the budget for the Dealership's holiday party, without approval or permission from PAH.

71.     J. Beckley also spent $17,000 on gifts for an inappropriate and excessive employee raffle.

72.     J. Beckley ignored and violated PAH's holiday and expense requirements and did all of this without requesting or receiving permission or approval from PAH.

**J. Beckley Intentionally Abuses PAH's Demo Vehicle Policy**

73.     As is common practice in the automotive sales industry, the Dealership had a limited number of demonstrator vehicles ("Demos") available for key Dealership personnel to drive and use.

74.     Demonstrator vehicles, including the Demos in this case, are new cars that have been driven by a dealership's staff for commuting and to test out newer models in the Honda lineup so that staff could be more educated about their products.

75.     Demonstrator vehicles, including the Demos, are typically sold at a reduced price as compared to vehicles with zero (0) miles on them, as Demos have diminished value.

76.      PAH's policy for Demos was that only Managers were permitted to have Demos.

77.     As the GM of the Dealership, J. Beckley was responsible for administering the Demo vehicle policy at the Dealership.

78.     Instead of following the Demo vehicle policy, J. Beckley instead knowingly allowed an unauthorized number of Demo vehicles to be issued and used by employees and non-employees.

79.     Instead of following the Demo vehicle policy, J. Beckley allowed ineligible employees and even non-employees to use Demo vehicles.

80.     Individuals who had Demo vehicles from the Dealership during the time J. Beckley was the GM included:

i.     Stuart King;
ii.    Scott Elsenheimer;
iii.   Jordan West;
iv.    Jamie Coffmon-Tarr;
v.     Jonathan Cuevas;
vi.    Robert Gathers;
vii.   Steven Carrasquillo;
viii.  Nasir Khan;
ix.    Marissa Puente;
x.     Donnie Farmer;
xi.    George Billett;
xii.   Charles Johnson;
xiii.  JB Beckley;
xiv.   Tanisha Beckley;
xv.    Alexander Fung-A-Ling;
xvi.   Stephen Williams;
xvii.  Paul Jamaine Washington, Jr. (NBA player for the Charlotte Hornets);
xviii. Rick Spicer;
xix.   Jimmy Bass;
xx.    Richie Iannotti;
xxi.   Mike Gaston; and
xxii.  Shane Watson.

81.     In total, J. Beckley authorized demo vehicles for twenty-three (23) individuals, many of whom were not even PAH employees, including Paul Jamaine Washington, Jr., a basketball player for the Charlotte Hornets who, upon information and belief, gave the vehicle to his father to use without approval.

82.     The investigation regarding J. Beckley's abuse of the demo vehicle policy remains ongoing, and the full extent of the damage suffered by PAH caused by J. Beckley's abuse of the demo vehicle policy remains to be determined at trial.

**J. Beckley Caused PAH to Purchase his Personal Vehicle for an Inflated Price,
and then, on information or belief, Conspired to have it Stolen.**

83.     On or about May 16, 2020, J. Beckley, without permission or authority, sold his personal 2018 Cadillac Escalade VIN: 1GYS4DKJ3JR200016 (the "Escalade") to PAH for an inflated price of $64,062.43. A copy of the check to purchase the Escalade is attached hereto as **Exhibit 9**.

84.     PAH's check for the Escalade was made payable to GM Financial and was signed by J. Beckley himself.

85.     At the time, PAH was not aware that J. Beckley sold the Escalade to PAH for an inflated value. When he sold the Escalade to PAH, J. Beckley was "upside down" (he owed more on the Escalade than it was worth) and paid off the Escalade to eliminate his personal debt.

86.     All vehicles purchased by the Dealership must be placed in the Dealership's dealer management system.

87.     No documents regarding the details of the purchase of J. Beckley's Escalade were placed into PAH's Dealer Management System.

88.     In fact, all documents related to the purchase of J. Beckley's Escalade are missing from the Dealership.

89.     On or about May 18, 2020, the Escalade was serviced by the Dealership.

90.     No documents as to the details of the service were placed into PAH's Dealer Management System.

91.     In fact, all documents about the Escalade's service are missing.

92.     At all relevant times, the Dealership used the NADA trade-in value as a benchmark for evaluating vehicle values.

93.     At the time of the purchase the Escalade, the NADA value of the vehicle on trade-in was $49,150.00 as evidenced by NADA values at the time attached as **Exhibit 10**.

94.     J. Beckley used PAH funds and a $14,912.00 overpayment on the value of the Escalade to pay off his personal debt owed on the Escalade.

95.     On or about June 18, 2020, the Escalade was stolen under suspicious circumstances from the Dealership at 4:34 A.M.

96.     Specifically, one of PAH's employees entered the Dealership that morning and asked where the Escalade was since it was not on the lot.

97.     Without skipping a beat, J. Beckley responded by exclaiming that he just saw video of his former Escalade being stolen at 4:00 in the morning.

98.     Both J. Beckley and T. Beckley stated that the keys to the vehicle were still at the dealership when the Escalade was stolen.

99.     Kyle Galdron, an employee of PAH, reported the theft to police but did not inform PAH until the next day at 2:36 PM through the incident reporting system.

100.    The matter was later reported to the Dealership's insurance company DealerGuard.

101.    On or about August 20, 2020, DealerGuard offered an insurance settlement of $53,925.00 with a deductible of $2,500.00 as settlement for the claim relating to the Escalade being stolen.

102.    After accounting for the deductible, DealerGuard tendered a check for $51,425.00 to PAH. A copy of the check is attached hereto as **Exhibit 11**.

103.    Shortly after J. Beckley's Escalade was stolen, other cars on the PAH began being stolen including a BMW, a Honda Pilot, and others.

104.    All stolen vehicles were recovered by the Police aside from J. Beckley's Escalade.

105.    To date, PAH has unrecovered losses of at least $10,137.43 attributed to J. Beckley and T. Beckley's actions and omissions and damages for the service preformed on the Escalade. The investigation is ongoing, and the full amount of damages is to be determined at trial.

**J. Beckley causes PAH to purchase a vehicle for his attorney**

106.    J. Beckley's attorney, in this case and in the earlier lawsuit where J. Beckley was sued by his former employer Lake Normal Auto Mall, LLC d/b/a/ Keffer Mazda ("Keffer Mazda"), is Philip J. Gibbons, Jr. ("Gibbons") and his firm Gibbons Law Group, PLLC f/k/a Gibbons Leis, PLLC (the "Gibbons Firm").

107.    Unbeknownst to PAH, at the time PAH hired J. Beckley as the GM of the Dealership, J. Beckley was involved in a legal dispute with his former employer, Keffer Mazda, and incurring substantial legal fees to Gibbons and the Gibbons Firm.

108.    Keefer Mazda filed the Keffer Mazda Lawsuit against J. Beckley for breach of contract on July 29, 2019, and the Court entered the Temporary Restraining Order against J. Beckley on August 1, 2019.

109.    J. Beckley incurred substantial legal fees to Gibbons and the Gibbons Firm in the defense of the Keffer Mazda Lawsuit.  Unwilling or unable to pay Gibbons and the Gibbons Firm, J. Beckley exploited his position as the GM of the Dealership and engaged in fraudulent transactions and self-dealing to resolve his debt to Gibbons and the Gibbons Firm for unpaid legal services.

110.    In August 2019, J. Beckley orchestrated Gibbons' and the Gibbons Firm's inflated trade in of an old Jeep Wrangler, VIN No. 1C4BJWFG1FL572165 (the "Trade-In Jeep") and materially discounted "purchase" of a non-street legal 2015 Jeep Wrangler Unlimited, VIN No. 1C4AJWAG4FL744577 (the "Non-Street Legal Jeep") as part of a scheme to resolve his debt to Gibbons and the Gibbons Firm for unpaid legal services (the "Jeep Transaction").

111.    The Jeep Transaction benefited and enriched J. Beckley, Gibbons and the Gibbons Firm at the expense of and to the detriment of PAH.

112.    Through an investigation, PAH has discovered that Gibbons and the Gibbons Firm were not only fully aware of and active participants in J. Beckley's fraudulent and self-dealing Jeep Transaction, they were its primary beneficiary.  Gibbons and the Gibbons Firm were the recipients of the Non-Street Legal Jeep that J. Beckley purchased with PAH's funds to pay off his legal fees owed to Gibbons and the Gibbons Firm from the Keffer Mazda Lawsuit.

113.    As their own text messages confirm, Gibbons and the Gibbons Firm have personal knowledge of, proposed and actively participated in, and materially benefitted from the Jeep Transaction.

114.    When they purchased the Non-Street Legal Jeep, Gibbons and the Gibbons Firm traded in the Trade-In Jeep which J. Beckley approved at an inflated trade-in credit of $37,000.  At all relevant times, PAH determined the trade-in credit of a vehicle based on its NADA trade-in value.   At the time of Gibbons' and the Gibbons Firm's purchase of the Non-Street Legal Jeep, the trade-in value of the Trade-In Jeep was approximately $26,000.  Gibbons' and the Gibbons Firm's trade-in credit of $37,000 for the Trade-In Jeep was intentionally overvalued by J. Beckley by at least $11,000, which caused a substantial loss to PAH to the benefit of J. Beckley, Gibbons

and the Gibbon Firm. PAH is a high volume seller, so the overpayment on J. Beckley's Trade-In Jeep constitutes a lost profit to PAH.

115.    The Trade-In Jeep listed the Gibbons Firm as the debtor for the vehicle. J. Beckley used PAH's funds to exhaust the debt of Gibbons and the Gibbons Firm by overpaying for the Trade-In Jeep.

116.    J. Beckley caused PAH to purchase the Non-Street Legal Jeep for Gibbons and the Gibbons Firm.

117.    On or about August 12, 2019, less than one month after J. Beckley was hired as the GM of the Dealership, J. Beckley used PAH's funds to purchase the Non-Street Legal Jeep for Gibbons and the Gibbons Firm.  J. Beckley did this to pay off his legal fees owed to Gibbons and the Gibbons Firm from the Keffer Mazda Lawsuit.

118.    As their text messages to J. Beckley attached hereto as **Exhibit 12** confirm, Gibbons and the Gibbons Firm have personal knowledge of, proposed and actively participated in, and materially benefitted from the Jeep Transaction:  "**On attorney's fees — I have a proposition for you**. If you look back at our texts, I estimated that you will end up in the 30k to 50k range for fees by the time this case is finished. On the new Jeep, I am looking at a balance of approximately 38k with the AEV trade-in. **If you want, I am willing to flat rate the entire defense of the lawsuit for the balance of the Jeep**. This means that you are 100% paid on fees. **The only out-of-pocket money on your end would be litigation costs**, which we will keep to a minimum. Costs are things like transcripts, court reporter fees, etc.  Let me know if this works for you. … **Looking for a win-win arrangement** that provides certainty for both of us; i.e. you won't be running up big legal bills defending the case and I am paid in full." **Exhibit 12** (emphasis added).

119.    The Jeep Transaction was detrimental to PAH and furthered the personal interests of J. Beckley, Gibbons and the Gibbons Firm at the expense of and to the detriment of PAH.

120.    J. Beckley, against PAH policy, personally went to PAH's bank and took out a $42,000 cashier's check made payable to the owner of the Jeep that Gibbons wanted J. Beckley to purchase for him. In addition, a $1,000 PayPal deposit was paid to reserve the Jeep for purchase. A copy of the company check is attached hereto as **Exhibit 13**.

121.    J. Beckley purchased the Non-Street Legal Jeep by a PAH check in the amount of $42,000, plus a $1,000 PayPal deposit.  J. Beckley purchased the Non-Street Legal Jeep for Gibbons and the Gibbons Firm from Gallatin, Tennessee, and had the Non-Street Legal Jeep transported to PAH.  J. Beckley did not charge Gibbons and the Gibbons Firm for the transportation fee, which is supposed to be passed on to the customer.  Instead, J. Beckley caused PAH to pay this fee..

122.    PAH does not purchase non-street legal vehicles for third parties, nor does it participate in the exclusively off road vehicle market.

123.    In spite of this, the Non-Street Legal Jeep that Gibbons and the Gibbons Firm wanted J. Beckley to purchase was not street legal, and could not pass inspection in North Carolina.

124.    In order for the Dealership to sell the Non-Street Legal Jeep, it would have to pass inspection.

125.    J. Beckley purchased the Non-Street Legal Jeep for Gibbons and the Gibbons Firm from Gallatin, Tennessee, and had the Non-Street Legal Jeep transported to the Dealership for Gibbons and the Gibbons Firm. A copy of the Bill of Sale for PAH's purchase of the Non-Street Legal Jeep is attached as **Exhibit 14**.

126. J. Beckley did not charge Gibbons and the Gibbons Firm for this transportation fee, which is ordinarily passed on to the customer.

127. Instead, J. Beckley caused PAH to pay for this transportation fee.

128. Gibbons then traded in his old vehicle, the Trade-In Jeep, which J. Beckley approved to purchase at a price of Thirty-Seven Thousand Dollars ($37,000.00).

129. The Trade-In Jeep was titled in the name of Gibbons personally, but the debt on the Trade-In Jeep was in the name of the Gibbons Firm. Through this transaction, J. Beckley paid off the Gibbons Firm's debt with an inflated trade-in value, and provided Gibbons with the Non-Street Legal Jeep at a substantially reduced cost.

130. At all relevant times, the Dealership used the NADA trade-in value as a benchmark for evaluating vehicle values.

131. At the time of the purchase Gibbons' Trade-In Jeep, the appropriate trade-in value was approximately $26,000.

132. Gibbons' received a trade-in payment of Thirty-Seven Thousand Dollars ($37,000) which was intentionally inflated and overvalued by J. Beckley by at least $11,000, which caused the Dealership to suffer a loss.

133. When purchasing the Non-Street Legal Jeep from The Dealership, Gibbons was supposed to pay a down payment of Seven Thousand Sixty Dollars and Ninety-Seven Cents ($7,060.97).

134. Instead, Gibbons and the Gibbons Firm only paid a down payment of Two Thousand Sixty Dollars and Ninety-Seven Cents ($2,060.97).

135.    J. Beckley attempted to use PAH's funds to cover the remaining Five Thousand Dollars ($5,000.00) of Gibbons' down payment in order to eliminate J. Beckley's up front cost in paying for Gibbons' and the Gibbons Firm's Non-Street Legal Jeep.

136.    J. Beckley even went so far as to write "$5,000 covered by Company" on the settlement sheet for the sale of the Non-Street Legal Jeep.   J. Beckley intended to have PAH pay the down payment for Gibbons' and the Gibbons Firm's Non-Street Legal Jeep.  A copy of the settlement sheet is attached hereto as **Exhibit 15**.

137.    J. Beckley's attempt to have PAH pay the down payment for Gibbons' and the Gibbons Firm's Non-Street Legal Jeep was discovered and stopped by M. Ellmer.  After being caught attempting to use PAH funds to offset the purchase of Gibbons' and the Gibbons Firm's Non-Street Legal Jeep, J. Beckley reluctantly personally paid the remaining $5,000 of Gibbons' and the Gibbons Firm's down payment on the Non-Street Legal Jeep.  Gibbons listed himself personally as the owner on the title for the Non-Street Legal Jeep and listed the Gibbons Firm as the borrower to pay the balance of the loan taken out to purchase the Non-Street Legal Jeep.  J. Beckley exploited his position as the GM of the Dealership to harm PAH to the benefit of J. Beckley, Gibbons and the Gibbons Firm so that J. Beckley could use PAH funds and resources (instead of his own) to pay off his personal debt to Gibbons and the Gibbons Firm.

138.    The $5,000 payment made by J. Beckley jeopardized PAH's Dealer Agreement with Northwest Financial Credit Union because it is an impermissible transaction.

139.    J. Beckley jeopardized the Dealership's lending relationship and caused the Dealership to suffer losses through the arrangement of a sweetheart self-dealing transaction with Gibbons and the Gibbons Firm to purchase them the Non-Street Legal Jeep, and buy their Trade-In Jeep at an inflated price to pay off his legal debt.

140.     The Jeep Transaction involving Gibbons' and the Gibbons Firm's inflated trade in credit for the Trade-In Jeep and materially discounted "purchase" of the Non-Street Legal Jeep without paying any transportation fee or a proper down payment benefited and enriched J. Beckley, Gibbons and the Gibbons Firm at the expense of and to the detriment of PAH.

141.     J. Beckley intentionally used his position as the GM of the Dealership to harm PAH to the benefit of his attorney, Gibbons and the Gibbons Firm and himself so that he, J. Beckley, did not need to pay attorneys' fees to Gibbons and the Gibbons Firm.

142.     J. Beckley attempted to use PAH's funds to cover $5,000 of Gibbons and the Gibbons Firm's down payment on the Non-Street Legal Jeep.

143.     The purchase of Gibbons and the Gibbons Firm's Non-Street Legal Jeep by J. Beckley caused PAH to lose money on that transaction.

144.     J. Beckley used his position of power as the GM of the Dealership to minimize J. Beckley's own out-of-pocket cost to pay his attorneys' fees to Gibbons and the Gibbons Firm by using PAH to absorb as much loss as possible.

145.     J. Beckley used the purchase of the Jeep to help himself and Gibbons and the Gibbons Firm and harm the Dealership.

146.     Gibbons and the Gibbons Firm are material witnesses because they not only were aware of and participated in but also proposed and personally benefitted from the Jeep Transaction.

147.     In their own words, Gibbons and the Gibbons Firm were "**willing to flat rate the entire defense of the lawsuit for the balance of the Jeep**" and "**Looking for a win-win arrangement**."  They got it to the benefit of themselves and J. Beckley and at the expense of and to the detriment of PAH.  **Exhibit 12** (emphasis added).

**J. Beckley writes checks from PAH to himself and his wife, T. Beckley.**

148.    PAH's policy is for company checks to be written only for authorized business purposes that benefit the Dealership.

149.    During his employ with PAH, J. Beckley violated company protocol and policies by signing a number of checks to himself.

150.    In total, J. Beckley paid to himself or T. Beckley at least Twenty-Six Thousand Nine Hundred Thirteen Dollars and Thirty-Eight Cents ($26,913.38) through company checks without providing required documentation for any reimbursement to be made by the company. Copies of each of these company checks are attached hereto as **Exhibit 16** (the "Company Checks").

151.    J. Beckley personally signed each of the Company Checks, including the Company Checks that he wrote to himself.

152.    On or about July 22, 2019, three days after his start date, J. Beckley made out company check number 301719 to T. Beckley — who was not an employee of PAH at the time — in the amount of $865.76.

153.    On or about August 5, 2019, J. Beckley made out company check number 301973 to himself in the amount of $1,105.73.

154.    On or about August 13, 2019, J. Beckley made out company check number 302208 to himself in the amount of $835.51.

155.    On or about August 31, 2019, J. Beckley made out company check number 302600 to himself in the amount of $1,834.83.

156.    On or about October 3, 2019, J. Beckley made out company check number 301973 to himself in the amount of $2,333.91.

157. On or about November 14, 2019, J. Beckley made out company check number 304184 to himself in the amount of $278.31.

158. On or about November 21, 2019, J. Beckley made out company check number 304288 to himself in the amount of $2,037.36.

159. On or about December 20, 2019, J. Beckley made out company check number 304852 to "petty cash" to himself or Kyle Galdron in the amount of $8,200.00.

160. On or about December 31, 2019, J. Beckley made out company check number 304971 to himself in the amount of $1,145.66.

161. On or about January 8, 2020, J. Beckley made out company check number 305034 to himself in the amount of $199.99.

162. On or about January 21, 2020, J. Beckley made out company check number 305421 to himself in the amount of $2,093.38.

163. On or about July 7, 2020, J. Beckley made out company check number 309155 to T. Beckley in the amount of $40.00.

164. On or about September 14, 2020 — **five days after D. Ellmer and M. Ellmer informed J. Beckley about the sale of the Dealership to MileOne** — J. Beckley made out company check number 310303 to T. Beckley in the amount of Five Thousand Nine Hundred Eleven Dollars and Ninety-Four Cents ($5,911.94).

165. On or about September 21, 2020, J. Beckley made out company check number 310424 to T. Beckley in the amount of $40.00.

**J. Beckley intentionally abuses PAH's Employee Discounts Program.**

166. As a benefit of employment with PAH, the Handbook included a policy which set forth an employee service discount program.

167.    Relevant provisions of the employee service discount program included:

    i.   Employees could purchase parts for their personal vehicles at cost plus 25 percent;

    ii.   Service on employees' personal vehicles was available at 10 percent less than the regular customer rate; and

    iii.   Discounts on parts and service were strictly limited to employees and their personally owned vehicles.

168.    The Handbook also contained a policy through which PAH employees could purchase a limited number of vehicles at a special discounted rate.

169.    Relevant provisions of the employee vehicle purchase policy of the Handbook include:

    i.   Employees could purchase a new vehicle for $100 over the invoice price of the vehicle less any customer incentives. This invoice price included any costs. expenses or packs included in the vehicle;

    ii.   If it was more beneficial, employees could use the manufacturer's employee purchase program if one was available from the factory at the time of purchase;

    iii.   A General Manager is responsible for providing employees with the most current program and rebates at the time of their purchase;

    iv.   If a used car trade is involved, employees will have the option of selling it privately or accepting the appraisal value at the time of purchase, the appraisal values to correspond with the trade-in-value of the vehicle as defined by industry standards (i.e. NADA Black Book and the like);

> v.    Used-vehicles under thirty (30) days old could be purchased for the retail market value as determined by PAH;
>
> vi.   Used vehicles older than 30 days could be purchased for $100 over PAH's general ledger amount; and
>
> vii.  Used vehicles determined to be wholesale units could be purchased for $100 over wholesale market value as determined by PAH.

170.    The Handbook also contains the details of the employee service discount program and the employee vehicle purchase policy (the "Employee Discounts Program" or "EDP").

> i.    The Handbook explains that the vehicle purchase portion of the EDP was limited to PAH employees and their **immediate** family members.
>
> ii.   The Handbook also explains that the vehicle maintenance portion of the EDP applied to PAH **employees only**.

171.    The Handbook further explains that PAH employees and their immediate family members (i.e. the employee, their spouse or children) were limited to a total of two (2) vehicle purchases at the employee discounted pricing for any given 12-month period under the EDP.

172.    When the EDP is properly adhered to, PAH does not suffer financial losses associated with employee purchases of vehicles.

173.    Instead of applying the EDP correctly, J. Beckley, in collusion with other PAH employees, intentionally violated company policies and embezzled from the Company to the benefit of himself, his family, and other employees.

174.    On numerous occasions, J. Beckley in concert with other employees sold parts under the EDP without adding the 25% to the price as required by the EDP.

175.    J. Beckley along with others sold parts at cost to various family members and friends who were ineligible to participate in the part discount program portion of the EDP.

176.    J. Beckley used the EDP to benefit other bad-actor employees at PAH by providing those employees with an immense benefit at the expense of PAH.

177.    J. Beckley used the EDP to garner favor with these employees, who helped J. Beckley conceal his bad actions during his tenure with PAH.

### Embezzlement involving Alexander Fung-A-Ling.

178.    Each of J. Beckley's improper transactions involving Fung-A-Ling known to date are set forth in more detail below.

179.    On Deal 66825, J. Beckley conspired with Alexander Fung-A-Ling ("Fung-A-Ling") to sell to himself and Yaric Jimenez Encarnacion ("Yari"), lighted running boards for $957.00 and a window tint at $175.00 without paying for either part, and without adding the 25% premium required under the EDP ("Deal 66825"). The total loss on just the parts alone for Deal 66825 was $1,132, and the omitted 25% premium on the parts is not included in that total, which amount is $283.00. The total loss for Deal 66825 was at least $3,499.50.

180.    On Deal 63564 J. Beckley conspired with Fung-A-Ling to not charge Shawn Fung-A-Ling for the cost associated with having a driver transport the Vehicle to Georgia which caused PAH to lose $250.00 ("Deal 63564"). J. Beckley also allowed for an inappropriately cashed a personal check for Sawn Fung-A-Ling using the Dealership's funds in the amount of $1,283.00 to pay off a personal loan Fung-A-Ling had.

    i.    The total damages calculated to date associated with J. Beckley's failure to correctly apply parts discount program portion of the EDP to his family members plus J. Beckley's failure for properly charge for vehicle transportation is $1,665.00.

ii.    In addition to failing to correctly apply, or properly charge, the margin required by the EDP for parts, J. Beckley also abused his power as a General Manager and conspired with others to abuse their power and orchestrated several vehicle purchase/ lease transactions in violation of the EDP which caused harm to PAH and directly benefitted himself and other employees.

iii.    J. Beckley conspired with Fung-A-Ling to not charge the processing fee to four of the excess employee deals Fung-A-Ling orchestrated which caused PAH to suffer a loss of at least $2,526.99 associated with Deal 63564.

181.    On or about December 18, 2019, J. Beckley conspired with Fung-A-Ling to facilitate an employee purchase for his own family members of a 2020 Platinum White Honda Accord in deal number 66573, VIN: HGCV1F54LA116843, and took in trade a 2018 Honda Civic VIN: 2HGFC2F70JH542490 ("Deal 66573").

i.    This sale was to Fung-A-Ling's family members Alisha Maya Fung-A-Ling and Michelle Kim Bailey.

ii.    J. Beckley facilitated and allowed the lease of the vehicle in violation of the EDP.

iii.    Further, Defendant intentionally overpaid on trade-in vehicle in excess of the retail price as required by the EDP to the benefit of himself, Alisha Mya Fung-A-Ling, and Michelle Kim Bailey.

iv.    Defendant then leased the vehicle for an inflated cash price of $33,040.97 which should have been leased for an employee invoice price of $30,154.48 under the EDP.

v.      The overpayment in the lease price would have normally washed the negative equity of the trade-in of $4,884.70 into the cost of the newly leased vehicle, but because Defendant intentionally overpaid for the trade-in vehicle, the negative equity was washed away.

vi.     Deal 66573 resulted in a loss of $4,884.70 in negative equity from the trade which was a loss PAH suffered directly as a high volume seller.

vii.    J. Beckley failed to collect a $799 processing fee for this deal.

viii.   After accounting for manufacturer incentives, the total loss to PAH on Deal 66573 was at least $7,081.87.

182.    On or about April 30, 2020 J. Beckley conspired with Fung-A-Ling to facilitate the lease of a Crystal Black 2020 Honda Accord in deal number 64754, VIN: 1HGCVIF36LA016550 ("Deal 64754").

i.      This sale was to FUNG-A-LING's family member, Pasche Tatiana FUNG-A-LING.

ii.     In this deal, J. Beckley facilitated and allowed the sale of the vehicle in violation of the EDP.

iii.    J. Beckley conspired with Fung-A-Ling to lease the vehicle at a value of $23,673.00 which value should have been $25,318.04 under the terms of the EDP.

iv.     J. Beckley also allowed for a negative cost adjustment of $1,750.00, which constitutes a lost profit as PAH is a high volume seller.

v.      J. Beckley failed to collect a $799 processing fee for this deal.

vi.      After accounting for manufacturer incentives, the total loss to PAH on Deal 64754 was at least $4,781.44.

183.    On or about April 30, 2020, J. Beckley conspired with Fung-A-Ling to facilitate the lease of a Black 2019 Honda CRV in deal number 65035, VIN: T2HKRW1H89KHS13436 ("Deal 65035").

i.      As part of this transaction, J. Beckley conspired with Fung-A-Ling to take a trade-in of a 2013 Hyundai Elantra, VIN: 5NPDH4AE6DH395841.

ii.     This sale was to FUNG-A-LING's family member, Alisha Mya Fung-A-Ling.

iii.    In this deal, J. Beckley conspired with Fung-A-Ling to facilitate and allow the lease of the vehicle in violation of the EDP.

iv.    Further, J. Beckley conspired with Fung-A-Ling to again intentionally overpay for the trade-in vehicle in excess of the retail price as required by the EDP to the benefit of Fung-A-Ling's family member, Alisha Mya Fung- A-Ling.

v.      J. Beckley conspired with Fung-A-Ling to lease the vehicle for a cash price of $33,069.65 which should have been valued at $29,252.98 under the EDP.

vi.     J. Beckley conspired with Fung-A-Ling to again intentionally overpaid for the trade-in which resulted in a loss of $7,200.00 in lost profit to PAH as PAH is a high volume seller.

vii.    After accounting for manufacturer incentives, the total loss to PAH on Deal 65035 was at least $9,794.10.

184.    On or about August 31, 2020, J. Beckley conspired with Fung-A-Ling to facilitate the lease of a White Honda Passport in deal number 66690, VIN: FNYF7H53LB003670 ("Deal 66690").

    i.    As part of this transaction, J. Beckley conspired with Fung-A-Ling to take a trade-in of a 2013 Nissan Altima, VIN: 1N4AL3AP9DC164088.

    ii.    J. Beckley conspired with Fung-A-Ling to intentionally overpay for the trade-in vehicle in excess of retail as required under the EDP to the benefit of Fung-A-Ling's family members Norlan and Leslie Fung-A-Ling and Lissett Quintanilla Fung-A-Ling.

    iii.    J. Beckley allowed a negative cost adjustment of $400, and failed to collect a processing fee for this deal.

    iv.    J. Beckley conspired with Fung-A-Ling to lease the vehicle for a cash price of $39,518.06 which should have been valued at $34,519.60 under the EDP.

    v.    J. Beckley again conspired with Fung-A-Ling to overpay for the trade-in which resulted in $7,265.10 of lost profits as PAH is a high volume seller.

    vi.    After accounting for manufacturer incentives, the total loss to PAH on Deal 66690 was at least $10,654.04.

185.    On or about September 1, 2020, J. Beckley conspired with Fung-A-Ling to facilitate the lease of a 2020 Crystal Black Honda Pilot in deal number 66691, VIN: 5FNYF6H7XLB012653, and traded in a 2019 Honda Accord, VIN: 1HGCV2F33KA029390 in deal number 66825 Fung-A-Ling and Yari ("Deals 66691 & 66825").

    i.    Prior to these transactions being consummated, JB was clearly instructed by an owner of the company that JB could not complete the deal.

ii.      Despite this clear and unambiguous prohibition, J. Beckley conspired with Fung-A-Ling to charge forward with this deal to benefit Fung-A-Ling and Yari.

iii.     J. Beckley conspired with Fung-A-Ling to lease the vehicle for a cash price of $52,592.10 which should have been valued at $46,543.45 under the EDP, and failed to collect a $799 processing fee for this deal.

iv.      J. Beckley conspired with Fung-A-Ling to again overpay for the trade-in which resulted in a loss of $11,250.00 in lost profit as PAH is a high volume seller.

v.       After accounting for manufacturer incentives, the total loss to PAH on Deals 66691 & 66825 was at least $14,648.90.

186.    On or about July 20, 2020 J. Beckley conspired with Fung-A-Ling to facilitate the Sale of a used 2013 AUDI ALLROAD in deal number 66300, VIN: WAIUFAFL 7DA183981 ("Deal 66300").

i.       As part of the transaction, J. Beckley conspired with Fung-A-Ling to take in a trade of a 2009 Nissan Maxima, VIN: 1N4AA51E09C841052 for employee Demario Lajuan Hutchings.

ii.      In the Deal 8, J. Beckley and Fung-A-Ling facilitated and allowed the sale of the vehicle in violation of the EDP and overpaid for the trade-in vehicle to the benefit of Demario Lajuan Hutchings in the amount of $10,835.29 which is lost profit as PAH is a high volume seller.

iii.     J. Beckley allowed a negative cost adjustment of $356.96.

      iv.     J. Beckley and Fung-A-Ling sold the vehicle for a cash price of $14,655.00 which should have been sold for $15,130.62 under the EDP.

      v.     After accounting for manufacturer incentives, the total loss to PAH on Deal 66300 was at least $11,364.83.

187.    The losses suffered by PAH associated with J. Beckley's collusion with Fung-A-Ling outlined above were instrumented by J. Beckley and Fung-A-Ling to impermissibly wash out upside-down balances on trade in vehicles to the detriment of PAH.

188.    This type of transaction is not permitted by the EDP, and J. Beckley and Fung-A-Ling were made well aware that these transactions were impermissible.

189.    J. Beckley's and Fung-A-Ling's intentional action resulted in direct and substantial losses to PAH.

190.    Each of the deals above have each directly, or indirectly, benefitted J. Beckley Fung-A-Ling, Fung-A-Ling's family, or a coworker.

191.    Each of the deals enumerated above were in violation of the Handbook and the EDP.

192.    In total, to date, PAH has uncovered losses of at least $64,351.67 attributed to J. Beckley's and Fung-A-ling's actions and omissions.

193.    An audit continues in this matter and upon information and belief, there are more deals of this nature whereby J. Beckley structured deals to his own benefit that harmed PAH.

**Other deals involving J. Beckley's abuse of the EDP.**

194.    On or about October 25, 2019 J. Beckley conspired, facilitated or conspired with others to facilitate an employee purchase for Kenneth Rhodes Larigey IV, of a 2018 Honda Civic in Deal Number: 63034, Stock Number: HT210175A, VIN: SHHFK7H41JU210175 ("Deal 63034").

<ol type="i">
<li>This sale was to an employee.</li>
<li>In Deal 63034, J. Beckley conspired with other PAH employees to include but not limited to Rick Grey, to facilitate and allow the sale of the Honda Civic in violation of Company Policy, the Employee Handbook and the EDP.</li>
<li>J. Beckley allowed the sale of the Honda Civic for a price of $17,500.00 when the cost of the Civic to the Dealership was $16,980.00.</li>
<li>J. Beckley also allowed a repair order on the Honda Civic to not be paid at a cost of $340.46 causing a loss to the Dealership.</li>
<li>J. Beckley also allowed a negative cost adjustment of $544.46 which constitutes a lost profit as PAH was a high volume seller.</li>
<li>He also allowed an overpayment on the employee trade-in of $200.00 all resulting in a loss to the Dealership.</li>
<li>The total loss to PAH on sale was $619.92.</li>
</ol>

195. On or about November 1, 2019 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Bernard Edward Barksdale, of a 2005 Mercedes CLK320A in Deal Number: 63092, Stock Number: HT041374, VIN: WDBTK65G75T041374 ("Deal 63092").

<ol type="i">
<li>This sale was to an employee.</li>
<li>In Deal 63092, J. Beckley conspired with other PAH employees to include but not limited to Rick Grey to facilitate and allow the sale of the CLK320A in violation of PAH's policy, the Employee Handbook and the EDP.</li>
<li>J. Beckley allowed the sale of the CLK320A for a price of $1,500.00 when the cost of the CLK320A to the Dealership was $2,480.00</li>
<li>The total loss to PAH on sale was $980.00.</li>
</ol>

196.    On or about November 5, 2019 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Jerry Michael Kennedy Sr., of a 2011 Honda Accord in Deal Number: 63174, Stock Number: HT050979, VIN: 1HGCP2F84BA050979 ("Deal 63174").

    i.    This sale was to an employee.

    ii.    In Deal 63174, J. Beckley conspired with other PAH employees to include but not limited to Grey to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Honda Accord for a price of $3,100.00 when the cost of the Honda Accord to the Dealership was $4,080.00.

    iv.    The total loss to PAH on sale was $980.00.

197.    On or about February 2, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Craig Jordan West, of a 2002 Jeep Wrangler in Deal Number: 63952, Stock Number: HT723653, VIN: 1J4FA39S72P723653 ("Deal 63952").

    i.    This sale was to an employee.

    ii.    In Deal 63952, J. Beckley conspired with other PAH employees to include but not limited to Rick Grey to facilitate and allow the sale of the Jeep Wrangler in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Jeep Wrangler for a price of $2,000.00 when the cost of the Jeep Wrangler to the Dealership was $2,980.00.

    iv.    The total loss to PAH on sale was $980.00.

198. On or about November 1, 2019, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Harry Walker Mayhall, of a 2019 Honda Insight in Deal Number: 63143, Stock Number: HX027590, VIN: 19XZE4F11KE027590 ("Deal 63143").

    i. This sale was to an employee.

    ii. In Deal 63143, J. Beckley conspired with other PAH employees to include but not limited to Jonathan Cuevas and Charles Johnson to facilitate and allow the sale of the Honda Insight in violation of Company Policy, the Employee Handbook and the EDP.

    iii. J. Beckley allowed the sale of the Honda Insight for a price of $21,834.01 when the cost of the Honda Insight to the Dealership was $23,359.59.

    iv. J. Beckley also approved a negative cost adjustment of $500.00 which constitutes a lost profit as PAH was a high volume seller.

    v. The total loss to PAH on this sale was $2,025.58.

199. On or about November 7, 2019 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Jessica Nicole West, of a 2014 Jeep Wrangler Unlimited in Deal Number: 63187, Stock Number: HT311838, VIN: 1C4BJWDG2EL311838 ("Deal 63187").

    i. This sale was to an employee.

    ii. In Deal 63187, J. Beckley conspired with other PAH employees to include but not limited to Johnathan Cuevas to facilitate and allow the sale of the Jeep Wrangler Unlimited in violation of Company Policy, the Employee Handbook and the EDP.

    iii. J. Beckley allowed the sale of the Jeep Wrangler Unlimited for a price of $22,180.00 when the cost of the Jeep Wrangler Unlimited to the Dealership

was $22,180.00. J. Beckley also allowed a repair order on the Jeep Wrangler Unlimited to not be paid at a cost of $282.00 causing a loss to the Dealership.

    iv.       The total loss to PAH on sale was $282.50.

200.    On or about November 18, 2019 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Zay William Billett of a 2006 Volkswagen Beetle in Deal Number: 63320, Stock Number: HT416141, VIN: 3VWRR31C06M416141 ("Deal 63320").

    i.        This sale was to an employee.

    ii.       In Deal 63320, J. Beckley conspired with other PAH employees to include but not limited to Jonathan Cuevas to facilitate and allow the sale of the Volkswagen Beetle in violation of Company Policy, the Employee Handbook and the EDP.

    iii.      J. Beckley allowed the sale of the Volkswagen Beetle for a price of $200.00 when the cost of the Volkswagen Beetle to the dealership was $1,081.00.

    iv.       This negative cost adjustment of $881.00 constitutes lost profit as PAH was a high volume seller.

    v.        J. Beckley also allowed a repair order on the Volkswagen Beetle to not be paid at a cost of $980.00 causing a loss to the Dealership.

    vi.      The total loss to PAH on sale was $2,561.00.

201.    On or about January 17, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Bernard Edward Barksdale of a 2002 Nissan Frontier in Deal Number: 63775, Stock Number: HT358630, VIN: 1N6DD26S02C358630 ("Deal 63775").

    i.        This sale was to an employee.

ii.   In Deal 63775, J. Beckley conspired with other PAH employees to include but not limited to Jonathan Cuevas to facilitate and allow the sale of the Nissan Frontier in violation of Company Policy, the Employee Handbook and the EDP.

iii.   J. Beckley allowed a repair order on the Nissan Frontier to not be paid at a cost of $979.00 causing a loss to the Dealership.

iv.   The total loss to PAH on sale was $1,818.00.

202.   On or about February 1, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Zay William Billett of a 2006 Audi A6 3.2 AVA in Deal Number: 64217, Stock Number: HT086787, VIN: WAUKH74F86N086787 ("Deal 64217").

i.   This sale was to an employee.

ii.   In Deal 64217, J. Beckley conspired with other PAH employees to include but not limited to Jonathan Cuevas to facilitate and allow the sale of the Audi A6 in violation of Company Policy, the Employee Handbook and the EDP.

iii.   J. Beckley allowed the sale of the Audi A6for a price of $1,002.00, when the cost of the Audi A6 to the Dealership was $1,001.00

iv.   J. Beckley also allowed a repair order on the Audi A6 to not be paid at a cost of $979.00 causing a loss to the Dealership.

v.   The total loss to PAH on sale was $979.00.

203.   On or about February 26, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Daniel William Cooke of a 2004 Honda Odyssey in Deal Number: 64536, Stock Number: HT076218, VIN: 5FNRL18634B076218 ("Deal 64536").

i.   This sale was to an employee.

ii.     In Deal 64536, J. Beckley conspired with other PAH employees to include but not limited to Jonathan Cuevas to facilitate and allow the sale of the Honda Odyssey in violation of Company Policy, the Employee Handbook and the EDP.

iii.     J. Beckley allowed the sale of the Honda Odyssey for a price of $601.00, when the cost of the Honda Odyssey to the Dealership was $501.00.

iv.     J. Beckley also allowed a repair order on the Honda Odyssey to not be paid at a cost of $1,044.00 causing a loss to the Dealership.

v.     The total loss to PAH on sale was $1,044.00.

204.    On or about February 26, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Lester McKoy JR. of a 1998 Honda Accord in Deal Number: 64533, Stock Number: HT058015, VIN: 1HGCG5658WA058015 ("Deal 64533").

i.     This sale was to an employee.

ii.     In Deal 64533, J. Beckley conspired with other PAH employees to include but not limited to Jonathan Cuevas to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

iii.     J. Beckley allowed the sale of the Honda Accord for a price of $851.00, when the cost of the Honda Accord to the Dealership was $751.00.

iv.     J. Beckley also allowed a repair order on the Honda Accord to not be paid at a cost of $1,489.00 causing a loss to the Dealership.

v.     The total loss to PAH on this sale was $1,489.00.

205.     On or about March 30, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Marcellus Travis Simpson of a 2020 Honda Accord in Deal Number: 64847, Stock Number: HH012491, VIN: 1HGCV2F3XLA012491 ("Deal 64847").

    i.    This sale was to an employee.

    ii.    In Deal 64847, J. Beckley conspired with other PAH employees to include but not limited to Jonathan Cuevas to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Honda Accord for a price of $34,309.99 when the cost of the Honda Accord to the Dealership was $30,891.29.

    iv.    J. Beckley also allowed an overpayment on the employee trade-in of $6,730.95 all resulting in a loss to the Dealership.

    v.    J. Beckley allowed a negative cost adjustment of $2,494.58 which constitutes a lost profit as PAH was a high volume seller.

    vi.    The total loss to PAH on sale was $9,225.45.

206.     On or about November 11, 2019, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Eric Clinton Crawford of a 1997 Honda Accord in Deal Number: 63248, Stock Number: HT059196, VIN: 1HGCD5530VA059196 ("Deal 63248").

    i.    This sale was to an employee.

    ii.    In Deal 63248, J. Beckley conspired with other PAH employees to include but not limited to Bagels Carrasquillo to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

      iii.      J. Beckley allowed the sale of the Honda Accord for a price of $600.00, when the cost of the Honda Accord to the Dealership was $1,480.00.

      iv.      The total loss to PAH on sale was $880.00.

207.    On or about November 27, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Johnathan Omar Lopez, of a 2019 Honda Accord in Deal Number: 63388, Stock Number: HX024121, VIN: 1HGCV2F90KA024121 ("Deal 63388").

      i.      This sale was to an employee.

      ii.      In Deal 63388, J. Beckley conspired with other PAH employees to include but not limited to Bagels Carrasquillo to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

      iii.      J. Beckley allowed the sale of the Honda Accord for a price of $37,436.89, when the cost of the Honda Accord to the Dealership was $34,412.98.

      iv.      J. Beckley allowed a negative cost adjustment of $750.00 which constitutes a lost profit as PAH was a high volume seller.

      v.      J. Beckley also allowed an overpayment on the employee trade-in of $5,500.00 all resulting in a loss to the Dealership.

      vi.      The total loss to PAH on sale was $1,726.09.

208.    On or about November 14, 2019, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Americars Leasing & Sales, of a 2019 Honda Ridgeline in Deal Number: 63144, Stock Number: HH044719, VIN: 5FPYK3F84KB044719 ("Deal 63144").

      i.      This sale was to an employee.

ii.   In Deal 63144, J. Beckley conspired with other PAH employees to include but not limited to Bagels Carrasquillo and Johnathan Lopez to facilitate and allow the sale of the Honda Ridgeline in violation of Company Policy, the Employee Handbook and the EDP.

iii.   J. Beckley allowed the sale of the Honda Ridgeline for a price of $39,183.00, when the cost of the Honda Ridgeline to the Dealership was $41,506.00.

iv.   J. Beckley approved a negative cost adjustment of $1,791.47 which constitutes a lost profit as PAH was a high volume seller.

v.   The total loss to PAH on sale was $522.53.

209.   On or about March 13, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Michael Andre Gaston of a 2006 Honda Accord in Deal Number: 64713, Stock Number: HT064492, VIN: 1HGCM66586A064492 ("Deal 64713").

i.   This sale was to an employee.

ii.   In Deal 64713, J. Beckley conspired with other PAH employees to include but not limited to Johnathan Cuevas and Jordan West to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

iii.   J. Beckley allowed the sale of the Honda Accord for a price of $2,301.00 when the cost of the Honda Accord to the Dealership was $2,200.00.

iv.   J. Beckley also allowed a repair order on the Honda Accord to not be paid at a cost of $1,195.00 causing a loss to the Dealership.

v.   The total loss to PAH on sale was $1,195.00.

210.    On or about December 9 2019, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Timothy Tyrone Rowell, of a 2008 Honda Accord in Deal Number: 63566, Stock Number  HT085040, VIN: 1HGCP36888A085040 ("Deal 63566").

     i.     This sale was to an employee.

     ii.     In Deal 63566, J. Beckley conspired with other PAH employees to include but not limited to Nasir Khan to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

     iii.     J. Beckley allowed the sale of the Honda Accord for a price of $2,600.00 when the cost of the Honda Accord to the Dealership was $3,480.00.

     iv.     J. Beckley allowed a negative cost adjustment of $880.00 which constitutes a lost profit as PAH was a high volume seller.

     v.     The total loss to PAH on sale was $880.00.

211.    On or about December 10, 2019 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Jamie Smith Sales, of a 2019 Honda Accord in Deal Number: 63588, Stock Number: HT010804, VIN: 1HGCV2F38KA010804 ("Deal 63588").

     i.     This sale was to an employee.

     ii.     In Deal 63588, J. Beckley conspired with other PAH employees to include but not limited to Nasir Khan to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

     iii.     J. Beckley allowed the sale of the Honda Accord for a price of $26,250.00 when the cost of the Honda Accord to the Dealership was $26,606.00.

    iv.    J. Beckley also allowed a repair order on the Honda Accord to not be paid at a cost of $245.00 causing a loss to the Dealership.

    v.    He also allowed other improper payments on the employee's account in the amount of $601.00.

    vi.    The total loss to PAH on sale was $601.00.

212.    On or about April 21, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Jerry Michael Kennedy Sr., of a 2003 Acura MDX in Deal Number: 64959, Stock Number: HT528673, VIN: 2HNYD18643H528673 ("Deal 64959").

    i.    This sale was to an employee.

    ii.    In Deal 64959, J. Beckley conspired with other PAH employees to include but not limited to Nasir Khan to facilitate and allow the sale of the Acura MDX in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Acura MDX for a price of $1,101.00 when the cost of the MDX to the Dealership was $1,000.00.

    iv.    J. Beckley also allowed a repair order on the Acura MDX to not be paid at a cost of $980.00 causing a loss to the Dealership.

    v.    The total loss to PAH on sale was $980.00.

213.    On or about April 30, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Rosetta Dana Campbelle, of a 2001 Honda Accord in Deal Number: 63445, Stock Number: HT015003, VIN: 1HGCG56641A015003 ("Deal 63445").

    i.    This sale was to an employee.

    ii.    In Deal 63445, J. Beckley conspired with other PAH employees to include but not limited to George Billett to facilitate and allow the sale of the Honda

Accord in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Honda Accord for a price of $450.00 when the cost of the Honda Accord to the Dealership was $350.00

    iv.    J. Beckley also allowed a repair order on the Honda Accord to not be paid at a cost of $1,029.95 causing a loss to the Dealership.

    v.    The total loss to PAH on sale was $1,029.95.

214. On or about May 11, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Jerry Michael Kennedy Sr., of a 2007 Honda Accord in Deal Number: 65119, Stock Number: HT038388, VIN: 1HGCM56877A038388 ("Deal 65119").

    i.    This sale was to an employee.

    ii.    In Deal 65119, J. Beckley conspired with other PAH employees to include but not limited to Nasir Khan to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Honda Accord for a price of $2,301.00 when the cost of the Honda Accord to the Dealership was $2,200.00

    iv.    J. Beckley also allowed a repair order on the Honda Accord to not be paid at a cost of $980.00 causing a loss to the Dealership.

    v.    The total loss to PAH on sale was $879.00

215. On or about May 13, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for William Matthew Drum, of a 2014 Acura MDX in Deal Number: 65146, Stock Number: HT012878, VIN: 5FRYD3H29EB012878 ("Deal 65146").

     i.     This sale was to an employee.

    ii.     In Deal 65146, J. Beckley conspired with other PAH employees to include but not limited to Nasir Khan to facilitate and allow the sale of the Acura MDX in violation of Company Policy, the Employee Handbook and the EDP.

   iii.     J. Beckley allowed the sale of the Acura MDX for a price of $11,899.03 when the cost of the MDX to the Dealership was $13,108.75

   iv.     J. Beckley also allowed a repair order on the Acura MDX to not be paid at a cost of $6.25 causing a loss to the Dealership.

    v.     The total loss to PAH on sale was $1,215.97.

216.    On or about March 4, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Clinton Eric Crawford, of a 2007 Honda Civic in Deal Number: 64619, Stock Number: HT569277, VIN: 2HGFG12867H569277 ("Deal 64619").

     i.     This sale was to an employee.

    ii.     In Deal 64619, J. Beckley conspired with other PAH employees to include but not limited to Nasir Khan to facilitate and allow the sale of the Honda Civic in violation of Company Policy, the Employee Handbook and the EDP.

   iii.     J. Beckley allowed the sale of the Honda Civic for a price of $602.00 when the cost of the CIVIC to the Dealership was $601.00

   iv.     J. Beckley also allowed a negative cost adjustment of $879.00 which constitutes a lost profit as PAH was a high volume seller.

    v.     The total loss to PAH on sale was $941.00.

217.    On or about May 20, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Christopher Hart, of a 2008 Nissan Altima in Deal Number: 65232, Stock Number: HT208428, VIN: 1N4AL21E08C208428 ("Deal 65232").

    i.    This sale was to an employee.

    ii.    In Deal 65232, J. Beckley conspired with other PAH employees to include but not limited to Michael Nystrom and Nasir Khan to facilitate and allow the sale of the Nissan Altima in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Nissan Altima for a price of $2,105.00 when the cost of the Nissan Altima to the Dealership was $2,039.00.

    iv.    J. Beckley also allowed a repair order on the Nissan Altima to not be paid at a cost of $941.00 causing a loss to the Dealership.

    v.    The total loss to PAH on sale was $875.00.

218.    On or about May 22, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for John Austin Davis, of a 2007 Ford Escape in Deal Number: 65268, Stock Number: HTA05773, VIN: 1FMYU03147KA05773 ("Deal 65268").

    i.    This sale was to an employee.

    ii.    In Deal 65268, J. Beckley conspired with other PAH employees to include but not limited to himself and Michael Nystrom, to facilitate and allow the sale of the Ford Escape in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Ford Escape for a price of $950.03 when the cost of the Ford Escape to the Dealership was $1,830.00.

iv.　　The total loss to PAH on sale was $879.97.

219.　　On or about June 1, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Wallah Richardson Jr., of a 2004 Mitsubishi Montero SP in Deal Number: 65106, Stock Number: HT004231, VIN: JA4LS21R14J004231 ("Deal 65106").

i.　　This sale was to an employee.

ii.　　In Deal 65106, J. Beckley conspired with other PAH employees to include but not limited to Michael Nystrom and Nasir Khan to facilitate and allow the sale of the Mitsubishi Montero in violation of Company Policy, the Employee Handbook and the EDP.

iii.　　J. Beckley allowed the sale of the Mitsubishi Montero for a price of $860.00 when the cost of the Mitsubishi Montero to the Dealership was 1,830.82.

iv.　　The total loss to PAH on sale was $969.82.

220.　　On or about July 27, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Samantha Michelle Lopez, of a 2020 Honda CR-V in Deal Number: 66194, Stock Number: HH651140, VIN: 2HKRW2H52LH651140 ("Deal 66194").

i.　　This sale was to an employee.

ii.　　In Deal 66194, J. Beckley conspired with other PAH employees to facilitate and allow the sale of the Honda CR-V in violation of Company Policy, the Employee Handbook and the EDP.

iii.　　J. Beckley allowed the sale of the Honda CR-V for a price of $27,600.00, when the cost of the Honda CR-V to the Dealership was $29,605.82.

iv.　　The total loss to PAH on sale was $1,805.82.

221. On or about March 16, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for George William Billet, Jr., of a 2007 Honda Civic in Deal Number: 64752, Stock Number: HT060604, VIN: 1HGFA16857L060604 ("Deal 64752").

    i.    This sale was to an employee.

    ii.    In Deal 64752, J. Beckley conspired with other PAH employees to include but not limited to himself and others to facilitate and allow the sale of the Honda Civic in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Honda Civic for a price of $3,010.68, when the cost of the CIVIC to the Dealership was $3,000.00.

    iv.    J. Beckley also allowed a repair order on the Honda Civic to not be paid at a cost of $1,195.00 which constitutes a lost profit as PAH was a high volume seller.

    v.    The total loss to PAH on sale was $1,195.00.

222. On or about April 11, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Emmanuel Fer Alsina-Perez, of a 2020 Honda Pilot in Deal Number: 64903, Stock Number: HH019081, VIN: 5FNYF5H53LB019081 ("Deal 64903").

    i.    This sale was to an employee.

    ii.    In Deal 64903, J. Beckley conspired with other PAH employees to include but not limited to George Billett to facilitate and allow the sale of the Honda Pilot in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Honda Pilot for a price of $40,761.83, when the cost of the Honda Pilot to the Dealership was $36,829.94.

      iv.      J. Beckley allowed a negative cost adjustment of $2,750.00 which constitutes a lost profit as PAH was a high volume seller.

      v.      J. Beckley also allowed an overpayment on the employee trade-in of $8,371.00 all resulting in a lost profit to the Dealership.

      vi.      The total loss to PAH on sale was $11,121.00.

223.    On or about May 8, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Eric Matthew Durand, of a 2008 Acura MDX in Deal Number: 65101, Stock Number: HT534291, VIN: 2HNYD28268H534291 ("Deal 65101").

      i.      This sale was to an employee.

      ii.      In Deal 65101, J. Beckley conspired with other PAH employees to include but not limited to George Billett to facilitate and allow the sale of the Acura MDX in violation of Company Policy, the Employee Handbook and the EDP.

      iii.      J. Beckley allowed the sale of the Acura MDX for a price of $2,600.00 when the cost of the Acura MDX to the Dealership was $3,480.00.

      iv.      The total loss to PAH on sale was $880.00.

224.    On or about July 31, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Christopher Kyle Galdron, of a 2019 Honda Passport in Deal Number: 61745, Stock Number: HH008907, VIN: 5FNYF7H99KB008907 ("Deal 61745").

      i.      This sale was to an employee.

      ii.      In Deal 61745, J. Beckley conspired with other PAH employees to facilitate and allow the sale of the Honda Passport in violation of Company Policy, the Employee Handbook and the EDP.

iii.     J. Beckley allowed the sale of the Honda Passport for a price of $36,900.00 when the cost of the Honda Passport to the Dealership was $37,720.73.

iv.     He also allowed an overpayment on the employee trade-in of $1,500.00 which constitutes lost profit as PAH was a high volume seller.

v.     The total loss to PAH on sale was $2,320.73.

225.     On or about August 5, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Mckenney Salinas Honda, of a 2020 Honda Pilot in Deal Number: 66333, Stock Number: HH031195, VIN: 5FNYF6H54LB031195 ("Deal 66333").

i.     This sale was to an employee.

ii.     In Deal 66333, J. Beckley conspired with other PAH employees to facilitate and allow the sale of the Honda Pilot in violation of Company Policy, the Employee Handbook and the EDP.

iii.     J. Beckley allowed the sale of the Honda Pilot for a price of $36,346.25, when the cost of the Honda Pilot to the Dealership was $38,305.65.

iv.     The total loss to PAH on sale was $1,959.40.

226.     On or about May 28, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Tyler Love, of a 2002 BMW 325I in Deal Number: 65343, Stock Number: HPL72707, VIN: WBAEV33492KL72707 ("Deal 65343").

i.     This sale was to an employee.

ii.     In Deal 65343, J. Beckley conspired with other PAH employees to include but not limited to George Billett, and Charles Johnson to facilitate and allow the sale of the BMW 325I  in violation of Company Policy, the Employee Handbook and the EDP.

      iii.      J. Beckley allowed the sale of the BMW 325I for a price of $600.00, when the cost of the BMW 325I to the Dealership was $1,280.00.

      iv.      The total loss to PAH on sale was $680.00.

227.    On or about June 20, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Ashutosh M. Paregi, of a 2018 Honda Accord in Deal Number: 65671, Stock Number:  HT195464, VIN: 1HGCV1F31JA195464 ("Deal 65671").

      i.      This sale was to an employee.

      ii.      In Deal 65671, J. Beckley conspired with other PAH employees to include but not limited to Charles Johnson and Stephen Williams Jr. to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

      iii.      J. Beckley allowed the sale of the Honda Accord for a price of $21,858.00 when the cost of the Honda Accord to the Dealership was $23,222.69.

      iv.      He also allowed an overpayment on the employee trade-in of $298.00 which constitutes a lost profit as PAH was a high volume seller.

      v.      The total loss to PAH on sale was $704.55.

228.    On or about October 5, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Jerry Michael Kennedy Sr., of a 2001 Nissan Pathfinder in Deal Number:  67135, Stock Number: H000098B, VIN: JN8DR09Y71W613459 ("Deal 67135").

      i.      This sale was to an employee.

      ii.      In Deal 67135, J. Beckley conspired with other PAH employees to facilitate and allow the sale of the Nissan Pathfinder in violation of Company Policy, the Employee Handbook and the EDP.

     iii.     J. Beckley allowed the sale of the Nissan Pathfinder for a price of $1,100.00 when the cost of the Nissan Pathfinder to the Dealership was $2,305.20

     iv.     J. Beckley allowed a negative cost adjustment in the amount of $395.00 which constitutes lost profit as PAH was a high volume seller.

     v.     The total loss to PAH on sale was $810.00.

229.    On or about July 1, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Delwin Deshawn Comer, of a 2020 Honda Accord in Deal Number: 65760, Stock Number: HH062051, VIN: 1HGCV1F39LA062051 ("Deal 65760").

     i.     This sale was to an employee.

     ii.     In Deal 65760, J. Beckley conspired with other PAH employees to include but not limited to Stephen Williams Jr. to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

     iii.     J. Beckley allowed the sale of the Honda Accord for a price of $31,389.00 when the cost of the Honda Accord to the Dealership was$ $28,153.57.

     iv.     J. Beckley also allowed a repair order on the Honda Accord to not be paid at a cost of $3,755.00 which constitutes a lost profit as PAH was a high volume seller.

     v.     J. Beckley also allowed a negative cost adjustment in the amount of $1,950.00.

     vi.     The total loss to PAH on sale was $2,269.57.

230. On or about July 24 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Vicky Ann Broadway, of a 2019 Honda HRV in Deal Number: 65866, Stock Number: HH723370, VIN: 3CZRU6H57KM723370 ("Deal 65866").

    i.    This sale was to an employee.

    ii.    In Deal 65866, J. Beckley conspired with other PAH employees to include but not limited to Charles Johnson and Alexander A. Fung-A-Ling to facilitate and allow the sale of the Honda HRV in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Honda HRV for a price of $27,567.45 when the cost of the Honda HRV to the Dealership was $26,797.39.

    iv.    J. Beckley also allowed a repair order on the Honda HRV to not be paid at a cost of $247.00 causing a loss to the Dealership.

    v.    He also allowed an overpayment on the employee trade-in of $4,287.00 which constitutes a lost profit as PAH was a high volume seller.

    vi.    The total loss to PAH on sale was $4,534.00.

231. On or about September 1, 2020 J. BECKLEY facilitated or conspired with others to facilitate an employee purchase for John Darmon Sackey, of a 2020 Honda Accord in Deal Number: 66467, Stock Number: H000211, VIN: 1HGCV1F11LA116683 ("Deal 66467").

    i.    This sale was to an employee.

    ii.    In Deal 66467, J. Beckley conspired with other PAH employees to include but not limited to Charles Johnson and Fung-A-Ling to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

      iii.     J. Beckley allowed the sale of the Honda Accord for a price of $26,970.00 when the cost of the Honda Accord to the Dealership was $24,534.24.

      iv.     He also allowed an overpayment on the employee trade-in of $6,602.00 which constitutes a lost profit as PAH was a high volume seller.

      v.     The total loss to PAH on sale was $7,111.11.

232.     On or about July 28, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Graig, Wynn Perry, of a 2020 Honda Accord in Deal Number: 66208, Stock Number: HX046164, VIN: 1HGCV1F38LA046164 ("Deal 66208").

      i.     This sale was to an employee.

      ii.     In Deal 66208, J. Beckley conspired with other PAH employees to include but not limited to Jonathan Lopez and Alexander A. Fung-A-Ling to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

      iii.     J. Beckley conspired with the sale of the Honda Accord for a price of $29,999.70 when the cost of the Honda Accord to the Dealership was $26,670.57.

      iv.     He also allowed an overpayment on the employee trade-in of $5,835.00 which constitutes a lost profit as PAH was a high volume seller.

      v.     J. Beckley also allowed a negative cost adjustment in the amount of $500.00.

      vi.     The total loss to PAH on sale was $6,513.03.

233.     On or about August 3, 2020 J. Beckley facilitated or conspired with others to facilitate an employee purchase for Demario Lajuan Hutchings, of a 2013 Audi Allroad in Deal Number: 66300, Stock Number: P000012, VIN: WA1UFAFL7DA183981 ("Deal 66300").

      i.     This sale was to an employee.

      ii.    In Deal 66300, J. Beckley conspired with other PAH employees to include but not limited to Alexander A. Fung-A-Lling to facilitate and allow the sale of the Audi Allroad in violation of Company Policy, the Employee Handbook and the EDP.

      iii.   J. Beckley allowed the sale of the Audi Allroad for a price of $14,655.00 when the cost of the Audi Allroad to the Dealership was $15,130.62.

      iv.   J. Beckley also allowed a negative cost adjustment in the amount of $356.96 which constitutes a lost profit as PAH was a high volume seller.

      v.    The total loss to PAH on sale was $529.54.

234.    On or about August 12, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Taren Russel Pecha, of a 2008 Honda Accord in Deal Number: 66433, Stock Number: H000059A, VIN: 1HGCP26448A154314 ("Deal 66433").

      i.     This sale was to an employee.

      ii.    In Deal 66433, J. Beckley conspired with other PAH employees to include but not limited to Stephen Pecha to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

      iii.   J. Beckley allowed the sale of the Honda Accord for a price of $2,640.00 when the cost of the Accord to the Dealership was $3,845.00.

      iv.   He also allowed a negative cost adjustment in the amount of $255.00 which constitutes a lost profit as PAH was a high volume seller.

      v.    The total loss to PAH on sale was at least $1,205.00.

235. On or about September 3, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Jerry Michael Kennedy Sr., of a 2008 Honda Accord in Deal Number: 66721, Stock Number: X000017B, VIN: 1HGCP26798A016925 ("Deal 66721").

    i.    This sale was to an employee.

    ii.    In Deal 66721, J. Beckley conspired with other PAH employees to include but not limited to Stephen Pecha to facilitate and allow the sale of the Honda Accord in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Honda Accord for a price of $2,220.00 when the cost of the Honda Accord to the Dealership was $3,470.00

    iv.    J. Beckley also allowed a negative cost adjustment in the amount of $395.00 which constitutes a lost profit as PAH was a high volume seller.

    v.    The total loss to PAH on sale was $1,250.00.

236. On or about Oct 6, 2020, J. Beckley facilitated or allowed others to facilitate an employee purchase for Stephen John Pecha, of a 2005 Toyota Prius in Deal Number: 67202, Stock Number: P000076, VIN: JTDKB20U753064169 ("Deal 67202").

    i.    This sale was to an employee.

    ii.    In Deal 67202 J. Beckley conspired with other PAH employees to include but not limited to Stephen Pecha to facilitate and allow the sale of the Toyota Prius in violation of Company Policy, the Employee Handbook and the EDP.

    iii.    J. Beckley allowed the sale of the Toyota Prius for a price of $802.18 when the cost of the Toyota Prius to the Dealership was $2,105.00.

     iv.     J. Beckley also allowed a negative cost adjustment of $395.00 which constitutes a lost profit as PAH was a high volume seller.

     v.     The total loss to PAH on sale was $1,302.82.

237.    On or about October 7, 2020, J. Beckley facilitated or conspired with others to facilitate an employee purchase for Lester McKoy Jr., of a 2012 Lincoln MKZ in Deal Number: 67213, Stock Number: H000352A, VIN: 3LNHL2JCXCR810069 ("Deal 67213").

     i.     This sale was to an employee.

     ii.     In Deal 67213, J. Beckley conspired with other PAH employees to include but not limited to Demario Hutchings and Stephen Pecha to facilitate and allow the sale of the Lincoln MKZ in violation of Company Policy, the Employee Handbook and the EDP.

     iii.     J. Beckley allowed the sale of the Lincoln MKZ for a price of $2,411.00 when the cost of the Lincoln MKZ to the Dealership was $3,616.00.

     iv.     J. Beckley also allowed a negative cost adjustment in the amount of $395.00 which constitutes a lost profit as PAH was a high volume seller.

     v.     The total loss to PAH on sale was $1,205.00.

238.    In total, J. Beckley harmed PAH in the amount of at least $75,263.42 through the intentional abuse and misuse of the EDP.

**PAH sells The Dealership to MileOne.**

239.    On October 11, 2020, PAH sold the Dealership to MileOne.

240.    As part of the sale, MileOne agreed to hire substantially all of the employees of the Dealership.

241.    J. Beckley was one of the employees hired by MileOne.

242.    On information and belief, J. Beckley was terminated for insubordination by MileOne shortly after the time MileOne took over the Dealership.

243.    Through the process of selling the Dealership, J. Beckley's malfeasance began to come to light, and the full extent of his misconduct is still being determined. PAH's investigation continues.

**The Beckleys have caused substantial harm to PAH's business.**

244.    The Beckleys have injured PAH by, among other things: (1) embezzling funds through the improper use of the Credit Card; (2) hosting a clearly inappropriate Holiday Party; (3) intentionally abusing the Demo vehicle policy; (4) causing PAH to purchase J. Beckley's personal vehicle in an amount significantly above value; (5) purchasing a vehicle for Gibbons and the Gibbons Firm to satisfy J. Beckley's personal attorneys' fees; (6) writing checks to J. Beckley; and (7) intentionally abusing the EDP in a manner that caused PAH to suffer a loss.

245.    By engaging in this and other similar conduct, the Beckleys have caused a significant amount of financial damage to PAH.

246.    The Beckleys knew and understood that their conduct would cause substantial harm to PAH and result in significant losses that would cause PAH to save costs in other areas during periods of financial hardship that PAH perceived at the time to be solely attributable to the Covid-19 pandemic. PAH did not realize until after its investigation into the Beckleys, that not only was it battling to stay afloat during a global pandemic, but PAH was also being attacked from the inside by its own, highest-ranking employee (J. Beckley) and his co-conspirator wife (T. Beckley).

247.    By engaging in the above acts, the Beckleys conspired with each other and others to injure PAH.

248. As of the date of this filing, the full extent of the Beckley's conspiracy and misappropriation is still being uncovered. Based on what already has been discovered, the Beckleys' actions, both individually and collectively, have proximately caused PAH to suffer substantial losses and damages.

249. PAH will suffer irreparable harm unless the Beckleys are forced to repay PAH for the true cost of their corrupt and unlawful acts.

## COUNT 1
## BREACH OF FIDUCIARY DUTIES
### (Against J. Beckley)

250. The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

251. Virginia law governs PAH's breach of fiduciary duties and other tort and tort-like claims because PAH is a Virginia corporation with its principal place of business in Chesapeake, Virginia and PAH suffered its injuries in Virginia. PAH's pecuniary loss was suffered in Virginia, where PAH's bank accounts are held, and thus Virginia law governs these claims. *Harco Nat. Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 694, 697 (2010).

252. Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's breach of fiduciary duties and other tort and tort-like claims. *See M.D. Russell Construction, Inc. v. Consolidated Staffing, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022) ("Virginia law governs Russell Construction's fraud-based tort claims because Russell Construction did not suffer an injury until it paid Consolidated from its bank accounts in Virginia" and "The Court agrees that Russell Construction's pecuniary loss was suffered in Virginia, where Russell Construction's bank accounts are held, and thus Virginia law governs these claims").

253.    Moreover, even if North Carolina law otherwise might apply (which it would not), "[u]nder North Carolina law, claims of breaches of fiduciary duty are governed by the 'internal affairs doctrine,' which applies the law of the state of incorporation to claims related to corporate standards of care. *Worley Claims Servs., LLC v. Jefferies*, 429 F. Supp. 3d 146 (W.D.N.C. 2019) (citing *Bluebird Corp. v. Aubin*, 188 N.C.App. 671, 680, 657 S.E.2d 55 (2008)). In *Bluebird*, the court summarized the internal affairs doctrine as follows:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders-because otherwise a corporation could be faced with conflicting demands. *Edgar v. MITE Corp*., 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269, 285 (1982). "States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care." *Atherton v. F.D.I.C*., 519 U.S. 213, 224, 117 S.Ct. 666, 136 L.Ed.2d 656, 668 (1997).

*Id.*

254.    Because PAH is incorporated in Virginia, Virginia law should apply to its breach of fiduciary duties claims pursuant to the internal affairs doctrine. *Worley Claims Servs., LLC*, 429 F. Supp. 3d 146 (W.D.N.C. 2019)

255.    In Virginia, a fiduciary relationship exists "when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *H-B Partnership v. Wimmer*, 220 Va. 176, 179 (1979); *see also AvalonBay Communities, Inc. v. Willden*, 2009 WL 2431571, at *11 (E.D.Va.).

256.    Virginia courts have long recognized that under common law, "an employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment." *Williams v. Dominion Tech. Partners, L.L.C*., 265 Va. 280, 576 S.E.2d 752 (2003)

(citing *Horne v. Holley*, 167 Va. 234, 241, 188 S.E. 169, 172 (1936)). "[A]n employee's fiduciary duty to his employer prohibits the employee from acting in a manner adverse to his employer's interest." *Hilb, Rogal & Hamilton Co. of Richmond v. DePew*, 247 Va. 240, 440 S.E.2d 918 (1994) (citing *Greenspan v. Osheroff*, 232 Va. 388, 400, 351 S.E.2d 28, 37 (1986); *Horne v. Holley*, 167 Va. 234, 241, 188 S.E. 169, 172 (1936)).

257.    PAH hired J. Beckley as the GM to oversee and operate the Dealership.

258.    As an employee of PAH and the GM of the Dealership, J. Beckley owes fiduciary duties of loyalty and confidentiality to PAH.  Such duties encompass obligations:  (1) not to use or disclose PAH information; (2) not to misappropriate such information to his own or another's purposes; (3) not to divert corporate opportunities, funds, or property from PAH; and (4) not to engage in conduct that causes harm to PAH.

259.    While employed with PAH as the GM of the Dealership, J. Beckley was entrusted with and allowed to access PAH's confidential information including, without limitation, customer lists, employee lists and information, conference contact lists, customer contacts, customer preferences and requirements, costs, pricing and profit margin information, sales data and plans, and other confidential and proprietary information which placed J. Beckley in a position of special confidence. J. Beckley was bound to act in good faith towards PAH, and was prohibited from acting in a manner adverse to PAH's interest.

260.    J. Beckley has breached his fiduciary duties and intentionally acted in a manner adverse to PAH's interest which resulted in actual damages to PAH by: (1) embezzling funds through the improper use of the Credit Card; (2) hosting a clearly inappropriate Holiday Party; (3) intentionally abusing the Demo vehicle policy; (4) causing PAH to purchase J. Beckley's personal vehicle in an amount significantly above value; (5) purchasing a vehicle for Gibbons and the

Gibbons Firm to satisfy J. Beckley's personal attorneys' fees; (6) writing checks to himself; and (7) intentionally abusing the EDP in a manner that caused PAH to suffer a loss.

261.    This conduct of J. Beckley proximately has caused PAH to suffer damages.

262.    J. Beckley's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith. As a result, PAH is entitled to recover punitive damages for J. Beckley's wrongful conduct.

263.    Even if the Court applies North Carolina law to PAH's breach of fiduciary duties claims, the North Carolina analysis arrives at the same result.

264.    The Supreme Court of North Carolina "has defined a fiduciary relationship as one in which 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *CommScope Credit Union*, 369 N.C. at 52, 790 S.E.2d at 660 (quoting *Green v. Freeman*, 367 N.C. 136,141, 749 S.E.2d 262, 268 (2013)). All fiduciary relationships are characterized by "a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party." *Dallaire v. Bank of Am.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014). In North Carolina, a fiduciary duty can arise by operation of law (de jure) or based on the facts and circumstances (de facto). *Lockerman v. S. River Elec. Membership Corp*., 250 N.C. App. 631, 636, 794 S.E.2d 346, 351 (2016).

265.    J. Beckley was placed in a position characterized by a high level of trust when PAH hired him as the GM of the Dealership.

266.    J. Beckley breached his fiduciary duties and intentionally acted in a manner adverse to PAH's interest which resulted in actual damages to PAH by: (1) embezzling funds through the improper use of the Credit Card; (2) hosting a clearly inappropriate Holiday Party; (3) intentionally

abusing the Demo vehicle policy; (4) causing PAH to purchase J. Beckley's personal vehicle in an amount significantly above value; (5) purchasing a vehicle for Gibbons and the Gibbons Firm to satisfy J. Beckley's personal attorneys' fees; (6) writing checks to himself; and (7) intentionally abusing the EDP in a manner that caused PAH to suffer a loss.

267. This conduct of J. Beckley proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from J. Beckley in an amount to be proven at trial.

268. J. Beckley's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith. As a result, PAH is entitled to recover punitive damages for J. Beckley's wrongful conduct.

## COUNT 2
## BREACH OF FIDUCIARY DUTIES
### (Against T. Beckley)

269. The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

270. Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's aiding and abetting breach of fiduciary duties and other tort and tort-like claims. *Harco Nat. Ins. Co.*, 206 N.C. App. at 694, 697 (2010); *M.D. Russell Construction, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022).

271. Moreover, because PAH is incorporated in Virginia, Virginia law should apply to its breach of fiduciary duties claims pursuant to the internal affairs doctrine. *Worley Claims Servs., LLC*, 429 F. Supp. 3d 146 (W.D.N.C. 2019).

272. T. Beckley was hired by her husband, J. Beckley, as an employee of PAH and the Sales Assistant of the Dealership.

273. As an employee of PAH and the Sales Assistant of the Dealership, T. Beckley owes fiduciary duties of loyalty and confidentiality to PAH. Such duties encompass obligations: (1) not to use or disclose PAH information; (2) not to misappropriate such information to his own or another's purposes; (3) not to divert corporate opportunities, funds, or property from PAH; and (4) not to engage in conduct that causes harm to PAH.

274. While employed with PAH as the Sales Assistant of the Dealership, T. Beckley was entrusted with and allowed to access PAH's confidential information including, without limitation, customer lists, employee lists and information, conference contact lists, customer contacts, customer preferences and requirements, costs, pricing and profit margin information, sales data and plans, and other confidential and proprietary information which placed T. Beckley in a position of special confidence. T. Beckley was bound to act in good faith towards PAH, and was prohibited from acting in a manner adverse to PAH's interest.

275. T. Beckley was hired by her husband, J. Beckley, as an employee of PAH and the Sales Assistant of the Dealership, purportedly to assist with Dealership sales activities. In actuality, however, T. Beckley conspired with J. Beckley to personally benefit themselves and harm PAH in breach of their fiduciary duties to PAH.

276. T. Beckley has breached her fiduciary duties and intentionally acted in a manner adverse to PAH's interest which resulted in actual damages to PAH by: (1) embezzling funds through the improper use of the Credit Card; (2) hosting a clearly inappropriate Holiday Party; (3) intentionally abusing the Demo vehicle policy; (4) causing PAH to purchase J. Beckley's personal vehicle in an amount significantly above value; (5) purchasing a vehicle for Gibbons and the Gibbons Firm to satisfy J. Beckley's personal attorneys' fees; (6) writing checks to J. Beckley; and (7) intentionally abusing the EDP in a manner that caused PAH to suffer a loss.

277. This conduct of T. Beckley proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from T. Beckley in an amount to be proven at trial.

278. T. Beckley's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith. As a result, PAH is entitled to recover punitive damages for T. Beckley's wrongful conduct.

## COUNT 3
## AIDING & ABETTING BREACH OF FIDUCIARY DUTIES
### (Against J. Beckley)

279. The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

280. Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's aiding and abetting breach of fiduciary duties and other tort and tort-like claims. *Harco Nat. Ins. Co.*, 206 N.C. App. at 694, 697 (2010); *M.D. Russell Construction, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022).

281. Moreover, because PAH is incorporated in Virginia, Virginia law should apply to its breach of fiduciary duties claims pursuant to the internal affairs doctrine. *Worley Claims Servs., LLC*, 429 F. Supp. 3d 146 (W.D.N.C. 2019).

282. "[O]ne who aids and abets a third party's breach of fiduciary duty may be held liable for providing such assistance." *Tysons Toyota, Inc. v. Globe Life Ins. Co.*, 45 F.3d 428, 1994 WL 717598 (4th Cir. 1994) (finding that district court erred by dismissing the claim when Tysons alleged their president breached his fiduciary duty by usurping a corporate opportunity, and the insurance companies knew there was a conflict of interest, followed the president's instructions to reinsure Tysons' policies and benefitted financially from the scheme).

283.    Under Virginia law, aiding and abetting a breach of a fiduciary duty constitutes a stand-alone cause of action.  *See AvalonBay Cmtys., Inc. v. Willden*, 2009 WL 2431571 at *11 (E.D. Va. 2009) (holding a defendant liable for aiding and abetting his brother's breach of fiduciary duty when he processed fraudulent invoices that harmed his brother's employer, AvalonBay); *St. Paul Fire and Marine Ins. Co. v. Hoskins*, 2012 WL 748574 at *5, *11 (W.D. Va. 2012) (finding a cause of action and a genuine issue of material fact concerning knowledge of the breach); *In re James River Coal Co.*, 360 B.R. 139, 174 (Bankr. E.D. Va. 2007) ("[a]iding and abetting breach of fiduciary duty is a viable claim under Virginia law."); *In re Health Diagnostic Lab'y, Inc.*, 2018 WL 4676339 at *11 (Bankr. E.D. Va. 2018) (finding a cause of action for aiding and abetting breach of fiduciary duty).

284.    J. Beckley had actual knowledge that the actions taken by T. Beckley were in breach of the fiduciary duties T. Beckley owed to PAH.

285.    Notwithstanding this actual knowledge, J. Beckley substantially assisted, or encouraged and induced T. Beckley to breach her fiduciary duties she owed to PAH and intentionally acted in a manner adverse to PAH's interest which resulted in actual damages to PAH.

286.    J. Beckley hired his wife, T. Beckley, as an employee of PAH and the Sales Assistant of the Dealership, purportedly to assist with Dealership sales activities.  In actuality, however, J. Beckley conspired with T. Beckley to personally benefit themselves and harm PAH in breach of their fiduciary duties to PAH.

287.    This conduct of J. Beckley proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from J. Beckley in an amount to be proven at trial.

288.    J. Beckley's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.  As a result, PAH is entitled to recover punitive damages for J. Beckley's wrongful conduct.

## COUNT 4
## AIDING & ABETTING BREACH OF FIDUCIARY DUTIES
### (Against T. Beckley)

289.    The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

290.    Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's aiding and abetting breach of fiduciary duties and other tort and tort-like claims.  *Harco Nat. Ins. Co.*, 206 N.C. App. at 694, 697 (2010); *M.D. Russell Construction, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022).

291.    Moreover, because PAH is incorporated in Virginia, Virginia law should apply to its breach of fiduciary duties claims pursuant to the internal affairs doctrine. *Worley Claims Servs., LLC*, 429 F. Supp. 3d 146 (W.D.N.C. 2019).

292.    T. Beckley had actual knowledge that the actions taken by J. Beckley were in breach of the fiduciary duties J. Beckley owed to PAH.

293.    Notwithstanding this actual knowledge, T. Beckley substantially assisted, or encouraged and induced J. Beckley to breach his fiduciary duties he owed to PAH and intentionally acted in a manner adverse to PAH's interest which resulted in actual damages to PAH.

294.    T. Beckley was hired by her husband, J. Beckley, as an employee of PAH and the Sales Assistant of the Dealership, purportedly to assist with Dealership sales activities.   In actuality, however, T. Beckley conspired with J. Beckley to personally benefit themselves and harm PAH in breach of their fiduciary duties to PAH.

295.    This conduct of T. Beckley proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from T. Beckley in an amount to be proven at trial.

296.    T. Beckley's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.  As a result, PAH is entitled to recover punitive damages for T. Beckley's wrongful conduct.

## COUNT 5
## FRAUD
### (Against the Beckleys)

297.    The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

298.    Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's fraud and other tort and tort-like claims. *Harco Nat. Ins. Co.*, 206 N.C. App. at 694, 697 (2010); *M.D. Russell Construction, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022).

299.    A claim for fraud under Virginia law requires a plaintiff to show: "(i) a false representation by defendant, (ii) of a material fact, (iii) made intentionally and knowingly, (iv) with intent to mislead, (v) reliance by the misled party, and (vi) resulting injury to the party misled." *Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 690 (E.D. Va. 1990).

300.    Even if the Court applies North Carolina law to PAH's fraud claims, the North Carolina analysis arrives at the same result.

301.     A claim for fraud under North Carolina law requires a plaintiff to similarly show: "(1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted

in damage." *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 194 (M.D.N.C. 1997); *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007) (whether each of the elements of actual fraud and reasonable reliance are met are ordinarily questions for the jury "unless the facts are so clear that they support only one conclusion").

302.    The Beckleys' actual fraud is manifest under Virginia or North Carolina law.

303.    The Beckleys defrauded PAH by: (1) embezzling funds through the improper use of the Credit Card; (2) hosting a clearly inappropriate Holiday Party; (3) intentionally abusing the Demo vehicle policy; (4) causing PAH to purchase J. Beckley's personal vehicle in an amount significantly above value; (5) purchasing a vehicle for Gibbons and the Gibbons Firm to satisfy J. Beckley's personal attorneys' fees;  (6) writing checks to J. Beckley; and (7) intentionally abusing the EDP in a manner that caused PAH to suffer a loss.

304.    PAH entrusted J. Beckley in his position of GM to operate the Dealership, and use the Credit Card for proper expenses. Throughout his employment with PAH, J. Beckley represented to PAH that he would fulfill his employment duties, operate the Dealership in accordance with policies, and only use PAH Credit Cards for proper PAH business expenses.

305.    J. Beckley knowingly made these representations to PAH and gave PAH these assurances with the intent to divert the attention of PAH's owners away from J. Beckley's actions.

306.    PAH relied to its detriment on the misrepresentations of J. Beckley by continuing to employ him, entrusting him with PAH's business, and entrusting him to lead PAH's employees.

307.    J. Beckley, in his capacity as the GM of the Dealership, intentionally concealed the Beckleys' bad actions by (1) failing to submit receipts for his credit card charges despite numerous requests for them to be produced; (2) moving the PAH comptroller to a different Dealership building 100 yards away from the building in which J. Beckley worked; and (3) incentivizing other

bad actor employees and instilling loyalty in them through J. Beckley's abuse of the EDP to create personal gain to J. Beckley's favored employees.

308. The Beckleys took these precautionary measures with the intent to deceive PAH so they could continue misappropriating the Credit Card, abusing the PAH demo vehicle policy, and abusing the EDP, all for their personal benefit and at the expense of and to the detriment of PAH.

309. PAH was actually deceived by the Beckleys' actions, as the Beckleys were able to conceal their fraud and evade detection until it was discovered after the sale of the Dealership to MileOne.

310. PAH was actually damaged by the Beckleys in an amount that includes but is not limited to the $100,000 plus in personal charges they placed on the Credit Card that were, in fact, paid by PAH.

311. PAH was actually damaged by the Beckleys in an amount that includes but is not limited to the amount the Beckleys gained from PAH in connection with their abuse of the EDP, and demo vehicle policy.

312. PAH was actually damaged by the Beckleys in an amount that includes but is not limited to the amount PAH lost in connection with the overpayment for PAH's Escalade which was suspiciously stolen.

313. This conduct of the Beckleys proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from the Beckleys in an amount to be proven at trial.

314. The Beckleys' actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith. As a result, PAH is entitled to recover punitive damages for the Beckleys' wrongful conduct.

**COUNT 6**
**CONVERSION**
**(Against the Beckleys)**

315. The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

316. Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's conversion and other tort and tort-like claims. *Harco Nat. Ins. Co.*, 206 N.C. App. at 694, 697 (2010); *M.D. Russell Construction, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022).

317. Under Virginia law, "the tort of conversion encompasses any wrongful exercise or assumption of authority over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *PGI, Inc. v. Rathe Prods., Inc.*, 265 Va. 334, 344 (2003)

318. Even if the Court applies North Carolina law to PAH's conversion claims, the North Carolina analysis arrives at the same result.

319. Under North Carolina law, "a claim for conversion accrues when 'some act is done which is a denial or violation of the plaintiff's dominion over or rights in the property.'" *Lockerman v. S. River Elec. Membership Corp.*, 2015 WL 3544521, at *7 (N.C. Super. Ct. June 8, 2015) (quoting *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 665 S.E.2d 478, 489 (2008)). The Supreme Court of North Carolina has stated that "[t]he tort of conversion is well defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (citation omitted). "There are, in effect, two essential elements of a conversion claim: [1] ownership in the

plaintiff and [2] wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC,* 365 N.C. 520, 723 S.E.2d 744 (2012) (citing *Gadson v. Toney*, 69 N.C.App. 244, 246, 316 S.E.2d 320, 321–22 (1984)).

320. The Beckleys' conversion is manifest under Virginia or North Carolina law.

321. The Beckleys wrongfully converted PAH's funds and property by (1) embezzling funds through the improper use of the Credit Card; (2) causing PAH to purchase J. Beckley's personal vehicle in an amount significantly above value; (3) intentionally abusing the Demo vehicle policy; (4) intentionally abusing the EDP; (5) hiring his wife to effectively assume his duties as the GM of the Dealership, and (6) purchasing a vehicle for his attorney to satisfy J. Beckley's personal attorneys' fees in a manner that caused PAH to suffer a loss.

322. By taking PAH's funds and property, the Beckleys have wrongfully exercised authority over these funds and property, thereby depriving PAH of its rightful possession of them.

323. On information and belief, the Beckleys also conspired to have PAH's Escalade stolen.

324. This conduct of the Beckleys proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from the Beckleys in an amount to be proven at trial.

325. The Beckleys' actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith a result, PAH is entitled to recover punitive damages for the Beckleys' wrongful conduct.

## COUNT 7
## COMMON LAW CIVIL CONSPIRACY
### (Against the Beckleys)

326. The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

327. Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's common law civil conspiracy claim and other tort and tort-like claims. *Harco Nat. Ins. Co.*, 206 N.C. App. at 694, 697 (2010); *M.D. Russell Construction, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022).

328. In Virginia, "[t]he common law has long recognized actions based on [civil] conspiracy." *Dunlap v. Cottman Transmission Systems LLC*, 287 Va. 207, 214-15 (2014). "In order to state a claim for common law conspiracy, a plaintiff must show (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) that the overt act was done pursuant to and in furtherance of the common scheme." *Skillstorm, Inc. v. Electronic Data Systems, LLC*, 666 F.Supp.2d 610, 618 (E.D. Va. 2009).

329. Even if the Court applies North Carolina law to PAH's common law civil conspiracy claim, the North Carolina analysis arrives at the same result.

330. A claim for common law civil conspiracy under North Carolina law requires a plaintiff to similarly show: (1) an agreement between two or more persons; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) which agreement results in injury to the plaintiff. *Boyd v. Drum*, 129 N.C.App. 586, 592, 501 S.E.2d 91 (1998), aff'd, 350 N.C. 90 (1999)

331. The Beckleys' common law civil conspiracy is manifest under Virginia or North Carolina law.

332. The Beckleys agreed, combined, conspired, and acted in concert together with each other and others to harm PAH's business by and through unlawful or improper means, including but not limited to breaches of their fiduciary duties, aiding and abetting, fraud and conversion.

333. The Beckleys undertook these actions intentionally, purposefully, willfully, wantonly, maliciously, and without lawful justification.

334. By virtue of the civil conspiracy between the Beckleys and others, PAH suffered injury to its business.

335. This conduct of the Beckleys proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from the Beckleys in an amount to be proven at trial.

336. The Beckleys' actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith a result, PAH is entitled to recover punitive damages for the Beckleys' wrongful conduct.

## COUNT 8
## BUSINESS CONSPIRACY
### (Against the Beckleys)

337. The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

338. Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's tort and tort-like claims. Accordingly, PAH asserts a claim for Business Conspiracy in violation of the VBCA. *Harco Nat. Ins. Co.*, 206 N.C. App. at 694, 697 (2010); *M.D. Russell Construction, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022).

339.     A claim for Business Conspiracy in violation of the VBCA has two elements:   "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business; and (2) resulting damage to the plaintiff." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014); See Virginia Code § 18.2-499.

340.     The Beckleys conspired with each other and others, and acted in concert together to harm the business of PAH in violation of the VBCA, Virginia Code § 18.2-499 and 500.

341.     The Beckleys undertook these actions intentionally, purposefully, willfully and wantonly, maliciously, and without lawful justification.

342.     By virtue of the Business Conspiracy between the Beckleys and others, PAH suffered injury to its business.

343.     This conduct of the Beckleys proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from the Beckleys in an amount to be proven at trial.

344.     The Beckleys' actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith a result, PAH is entitled to recover punitive damages for the Beckleys' wrongful conduct.

345.     By virtue of the Business Conspiracy between the Beckleys, in violation of the VBCA, Virginia Code § 18.2-499 and 500, PAH has suffered injury to its trade, business and reputation, including, but not limited to, lost profits and other damages, in an amount to be proven at trial.

346.     Pursuant to the VBCA, PAH is entitled to treble damages and recovery of attorneys' fees under Virginia Code § 18.2-499 and 500.

## COUNT 9
## UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against the Beckleys)

347.    The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

348.    To the extent North Carolina law applies, PAH asserts a claim for Unfair and Deceptive Trade Practices in violation of the NCUDTPA.

349.    A claim for Unfair and Deceptive Trade Practices in violation of the NCUDTPA has three elements: "(1) an unfair or deceptive act or practice or an unfair method of competition; (2) in or affecting commerce; (3) that proximately causes actual injury to the plaintiff." *RD&J Props. v. Lauralea-Dilton Enters., LLC*, 600 S.E.2d 492, 500 (N.C. Ct. App. 2004); see N.C. Gen. Stat. § 75-1.1(a).

350.    The Beckleys' actions alleged herein were in or affecting commerce.

351.    The Beckleys' actions alleged herein constitute unfair and deceptive acts or practices in violation of § 75-1.1, et seq. of the North Carolina General Statutes.

352.    This conduct of the Beckleys proximately has caused PAH to suffer damages, and PAH is entitled to recover these actual damages from the Beckleys in an amount to be proven at trial.

353.    The Beckleys' actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith a result, PAH is entitled to recover punitive damages for the Beckleys' wrongful conduct.

354.    Pursuant to the NCUDTPA, PAH is entitled to treble damages and recovery of attorneys' fees under N.C.G.S. §§ 75-1.1 and 75-16.

**COUNT 10**
**UNJUST ENRICHMENT**
**(Against the Beckleys)**

355.    The allegations contained in the preceding paragraphs are incorporated and realleged as if fully set forth herein.

356.    Because PAH's injuries and pecuniary loss was suffered in Virginia where its bank accounts are held, Virginia law should apply to PAH's unjust enrichment claims. *Harco Nat. Ins. Co.*, 206 N.C. App. at 694, 697 (2010); *M.D. Russell Construction, Inc.*, 2022 WL 875993 at *4 (E.D.N.C. March 23, 2022).

357.    An unjust enrichment claim under Virginia law requires a plaintiff to show: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 374 (E.D. Va. 2015), aff'd, 690 F. App'x 822 (4th Cir. 2017).

358.    Even if the Court applies North Carolina law to PAH's unjust enrichment claims, the North Carolina analysis arrives at the same result.

359.    An unjust enrichment claim under North Carolina law requires a plaintiff to similarly show: "(1) a measurable benefit conferred on defendant; (2) that the defendant consciously accepted; and (3) the benefit was not conferred on the defendant officiously or gratuitously." *Mountain Land Props., Inc. v. Lovell*, 46 F. Supp. 3d 609, 629 (W.D.N.C. 2014).

360.    The Beckleys (1) embezzled funds through the improper use of the Credit Card; (2) caused PAH to purchase J. Beckley's personal vehicle in an amount significantly above value; (3) intentionally abused the Demo vehicle policy; (4) intentionally abused the EDP; (5) hired T.

Beckley to effectively assume J. Beckley's duties as the GM of the Dealership, and (6) purchased a vehicle for his attorney to satisfy J. Beckley's personal attorneys' fees in a manner that caused PAH to suffer a loss.

361.    PAH's funds and property were conferred on the Beckleys, the Beckleys knew this and orchestrated it and the Beckleys accepted and wrongfully retained PAH's funds and property.

362.    J. Beckley has been paid substantial employment compensation, including salary and bonuses, during time periods when J. Beckley was disloyal to PAH, and was actively embezzling funds and misappropriating property from PAH.

363.    T. Beckley likewise has been paid employment compensation during time periods when T. Beckley was disloyal to PAH, and was actively embezzling funds and misappropriating property from PAH.

364.    The Beckleys have been unjustly enriched to the detriment and at the expense of PAH, and the Beckleys are obligated to make restitution to PAH, including all salary, bonuses or other employment compensation paid to J. Beckley or T. Beckley.  The Beckleys are further obligated to pay restitution for all amounts they embezzled or misappropriated or otherwise caused PAH to suffer as damages in connection with their actions alleged herein.

365.    PAH is entitled to recoup all of these funds, property and payments conferred on the Beckleys, along with pre-judgment interest and all other relief deemed appropriate by the Court.

## PRAYER FOR RELIEF

WHEREFORE, PAH prays for the following relief:

1.       PAH be awarded compensatory damages against the Beckleys in an amount to be determined at trial pursuant to Counts 1-10 or as otherwise provided by law;

2.       PAH be awarded punitive damages against the Beckleys in an amount to be determined at trial pursuant to Counts 1-9 or as otherwise provided by law;

3.       PAH's recovery against the Beckleys include, without limitation, forfeiture, recoupment and disgorgement of all profits, gains or other amounts received or realized by Hartman from the foregoing wrongful acts in an amount to be determined at trial pursuant to Counts 1-10 or as otherwise provided by law;

4.       PAH's recovery against the Beckleys include, without limitation, forfeiture, recoupment and disgorgement of all salary, bonuses or other employment compensation paid to the Beckleys in an amount to be determined at trial pursuant to Count 10 or as otherwise provided by law;

5.       PAH be awarded reimbursement of its attorneys' fees, costs and expenses against the Beckleys pursuant to Counts 8-9 and to the fullest extent permitted by the VBCA (Virginia Code § 18.2-499 and 500) and the NCUDTPA (N.C.G.S. §§ 75-1.1 and 75-16) or as otherwise provided by law;

6.       PAH be awarded pre-judgment and post-judgment interest and costs; and

7.       PAH be awarded such other and further relief as the Court deems proper.

A TRIAL BY JURY IS DEMANDED.

### Rule 38(b)(1) Jury Demand

Pursuant to Rule 38(b)(1), PAH demands trial by jury on any and all issues so triable.

Dated:  April 11, 2022               Respectfully submitted,

                                     **PRIORITY AUTOMOTIVE HUNTERSVILLE, INC.,**

                                     By _____/s/  Joshua F. P. Long_____

Joshua F. P. Long (N.C. Bar No. 26497)
WOODS ROGERS PLC
Wells Fargo Tower, Suite 1800
10 S. Jefferson Street
Roanoke, Virginia  24011
Telephone: (540) 983-7725
Facsimile: (540) 983-7711
jlong@woodsrogers.com

 *Counsel for Defendants and Counterclaimant Priority Automotive Huntersville, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

 I hereby certify that on April 11, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice to all counsel of record.

       _/s/ Joshua F. P. Long_____