| | |
|---|---|
| JAMES BECKLEY,<br><br>       Plaintiff,<br><br>v.<br><br>PRIORITY AUTO GROUP, INC.,<br>PRIORITY AUTOMOTIVE<br>HUNTERSVILLE, INC., DENNIS<br>ELLMER and MATTHEW ELLMER,<br><br>       Defendants,<br><br>―――――――――――――<br><br>PRIORITY AUTOMOTIVE<br>HUNTERSVILLE, INC.,<br><br>       Counterclaimant,<br><br>v.<br><br>JAMES BECKLEY and TANISHA<br>BECKLEY,<br><br>       Counterclaim Defendants. | **JAMES BECKLEY AND TANISHA BECKLEY'S BRIEF IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIM** |

## FACTUAL ALLEGATIONS

Priority Automotive Huntersville, Inc. ("PAH") hired James Beckley ("Mr. Beckley") as

general manager of a Honda dealership in Huntersville, North Carolina (the "Dealership"),

starting on around July 19, 2019. (Counterclaim ¶ 9 [Doc. 32].) According to the Counterclaim[1],

Mr. Beckley allowed his wife, Tanisha Beckley ("Ms. Beckley") to "work at the Dealership from

―――――――――――――

[1] This brief recites the allegations in the Counterclaim for purposes of this motion to dismiss, without admitting the truth of any of the allegations.

July 19, 2019 until May 29, 2020 without T. Beckley being an employee of the Dealership." (*Id.* ¶ 2.) During the period when Ms. Beckley "work[ed] at the Dealership," but was not an "employee," Ms. Beckley held meetings, advised her husband on which employees to terminate, "[p]urchased items for PAH (and personal items for herself and J. Beckley) using the Credit Card issued to J. Beckley," and filled out documentation related to vehicle purchase transactions. (*Id.* ¶ 23.) PAH claims that Beckley gave his wife access to unspecified "confidential and proprietary information" of the Dealership. (*Id.* ¶ 25.)[2]

Mr. Beckley then hired formally his wife as an employee, on around May 29, 2020, but "without the approval or authority of PAH's management." (*Id.* ¶¶ 2, 20, 26.) There is no allegation that PAH's management ever communicated to Mr. Beckley that he did not have approval or authority to hire Ms. Beckley, or that PAH did not know that Ms. Beckley was on the company payroll working at the Dealership. The Counterclaim alleges Mr. Beckley failed to properly complete a hiring checklist and onboarding packet for his wife. (*See id.* ¶¶ 27-30.) Despite its allegation that Ms. Beckley frequently "covered the GM duties for J. Beckley" when he was "habitually absent from work," PAH contends the company management had no idea that she had assumed certain responsibilities of the Dealership. (*See id.* ¶¶ 32, 35.)

The Counterclaim further alleges that "[u]nbeknownst to PAH, T. Beckley and J. Beckley conspired to harm PAH throughout their time at the Dealership." (*Id.* ¶ 33.)

First, the Counterclaim alleges the Beckleys used the company-issued credit card on unapproved personal expenses, which did not qualify as approved business expenses. (*See id.* ¶¶ 40-66.) Having only recently reviewed *its own* credit card statements, PAH alleges they show "a

---

[2] PAH does not, however, assert any claim for violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. § 66-152 *et seq.*, or any other cause of action for misuse of confidential and/or proprietary information.

litany of improper charges," totaling at least $100,000. (*See id.* ¶¶ 48-50.) This purported harm apparently was unnoticed by PAH for some 15 months of Mr. Beckley's employment, as there is no allegation in the Counterclaim that it ever raised these issues with the Beckleys during the period PAH owned the Dealership.[3]

Second, PAH seeks to hold the Beckleys liable for hosting the Dealership's holiday party, which was "decadent," that is, "inappropriate and unauthorized in size and scope." (*Id.* ¶ 68.) According to PAH, the Beckleys' holiday spirit "vastly exceed[ed] the budget for the Dealership's holiday party." (*Id.* ¶ 70.) There is no allegation in the Counterclaim that the Beckleys' benefited personally from the holiday party—just the opposite: Beckley spent too much of PAH's money on employee gifts and an employee raffle. (*Id.* ¶ 71.) PAH does not allege that it disciplined the Beckleys for the holiday party, or even discussed the matter with them. The Counterclaim alleges no facts to explain why PAH continued to employ the Beckleys for 10 months after the holiday party, only to raise this issue for the first time in federal court.

Third, PAH alleges that Beckley "abuse[d] PAH's Demo Vehicle Policy" by allowing "ineligible employees and even non-employees to use Demo vehicles." (*Id.* ¶¶ 73-82.) The Counterclaim admits that its policy allowed "key Dealership personnel," including Mr. Beckley, to drive Demos. (*Id.* ¶¶ 73, 76.) PAH does not allege any personal benefit to the Beckleys from the "abuse of the demo vehicle policy," or any determinable damages to PAH. (*See id.* ¶ 82.)

Fourth, PAH alleges that Beckley, "without permission or authority," sold his Cadillac Escalade to the Dealership for an "inflated price" on around May 16, 2020. (*Id.* ¶ 83.) More than a month later, the Cadillac was "stolen under suspicious circumstances from the Dealership." (*Id.*

---

[3] The Counterclaim reveals that Mr. Beckley reimbursed PAH for a far lesser sum ($5,887.25) that he acknowledged was incorrectly charged to the Credit Card, *after* the sale of the Dealership by PAH to MileOne on October 11, 2020. (*Id.* ¶¶ 51, 239.) "J. Beckley never took action to reimburse PAH for any of the ***other*** charges" (*id.* ¶ 51 (emphasis added)). By implication, Mr. Beckley reimbursed PAH for the $5,887.25 that he admitted was a mistake.

¶¶ 95-99.) The vehicle was one of several cars stolen from the Dealership around this time, including "a BMW, a Honda Pilot, and others." (*Id.* ¶ 103.) The theft of the Cadillac was captured on video, and a police report was filed the next day. (*Id.* ¶ 99.)

PAH was informed of the theft of the Cadillac at the time it occurred. (*Id.*) In the end, the Dealership's insurance company covered the loss for the stolen vehicle. (*Id.* ¶ 100). PAH continued to employ Beckley for nearly five months after the Cadillac was stolen from the Dealership, until the sale of the dealership on October 11, 2020—but now alleges, "upon information and belief," that the Beckleys "conspired to have [the Cadillac] stolen." (*Id.* ¶ 83.)

Fifth, the Counterclaim alleges that Beckley defrauded PAH—at the start of his employment—by paying legal fees to his lawyer in the Keffer Mazda litigation through an inflated trade-in value for a Jeep owned by Beckley's lawyer and a discounted the purchase price for another Jeep. (*Id.* ¶ 15.) PAH argues that Beckley "exploited his position as the GM of the Dealership" (*id.* ¶ 109) and "enriched" himself, at "the expense of and to the detriment of PAH," by paying for the legal fees through the "Jeep Transaction." (*See id.* ¶¶ 110-111.)[4]

The Counterclaim reveals, however, that the attorney's fees incurred by Mr. Beckley benefited PAH. Specifically, the temporary restraining order ("TRO") issued on August 1, 2019 shows that Mr. Beckley's attorney's fees were incurred in defense of a civil action by Keffer Mazda, in which the court found that Beckley had solicited employees of Keffer Mazda to resign their employment "*in order to work with Beckley at his new place of employment*," that is, PAH. ([Doc. 32-1] ¶ 5 (emphasis added).)

---

[4] While the Counterclaim alleges the legal dispute between Beckley and his formal employer, Keffer Mazda, was ongoing "at the time PAH hired J. Beckley," (*id.* ¶ 12), the Counterclaim discloses the lawsuit for breach of contract was not filed by Keffer Mazda until after the start of Beckley's employment, that is, on around July 29, 2019. (*Id.* ¶ 13)

The Counterclaim also discloses that Defendant Matthew Ellmer, on behalf of PAH, discovered and objected to the transactions *before they were consummated*, which resulted in Mr. Beckley reimbursing PAH $5,000 from his personal funds. (*See id.* ¶¶ 135-137.) PAH offers no explanation for why the company continued to employ Beckley for some 14 months after it "discovered and stopped" (*id.* ¶ 137) his alleged "sweetheart self-dealing transaction" (*id.* ¶ 139) only to raise these issues in federal court. The Counterclaim also does not allege why Mr. Beckley's $5,000 payment was not a full and complete satisfaction of PAH's claim for reimbursement.

Sixth, PAH alleges that Beckley "violated company protocol and policies by signing a number of checks to himself" and his wife. (*Id.* ¶ 149.) While alleging that Beckley breached protocol by not providing "required documentation for any reimbursement to be made by the company," (*id.* ¶ 150) the Counterclaim fails to allege the checks were not for the reimbursement of business expenses incurred by Beckley. And, again, PAH offers no explanation for why it continued to employ Beckley for 15 months after he allegedly first breached this company protocol, "three days after his start date." (*Id.* ¶ 152.)

Seventh, PAH alleges that Beckley "abuse[d] PAH's Employee Discount Program," ("EDP") in violation of the detailed formulas and calculations governed by the company's Handbook. (*Id.* ¶¶ 166-171, 191.) The Counterclaim alleges Beckley, "in collusion with other PAH employees, intentionally violated company policies and embezzled from the Company to the benefit of himself, his family, and other employees." (*Id.* ¶ 173)

PAH alleges that no fewer than **<u>forty-six (46)</u>** of PAH's former employees conspired with Beckley to "embezzle[d] from the Company": **(1)** Alexander Fung-A-Ling (*id.* ¶¶ 178-193, 230(ii), 231(ii), 232(ii), 233(ii)); **(2)** Demario Lajuan Hutchings (*id.* ¶ 186); **(3)** Kenneth Rhodes

Larigey IV (*id.* ¶ 194); **(4)** Rick Grey (*id.* ¶¶ 194(ii), 195(ii), 196(ii)); **(5)** Bernard Edward Barksdale (*id.* ¶ 195); **(6)** Jerry Michael Kennedy Sr. (*id.* ¶¶ 196, 212, 214, 228, 235); **(7)** Craig Jordan West (*id.* ¶ 197, 209(ii)); **(8)** Harry Walker Mayhall (*id.* ¶ 198); **(9)** Jessica Nicole West (*id.* ¶199); **(10)** Zay William Billet (*id.* ¶¶ 200, 202); **(11)** Bernard Edward Barksdale (*id.* ¶ 201); **(12)** Jonathan Cuevas (*id.* ¶¶ 201(ii), 202(ii), 203(ii), 204(ii), 205(ii), 209(ii)); **(13)** Daniel William Cooke (*id.* ¶ 203); **(14)** Lester McKoy Jr. (*id.* ¶ 204); **(15)** Marcellus Travis Simpson (*id.* ¶ 205); **(16)** Eric Clinton Crawford (*id.* ¶ 206); **(17)** Bagels Carrasquillo (*id.* ¶¶ 206(ii), 207(ii), 208(ii)); **(18)** Johnathan Omar Lopez (*id.* ¶¶ 207, 208(ii), 232(ii)); **(19)** Michael Andre Gaston (*id.* ¶ 209); **(20)** Timothy Tyrone Rowell (*id.* ¶ 210); **(21)** Nasir Khan (*id.* ¶¶ 210(ii), 211(ii), 212(ii), 214(ii), 215(ii), 216(ii), 217(ii), 219(ii)); **(22)** Jamie Smith Sales (*id.* ¶ 211); **(23)** Rosetta Dana Campbelle (*id.* ¶ 213); **(24)** George William Billett Jr. (*id.* ¶¶ 213(ii), 221, 222(ii), 223(ii), 226(ii)); **(25)** William Matthew Drum (*id.* ¶ 215); **(26)** Clinton Eric Crawford (*id.* ¶ 216); **(27)** Christopher Hart (*id.* ¶ 217); **(28)** Michael Nystrom (*id.* ¶¶ 217(ii), 218(ii), 219(ii)); **(29)** John Austin Davis (*id.* ¶ 218); **(30)** Wallah Richardson Jr. (*id.* ¶ 219); **(31)** Samantha Michelle Lopez (*id.* ¶ 220); **(32)** Emmanuel Fer Alsina-Perez (*id.* ¶ 222); **(33)** Eric Matthew Durand (*id.* ¶ 223); **(34)** Christopher Kyle Galdron (*id.* ¶ 224); **(35)** Mckenney Salinas (*id.* ¶ 225): **(36)** Tyler Love (*id.* ¶ 226); **(37)** Charles Johnson (*id.* ¶¶ 226(ii), 227(ii), 230(ii), 231(ii)); **(38)** Ashutosh M. Paregi (*id.* ¶ 227); **(39)** Stephen Williams Jr. (*id.* ¶¶ 227(ii), 229(ii)); **(40)** Delwin Deshawn Comer (*id.* ¶¶ 229); **(41)** Vicky Ann Broadway (*id.* ¶ 230), **(42)** John Darmon Sackey (*id.* ¶ 231); **(43)** Graig Wynn Perry (*id.* ¶ 232); **(44)** Demario Lajuan Hutchings (*id.* ¶¶ 233, 237(ii)); **(45)** Stephen John Pecha (*id.* ¶¶ 234, 235(ii), 236, 237(ii)), and **(46)** Lester McKoy (*id.* ¶ 237).

PAH alleges the Beckleys embezzled from the Dealership participated by: (a) selling car parts to employees *at cost*, that is, without adding the 25% "premium" (*id.* ¶ 179) or "margin"

(*id.* ¶ 180(ii)), which PAH charges even its own employees (*id.* ¶ 174); (b) not passing along the cost of all repair orders on the vehicles to employees (see, for example, *id.* ¶ 199(iii) (complaining about a $282.00 repair order); (c) selling vehicles for less than the EDP formula provided (see, for example, *id.* ¶ 202(ii), complaining about the sale of a vehicle for a price of $1,002, when the cost to the Dealership was $1,001, and the EDP ostensibly called for the sales price to be $1,101, *see id.* ¶ 169(i)); and (d) extending the EDP to employees' friends and extended family members (*id.* ¶ 175), who apparently were not "their _immediate_ family members, eligible for the EDP" (*id.* ¶ 171 (emphasis added)).

The only alleged benefit to the Beckleys from these overly generous employees discounts involves a wide-ranging conspiracy: Mr. Beckley used the EDP to garner favor with a plethora of "bad-actor employees," who "helped J. Beckley conceal his bad actions during his tenure with PAH." (*Id.* ¶ 177.)

The Counterclaim does not allege any acts taken by Mr. Beckley to conceal the transactions. The Counterclaim does not allege what policies and procedures it implements for monitoring the EDP, including the role, if any, of the Dealership's comptroller, Diane Ullmer. The Counterclaim admits PAH's knew that Mr. Beckley allegedly was overly generous in his administration of the EDP, in violation of the company Handbook, while he was still employed by PAH. (*See id.* ¶ 185(i)-(ii).) Nonetheless, PAH continued to employ Mr. Beckley and apparently never counseled or disciplined him in any way related to the EDP before filing its Counterclaim. The Counterclaim includes no allegation that PAH ever counseled or disciplined the Beckleys (or the 46 other "bad-actor employees") of their alleged abuse of the EDP, in violation of the company Handbook, or for any other reason.

For reasons that remain completely unexplained, PAH did not discover or even know that it had allegedly been harm by the Beckleys—to the tune of "far in excess of $200,000"—until after PAH sold the Dealership on around October 11, 2020 (*id.* ¶¶ 5, 17, 34), or else "through the process of selling the Dealership" (*id.* ¶ 243). PAH conducted "an investigation" only after the sale of the Dealership to MileOne, on around October 11, 2020. (*Id.* ¶ 5.) It appears from the face of the Counterclaim that PAH's discovery of "smoking guns" was based on nothing more than a review of the records kept in the normal course of its business. (*See id.* ¶ 5) The full extent of the Beckleys' wrongdoing was discovered upon a review of "credit card statements, receipts, bank records, check images, accounting records, work and personal emails, text messages, and other documents and information." (*Id.*) There is no allegation that any of these documents were unavailable to PAH during Mr. Beckleys' employment. Now, after having reviewed its own records for the first time, PAH purports to identify its loss, including lost profit, *down to the penny*. (*See id.* ¶ 238.)

Apparently, it was not until after PAH sold the Dealership that the company leadership communicated with any of its employees at the Dealership about Beckley and his job performance. (*See id.* ¶¶ 34-38.)

## LEGAL STANDARD

The standard of review for a motion to dismiss under Rule 12(b)(6) for failure to state a claim is well known. Fed. R. Civ. P. 12(b)(6). "A motion to dismiss under Rule 12(b)(6) 'challenges the legal sufficiency of a complaint,' including whether it meets the pleading standard of Rule 8(a)(2)." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009)). A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive ONLY if it contains enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). Facial plausibility means allegations that allow the court to draw the reasonable inference that defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

**ARGUMENT**

**I.     North Carolina law applies to the Counterclaim because all acts giving rise to alleged liability occurred in North Carolina.**

Mr. Beckley was the general manager of Priority Automotive Huntersville, Inc.'s only auto dealership: as the party's name suggests, the Priority Automotive dealership was located in Huntersville, North Carolina (the "Dealership"). All the bad acts alleged in the Counterclaim took place in North Carolina. The Counterclaim does not allege that either of the Beckleys performed any tortious conduct in the state of Virginia.

In prior briefing before this Court, PAH effectively conceded that North Carolina law governed Mr. Beckley's claims for fraudulent inducement ([Doc. 5, pp. 21-23; Doc. 7, pp. 12-14), negligent misrepresentation ([Doc. 5, pp. 23-24]; Doc. 7 pp. 14-15), and unpaid wages ([Doc. 5, pp. 14-18; Doc. 7, pp. 6-9]). Nonetheless, PAH insists that Virginia law governs all of the causes of action in its Counterclaim (*see* Counterclaim [Doc. 32], ¶¶ 251, 270, 280, 290, 298, 316, 327, 338, 356), with the exception of a claim brought under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") (*see id.* ¶¶ 347-54).

PAH's ambitious argument for the application of Virginia law to the Counterclaim follows a pattern. Having lost in its efforts to dismiss this action for lack of personal jurisdiction ([Doc. 5, p. 10-14) and to transfer venue to Virginia ([Doc. 5 pp. 24-25]; [Doc. 7, p. 2 fn. 1]), PAH has repackaged its arguments related to jurisdiction and venue to now contend that Virginia law applies to its Counterclaim under choice-of-law principles.

9

North Carolina's choice-of-law test dictates that "the law of the situs of the claim," that is, the law of the State "where the last act occurred giving rise to injury" governs a tort action. *Harco Nat'l Ins. Co. v. Grant Thornton LLP*, 698 S.E.2d 719, 724 (N.C. Ct. App. 2010 (quoting *United Va. Bank v. Air-Lift Assocs., Inc.*, 339 S.E.2d 90, 94 (N.C. Ct. App. 1986)); *see also Charnock v. Taylor*, 26 S.E.2d 911, 913 (N.C. 1943) ("The law of the place of wrong determines whether a person has sustained a legal injury." (citation omitted)); *Tatham v. Hoke,* 469 F.Supp. 914, 916 (W.D.N.C.1979) (citing *Charnock* and applying the "forum in which the acts giving rise to the claim occurred" to tort claims), *aff'd,* 622 F.2d 587 (4th Cir.1980). When all of defendant's alleged actions took place in one state, that state is where the last act occurred giving rise to injury, as a matter of law. *See RoundPoint Mortg. Co. v. Florez*, No. 13-CVS-8803, 2016 WL 687629, at *22 (N.C. Bus. Ct. Feb. 18, 2016 (citing *Harco* to apply Nevada law when there was no issue of material fact that defendants "did not undertake any actions outside of Nevada that were related to [plaintiff's] claims") [Doc. 42-1].

PAH does not allege the Beckleys took <u>any</u> action outside of North Carolina related in any way to the Counterclaim. <u>All</u> the alleged acts occurred in North Carolina: PAH alleges the Beckleys used a company-issued credit card for personal expenses at retailers in Charlotte, North Carolina (*see* Counterclaim ¶¶ 40-66; [Doc. 32-5] (map of realtors)); hosted a "decadent" holiday party at a bowling alley near the Dealership in North Carolina (*see id.* ¶¶ 67-72); provided Demo vehicles from the Dealership in North Carolina to ineligible persons (*see id.* ¶¶ 73-82); conspired to steal a vehicle from the lot of the Dealership in North Carolina (*see id.* ¶¶ 83-105); purchased a vehicle at a discount for Mr. Beckley's attorney, as delivered to him in

North Carolina (¶¶ 106-147);[5] wrote checks delivered to Mr. Beckley in North Carolina while he worked at the Dealership (*see id.* ¶¶ 148-165); and "embezzled" funds by authorizing overly generous discounts to PAH's employees, who worked at the Dealership in North Carolina, for the sale of vehicles from the Dealership in North Carolina (*see id.* ¶¶ 166-238). The Counterclaim's causes of action for conversion and unjust enrichment also appear to claim Mr. Beckley "embezzled" from PAH by hiring "his wife to effectively assume his duties as general manager of the Dealership," again, in North Carolina. (*See id.* ¶¶ 321; 360.)

The word "Virginia" does not appear <u>once</u> in the Counterclaim, other than to note that PAH was domiciled in Virginia (Counterclaim ¶ 1), and when discussing caselaw in the legal section (*see, e.g.*, ¶¶ 6, 251).

PAH cannot argue that Virginia law applies merely because PAH is domiciled in Virginia. Courts applying North Carolina choice-of-law principles have rejected the application of any bright-line rule that a corporate plaintiff suffers injury at its principal place of business, dismissing arguments that the principal place of business is where the injury occurs "because plaintiff felt the economic impact of its damages there." *Harco Nat. Ins. Co. v. Grant Thornton LLP*, 698 S.E.2d 719, 725-26 (N.C. Ct. App. 2010). A corporate entity's principal place of business is useful for determining the place of a plaintiff's injury <u>only</u> in "rare cases where, even after a rigorous analysis, the place of injury is difficult or impossible to discern." *Id.* at 726. The location of a plaintiff's principal place of business otherwise is immaterial in "a significant number of cases [ ] where a plaintiff has clearly suffered its pecuniary loss in a particular state." *Id.*

---

[5] The "Non-Street Legal Jeep" was purchased from Gallatin, Tennessee and transported to the Dealership in North Carolina. (Counterclaim ¶ 121)

In this case, like many others, it is not difficult to ascertain the place where PAH allegedly suffered loss: at its Dealership in North Carolina.

PAH makes a creative—but ultimately, unavailing—argument that Virginia law applies to its Counterclaim, not only because its principal place of business is in Virginia,[6] but because its *bank accounts* are in Virginia. (*See* Counterclaim ¶ 251.)

The Counterclaim cites to *Harco* for the proposition that PAH suffered pecuniary loss in Virginia, where its bank accounts are held—and therefore, that, Virginia law should apply. (*See id.*) *Harco* is easily distinguishable: the plaintiff was a corporation in the business of insuring bail bonds, including in North Carolina. *See id.* at 721. The court found that the "last act" giving rise to plaintiff's injury occurred when "the North Carolina Department of Insurance seized more than $900,000 from plaintiff's North Carolina trust account located at Wachovia Bank in North Carolina in order to satisfy outstanding bond obligations." *See id.* The court found that plaintiff's cause of action accrued when "plaintiff involuntarily parted with tangible property located in North Carolina." *Id.* at 726.[7] PAH can point to no facts in this matter analogous to the involuntary "seiz[ure]" of "tangible property" in *Harco*.

In *United Dominion Industries, Inc. v. Overhead Door Corporation*, 762 F. Supp. 126 (W.D.N.C. 1991), this Court roundly rejected the argument that the location of plaintiff's

---

[6] While PAH was domiciled in Virginia (Counterclaim ¶ 1), the corporation's sole place of business was the Dealership in Huntersville, North Carolina. Public records maintained by the North Carolina Secretary of State, which are properly subject to judicial notice, *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009), show that PAH incorporated in Virginia on June 16, 2019 and, within one week, applied for a certificate of authority in North Carolina. ([Doc. 42-2].) Within months after the sale of the dealership in Huntersville on October 11, 2020 (Counterclaim ¶ 1), PAH submitted a destruction filing to the North Carolina Secretary of State. ([Doc. 42-3.) The Counterclaim does not allege any ongoing business of PAH, separate and apart from this litigation.

[7] The other case cited by PAH for application of Virginia law is an unpublished federal district court case, which has no precedential value with regards to North Carolina law. *See M.D. Russell Construction, Inc. v. Consolidated Staffing, Inc.*, 19-CV-221, 2022 WL 875993 (E.D.N.C. March 23, 2022) (cited at Counterclaim, ¶ 252) (enclosed herewith as [Doc. 42-4]).

"pocketbook" in North Carolina was where the plaintiff suffered the damage—and therefore determinative of choice of law. *See id.* at 129-30. The plaintiff, a North Carolina corporation, argued that North Carolina law should apply to a dispute over an asset purchase agreement because its "pocketbook" was located at its principal place of business. *See id.* Plaintiff asserted a violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), based on misrepresentations made by defendant in connection with the sale of a corporate division. *See id.*

The court applied Texas law because that is where the transaction closed, that is, the state in which "defendants conveyed the assets and plaintiff delivered its money." *Id.* at 131. In rejecting the application of North Carolina law, this Court reasoned that adopting plaintiff's position "would allow a corporation to conduct an entire transaction in a foreign jurisdiction and urge the law of the corporation's state of residency in subsequent litigation." *See id.* at 130. ("Indeed, since plaintiff is a subsidiary of a Canadian corporation, by this rationale the ultimate injury may have occurred in Canada.") The Supreme Court of North Carolina has since cited *United Dominion* approvingly and reached a result consistent with its holding. *See SciGrip, Inc. v. Osae*, 838 S.E.2d 334, 345-46 (N.C. 2020) (applying the law of the state in which the last act necessary to support a claim of misappropriation of trade secrets occurred).

PAH's argument for Virginia law premised on the location of its bank account is an attempted end-run around the principle that its principal place of business is irrelevant for choice-of-law purposes. *See Harco*, 698 S.E.2d at 725-26. Application of Virginia law to PAH's Counterclaim would achieve what this Court prohibited in *United Dominion*: PAH conducted an entire transaction, or series of transactions over 15 months, in North Carolina, but now urges the law of the corporation's state of residency (or bank account) in subsequent litigation. *See United*

*Dominion*, 762 F. Supp. at 130. Allowing this impermissible renunciation of North Carolina law could lead to perverse incentives, with corporate plaintiffs effectively taking advantage of an unrelated state's favorable law simply by incorporating, or merely setting up a bank account, in that unrelated jurisdiction. It also would deprive North Carolina residents the clarity, certainty, and consistency in choice of law. *See, e.g.*, *Boudreau v. Baughman*, 386 S.E.2d 849, 854-58 (N.C. 1988) (articulating public policy of North Carolina).

Lastly, the internal affairs doctrine clearly does not call for application of Virginia law to the breach of fiduciary claims, as PAH maintains. (*See* Counterclaim ¶ 253). There is no allegation that either of the Beckleys was an officer, director, or shareholder of PAH, so the internal affair doctrine (and Virginia law) does not apply to PAH's claims for breach of fiduciary duty. *See, e.g.*, *Islet Scis., Inc. v. Brigthaven Ventures, LLC*, No. 15-CVS-16388, 2017 WL 129944, at *3 (N.C. Bus. Ct. Jan. 12, 2017) ("Mr. Kaplan is neither an officer, director, nor shareholder of RVG. Therefore, this claim does not invoke the internal affairs doctrine and Nevada law is inapplicable." (citation omitted)) [Doc. 42-5].

II.     **PAH's claims for breach of fiduciary duty fail as a matter of law because North Carolina law does not apply fiduciary duties to the relationship of employer and employee.**

A fiduciary duty, under North Carolina law, requires confidence reposed on one side, and resulting superiority and influence on the other. *See, e.g.*, *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999). The party with the duty must "figuratively hold all the cards—all the financial power or technical information for example." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 659 S.E.2d 442, 451 (N.C. Ct. App. 2008) (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998)).

It is well-established under North Carolina law that the relationship of employer and employee is not one of those that gives rise to fiduciary obligations. *See Dalton v. Camp*, 548

S.E. 2d 704, 707-08 (N.C. 2001); *King v. Atlantic Coast Line R.R. Co.*, 72 S.E. 801 (N.C. 1911); *Hiatt v. Burlington Indus., Inc.*, 286 S.E.2d 566, 569 (N.C. Ct. App. 1982). Under the general rule, "The relation of employer and employee is not one of those regarded as confidential." *See King*, 72 S.E. at 808; *see also Hiatt v. Burlington Indus., Inc.*, 286 S.E.2d 566, 569 (N.C. Ct. App. 1982). Courts in North Carolina will not impute a fiduciary duty to an employee—even when the employer has place confidence in the employee as a manager of the company—because there is not the necessary "resulting domination and influence" held by *the employee*. *See Dalton*, 548 S.E.2d at 707-08.

In *Dalton* the Supreme Court of North Carolina expressly rejected a federal court's prediction, in *Food Lion v. Capital Cities/ABC, Inc.*, 951 F. Supp. 1224 (M.D.N.C. 1996), that North Carolina courts would recognize a claim by an employer against an employee for breach of duty of loyalty. *See* 548 S.E.2d at 709 ("[T]he federal court incorrectly interpreted our state case law.") An employee's failure to serve his employer faithfully and discharge his duties with reasonable diligence, care, and attention—while not giving rise to liability for breach of fiduciary duty—serves instead as a defense to an employer in a wrongful termination action. *See id.* at 708.

Accordingly, Counts 1 through 4 of the Counterclaim for breach of fiduciary duty should be dismissed for failing to state a claim under North Carolina law. Counts 3 and 4 should be dismissed for the additional reason that North Carolina law does not recognize a cause of action for "aiding and abetting" a breach of fiduciary duty. *See Bottom v. Bailey*, 767 S.E.2d 883, 889 (N.C. Ct. App. 2014).

III. **PAH's claims for "fraud" fail as a matter of law for several independent reasons.**

To state a claim for fraud, PAH sufficiently must allege: (a) a false representation or concealment of a material fact; (b) that was reasonably calculated to deceive; (c) that was made

15

with intent to deceive; (d) that did in fact deceive (*i.e.*, that was relied upon by the recipient of the misrepresentation); and (e) that resulted in damage to the injured party. *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648 (N.C. 1992). In addition to the general pleading requirements, Rule 9(b) requires that in all averments of fraud, "the circumstances constituting fraud . . . shall be stated with particularity." N.C.G.S. § 1A-1, Rule 9(b).

### a. PAH does not allege facts sufficient to give rise to a duty to disclose (i.e., fraud by concealment).

PAH attempts to allege a claim for fraud by concealment against the Beckleys. (*See* Counterclaim ¶ 307.) In the context of claims for fraud, North Carolina finds a "duty to disclose" only in one of three circumstances:

> (1) "a fiduciary relationship exists between the parties to the transaction";
>
> (2) there is no fiduciary relationship and "a party has taken affirmative steps to conceal material facts from the other"; and
>
> (3) there is no fiduciary relationship and "one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence."

*Hardin v. KCS Int'l, Inc.*, 682 S.E.2d 726, 733 (N.C. Ct. App. 2009) (quoting *Sidden v. Mailman*, 529 S.E.2d 266, 770-71 (N.C. Ct. App. 2000).

For the reasons stated above, the Beckleys did not owe any fiduciary duty to PAH (item 1), and there is no "subject matter" of a negotiation, or any alleged "latent defect" in the same (item 3). PAH's claim for fraud by concealment survives, therefore, only if PAH has sufficiently alleged the Beckleys took "affirmative steps to conceal material facts" from PAH.

While the Counterclaim alleges, in boilerplate fashion, that Beckley "took affirmative actions to conceal" his "routin[e] abuse" of the Credit Card for his personal benefit (¶ 45), the Counterclaim does not, in fact, allege any "affirmative actions" taken by Beckley that would

conceal his alleged misuse of the Credit Card. The most the Counterclaim alleges is that Beckley *failed* to act—that is, he did not provide purchase receipts to PAH's comptroller, or else some other unspecified person. (¶¶ 47, 64, 307) The *failure* to produce receipts is not an "affirmative step" that establishes a duty to disclose.

PAH attempts to allege an affirmative step by alleging that Mr. Beckley moved PAH's comptroller to a different building, from the one where Mr. Beckley worked, to conceal his abuse of the Credit Card. (*See id.* ¶ 307) While alleging that PAH's comptroller, Diane Ullmer, played a role in enforcing PAH's policies for approved use of the Credit Card (¶ 44), PAH makes no effort to explain how moving Ms. Ullmer's office to a different building concealed any material facts from PAH. By its own admission, PAH discovered Mr. Beckley's charges on the Credit Card by *reviewing the credit card statements* and other documents. (*See id.* ¶¶ 4-5) There is no allegation that these documents were *unavailable* to PAH, at any time. The Counterclaim discloses that PAH *reviewed* the documents only after the sale of the Dealership. (*See id.*; *see also id.* ¶¶ 49, 55-59, [Docs. 32-3 to 32-8]). The Counterclaim does not allege any facts to connect the relocation of the Comptroller's office to PAH's access to credit card statements, or any of the information revealed by its belated "investigation" in the Beckleys' allegedly fraudulent conduct. (¶ 52)

Lastly, PAH alleges the Beckleys concealed material facts of fraud by "incentivizing other bad actor employees and instilling loyalty in them through J. Beckley's abuse of the EDP to create personal gain to J. Beckley's favored employees." (Counterclaim ¶ 307.) PAH alleges the "bad actor employees" included some **forty-six (46)** of PAH's former employees, who were "co-conspirators" in the Beckleys' alleged scheme to defraud PAH out of profits from the sale of vehicles to employees. (*See* Counterclaim ¶¶178-237) PAH fails to allege that any of the "bad

actor employees" lied to PAH when confronted about the EDP, or that Mr. Beckley's "abuse of the EDP," in fact, concealed anything to PAH: the details of sales to employees under the EDP are alleged, in excruciating detail, in the Counterclaim (*see id.*)—apparently based on nothing more than a review of the company's *own records*.

For these reasons, PAH's Counterclaim based on concealment must fails as a matter of law.

### b. PAH does not allege any particular misrepresentation of then-existing fact or present intent.

"To support a claim for fraud, a false representation must relate to a past or existing fact." *Potts v. KEL, LLC*, 16-CVS-2877, 2018 WL 1597644, at *8 (N.C. Bus. Ct. Mar. 27, 2018) (citation omitted) [Doc. 42-6]. "Statements of opinion, predictions of future events, and promises of future intent generally do not give rise to an action for fraud." *Id.* The alleged misrepresentations also must be "more than mere puffing, guesses, or assertions of opinions but actual representations of material facts." *Value Health*, 18-CVS-12318, 2020 WL 2616400, at *6 (N.C. Bus. Ct. May 22, 2022) (citation omitted).

Federal Rule of Civil Procedure 9(b) mandates a heightened standard for pleading a claim for fraud. *Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*, 117 F.Supp.3d 722, 725 (M.D.N.C. 2015). Rule 9(b) requires, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, the plaintiff must, at a minimum, describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby," otherwise known as the "who, what, when, where, and how" of the alleged fraud. *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quotation marks omitted).

The Counterclaim does not come close to meeting this heightened pleading standard. PAH alleges <u>one</u> affirmative misrepresentation: "Throughout his employment with PAH, J. Beckley represented to PAH that he would fulfill his employment duties, operate the Dealership in accordance with policies, and only use PAH Credit Cards for proper PAH business expenses." (Counterclaim ¶ 304.) The is the *only* alleged misrepresentation made by either of the Beckleys to PAH, in support of the cause of action for fraud. The Counterclaim does not include <u>any</u> allegations that Ms. Beckley misrepresented anything to PAH, ever.

The only alleged misrepresentation by Mr. Beckley—that he "would" perform his employment duties and follow company policies—is not a past or existing fact. It is a prediction of future events, or a promise of future intent, that is not actionable fraud.

In stark contrast to the fraud particularly alleged in the Complaint (*see* [Doc. 31, p. 19]), the Counterclaim does not identify the time of this alleged misrepresentation: only that it occurred "throughout" Mr. Beckley's employment with PAH, a period spanning some 15 months. The Counterclaim also does not identify the place of this alleged misrepresentations, or to whom it was made.

The allegations in the Counterclaim, if true, may present cause for terminating Beckley's employment. Cloaked in terms of "fraud" and "breach of fiduciary duty," the bulk of the allegations in the Counterclaim reflect nothing more than a repackaging of PAH's allegation that Beckley demonstrated "poor leadership and work performance" (*see* Counterclaim ¶ 37) and failed to implement the company's Handbook policies (*see id.* ¶¶ 27-30, 32, 35, 47, 67-72, 149, 166).

In effect, PAH attempts to predicate a claim for *fraud* on Mr. Beckley's vague (alleged) broken promise to follow company policy. This allegation not only fails to constitute actionable

fraud, it also does not even support a claim for breach of contract. It is clearly established in North Carolina that "unilaterally promulgated employment manuals or policies do not become part of [an] employment contract unless expressly included in it." *Walker v. Westinghouse Elec. Corp.*, 335 S.E.2d 79, 83-84 (N.C. Ct. App. 1985). This legal principle is most often observed in dismissing cases brought by *employees* against *employers* for wrongful termination, based on the theory that an employment manual forms the basis for a breach-of-contract claim. *See, e.g.*, *Guarascio v. New Hanover Health Network, Inc.*, 592 S.E. 2d 612 (N.C. Ct. App. 2004) (breach of contract claim could not be based upon violation of personnel manual); *Johnson v. Mayo Yarns, Inc.*, 484 S.E.2d 840 (N.C. Ct. App. 1997) (same); *Rosby v. General Baptist State Convention, Inc.*, 307 S.E.2d 605 (N.C. Ct. App. 1988) (denying breach of contract based on employment manual that was presented as plaintiff's "work bible" because manual not incorporated into any contract of employment). It is comparatively unusual to see an employer attempt to sue an employee for violating provisions of an employee manual—likely because the employer has the remedy of terminating the employee at-will under North Carolina law.

Mr. Beckley's alleged violation of the company Handbook is not actionable fraud, and PAH fails to plead any actionable misrepresentations made by either of the Beckleys.

### c. PAH does not allege *any* reliance on a misrepresentation or concealment of fact by the Beckleys.

Finally, "when the party relying on [a] false or misleading representation could have discovered the truth upon inquiry, the complaint must allege [the plaintiff] was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346 (1999); *see also Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 341 (4th Cir. 1998) ("[I]f a

plaintiff had an alternative source for the information that is alleged to have been concealed from or misrepresented to him, his ignorance or reliance on any misinformation is not reasonable.").

The Counterclaim is devoid of any allegations of detrimental reliance by PAH, let alone *reasonable* reliance. And for good reason: the Counterclaim discloses that all the "fraudulent" credit card charges were disclosed to PAH on monthly account statements and otherwise. (See, e.g., Counterclaim ¶¶ 49, 55-59, [Docs. 32-3 to 32-8].) By PAH's *own admission*, it uncovered all the fraudulent credit card charges by reviewing account statements (Counterclaim ¶ 48), but not until after PAH sold the dealership (*id.* ¶¶ 4-5). Clearly, PAH was able to discover the facts of the alleged fraud with a modicum of due diligence.

And to the extent PAH claims damages from "fraud" around the Beckleys' administration of the EDP (*id.* ¶ 311) or for the stolen Escalade (*id.* ¶ 312), there is no alleged reliance or logical link between these "damages" and any misrepresentation by the Beckleys. PAH's claims for fraud fail because they cannot allege any reliance on a misrepresentation and, even if there was reliance, it was unreasonable as a matter of law.

**IV. The Counterclaim fails to allege a plausible claim for conversion.**

The Supreme Court of North Carolina has "long" defined conversion as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 190 (4th Cir. 2007) (citation omitted)

To avoid dismissal under Rule 12(b)(6), a counterclaim plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). While the Rule 8(a) pleading standard does not require "detailed factual allegations," it does demand more than an "unadorned accusation." *Id.* at 555. A complaint does not suffice if it tenders only "naked assertion[s]" devoid of further factual

enhancement. *Id.* at 557. A claimant must "nudge . . . their claims across the line from conceivable to plausible." *Id.* at 570.

Here, PAH alleges the Beckleys conspired with 46 other "bad actor employees" to convert company funds, as part of an alleged "conspiracy" of "abuse" of the EDP. Here again, PAH attempts to predicate a claim for conversion—also referred to throughout the Counterclaim by PAH as "embezzlement"—on an alleged breach of the detailed provisions in the company Handbook for calculating employee discounts. (*See* Counterclaim ¶¶ 166-171, 191.) It is simply implausible the Beckleys and 46 other employees of PAH would conspire in such a devious way. PAH's attempt to turn a garden-variety dispute over the minutiae of an EDP into a multi-party action in federal court for "embezzlement" is audacious and without known parallel. If this cause of action is allowed to proceed, the Beckleys would have potential crossclaims against each of the 46 other "bad actor employees." Far more likely than some elaborate conspiracy to embezzle from PAH is that the company did not properly implement or monitor the terms of its EDP.[8]

Similarly implausible is PAH's allegation, made solely on "information and belief," that the Beckleys sold their own vehicle to the Dealership and then, more than a month later, conspired to steal the vehicle back. (*See* Counterclaim ¶ 323) PAH cannot possibly believe this allegation to be true, as PAH continued to employ the Beckleys—*thieves*, according to PAH— for some almost five additional months, before the sale of the Dealership. PAH offers no explanation for why it did not terminate the Beckleys' employment if the company earnestly believed the Beckleys *conspired to steal a vehicle* from the dealership. The Counterclaim alleges

---

[8] As with most all the allegations in the Counterclaim, there is no evidence that PAH ever took any self-help measure before raising these issues with the Court. Nor is there any allegation that the company could not have discovered alleged "abuses" of the administration of its EDP if it had bothered to look into the matter earlier.

no new facts that were unknown to PAH during Beckley's employment that would justify a different position now, with regards to the stolen Cadillac.

**V.  PAH fails to allege a violation of the NCUDTPA because this matter is not "in or affecting commerce."**

The NCUDTPA provides, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75–1.1(a) (1999). In short, the statute is intended to apply to "(1) interactions between businesses, and (2) interactions between businesses and consumers." *White v. Thompson*, 691 S.E.2d 676, 679 (N.C. 2010). In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. *Dalton*, 548 S.E. at 711.

Employer-employee transactions are not subject to the NCUDTPA because they are not "in or affecting commerce." *See, e.g.*, *White v. Thompson*, 691 S.E.2d 676, 679-80 (N.C. 2010) (finding NCUDTPA was intended to address unfair or deceptive conduct in interactions between different market participants, not to regulate purely internal business operations); *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483 (N.C. 1991) (UDTPA "does not cover employer-employee relations") (citing *Buie v. Deniel Int'l Corp*, 289 S.E.2d 118, 119-20 (N.C. Ct. App. 1982) ("Employment practices fall within the purview of other statutes adopted for that express purpose")); *Kinesis Adver, Inc. v. Hill*, 652 S.E.2d 284, 298 (N.C. Ct. App. 2007) ("We have consistently held that the employer/employee relationship does not fall within the intended scope and purpose of the [UDTPA]"). *But see Dalton v. Camp*, 548 S.E.2d 704, 710 (N.C. 2001) ("[T]he mere existence of an employer-employee relationship does not in and of itself exclude a party from pursuing an unfair trade or practice claim," as exceptions exist for "egregious

activities outside the scope" of employment duties). As the Fourth Circuit has explained, the Supreme Court of North Carolina has allowed NCUDTPA claims in employer-employee disputes only when the claims brought by employers against employees otherwise "fall squarely within the UDTPA's intended reach." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 190-91 (4th Cir. 2007) (citing *Sara Lee Corp. v. Carter*, 519 S.E.2d 308, 311-12 (N.C. 1999) ("authorizing UDTPA claim based on self-dealing against purchasing agent who sold computer parts and services to employer at inflated prices").

Here, PAH alleges no facts that any transaction at issue was "in or affecting commerce" or that otherwise would justify deviating from the rule that employer-employee transactions are not covered by the UDTPA. Accordingly, PAH's claim for violation of the NCUDTPA (count 9) should be dismissed for failure to state a claim.

**VI.    The Counterclaim's remaining causes of action all fail as a matter of law.**

PAH's cause of action for "civil conspiracy" (Count 7) fails because each of the underlying causes of action on which it is premised fail for the reasons stated above. PAH's cause of action for violation of a Virginia statute related to business conspiracy (Count 8) should be dismissed because North Carolina law applies, for the reasons discussed *infra* Section 1.

Lastly, PAH's claim for unjust enrichment (count 10) fails to state a cause of action under North Carolina law, as the allegations are implausible for the same reasons as stated above. To the extent PAH seeks the return of wages and benefits paid to the Beckleys for services performed (*see* Counterclaim ¶¶ 362-365), the Counterclaim fails to state a cause of action. The wages and benefits paid to the Beckleys were part of an agreement between the parties (*see, e.g.* [Doc. 32-6]), and the law does not imply an equitable cause of action in the existence of an agreement between the parties. *See Krawiec v. Manly*, 811 S.E.2d 542, 551-52 (N.C. 2018). The undersigned has searched Westlaw for "unjust enrichment" and "employee" and was unable to

find any responsive cases in which an employer successfully sued an employee for a return of the employee's wages under a theory of unjust enrichment. At all relevant times, there was an adequate remedy to PAH if the company believed the Beckleys were failing to discharge their duties: PAH could have terminated their employment. PAH never did.

## CONCLUSION

This Court should decline PAH's invitation to transform "garden-variety employment issues" into actionable torts in federal court. *Cf Stephenson v. Carolina Physicians Network Inc.*, No. 3:21-cv-103, 2021 WL 4558198 at *4 (W.D.N.C. Oct. 5, 2021) (dismissing plaintiff's tort claims premised on workplace disagreements, internal investigations, and disciplinary actions) [Doc. 42-7]. PAH never terminated or even disciplined either of the Beckleys, at any time during their 15 months of employment. PAH never even communicated many of their complaints, prior to filing 10 separate causes of action in federal court.

The Beckleys request this Court dismiss PAH's overly ambitious Counterclaim, in full.


Respectfully submitted,

This, the 18th day of July, 2022.

**/s/ Eric Spengler**
Eric Spengler (N.C. State Bar No. 47165)
SPENGLER & AGANS, PLLC
352 N. Caswell Road
Charlotte, NC 28204
eric@sab.law
(704) 910-5469 (phone)
(704) 730-7861 (fax)