**RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)**

2016 NCBC 17

2016 WL 687629

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of North Carolina,
Mecklenburg County,
Business Court.

ROUNDPOINT MORTGAGE COMPANY, Plaintiff,
v.
German FLOREZ; Erica Price; Deanna Collins;
Cardinal Financial Company, Limited Partnership;
Julia Beckelman; and Maria Harrison, Defendants.

No. 13 CVS 8803.
|
Feb. 18, 2016.

{1} THIS MATTER is before the Court on the following motions: (1) Motion for Summary Judgment by Defendants Deanna Collins, Julia Beckelman, and Maria Harrison; (2) Defendant Cardinal Financial Company, Limited Partnership's Motion for Summary Judgment; (3) Motion for Summary Judgment by Defendants Florez and Price (collectively, "Defendants' Motions"); and (4) Plaintiff's Motion for Partial Summary Judgment ("RMC Motion").

**Attorneys and Law Firms**

Robinson, Bradshaw & Hinson, P.A. by Charles E. Johnson, R. Steven DeGeorge, and Brian L. Church, for Plaintiff RoundPoint Mortgage Company.

Parry & Tyndall, PLLC by K. Alan Parry, for Defendants German Florez and Erica Price.

Jerry Meek, PLLC by Gerald F. Meek, for Defendants Deanna Collins, Julia Beckelman, and Maria Harrison.

Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Susan H. Hargrove, Francisco J. Benzoni, and Lauren H. Bradley, for Defendant Cardinal Financial Company, Limited Partnership.

## ORDER & OPINION

GALE, Chief Judge.

## I. INTRODUCTION

 **\*1** {2} RoundPoint Mortgage Company ("RMC") brings claims against several of its former officers and employees who are alleged to have, at various times, taken RMC documents, recruited RMC employees, and otherwise taken improper action to start a competing company: Sebonic Financial ("Sebonic"), a division of Cardinal Financial Company, Limited Partnership ("Cardinal"). [1]

{3} German Florez ("Florez"), RMC's former president and director, started RMC's direct-to-consumer mortgage-lending business in Henderson, Nevada, after successfully starting and running a similar business called Meridias Capital ("Meridias"). In early 2013, Florez elected to leave RMC to start a similar venture for Cardinal. RMC's allegations against Florez include acts occurring both during and after Florez's time as RMC's employee, officer, and director. Florez is married to Erica Price ("Price"), who was also formerly employed by RMC and is now employed by Cardinal. Price held an executive title but was neither an RMC officer nor director.

{4} Three other RMC employees—Deanna Collins ("Collins"), Julia Beckelman ("Beckelman"), and Maria Harrison ("Harrison") (collectively, "CBH Defendants")— were acquainted with either Florez or Price from their time together at Meridias and from working together at RMC. They each left RMC to join Cardinal.

{5} Florez, Price, and the CBH Defendants are collectively referred to as the "Individual Defendants."

{6} RMC claims that Florez and Price directed a course of conduct, with assistance from the CBH Defendants, by which they unlawfully and unfairly used RMC's resources to establish Cardinal. This course of conduct included recruiting RMC employees, taking confidential RMC materials, copying settings from RMC's operational software, Encompass 360 ("Encompass"), and breaching confidentiality and nondisclosure agreements. RMC contends that at least some its materials were trade secrets that Defendants misappropriated.

{7} All Defendants vigorously challenge each of RMC's claims. Although Defendants admit certain of the underlying factual allegations, they contend that their conduct was proper. They assert that the information upon which RMC

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

bases many of its claims was neither confidential nor a protectable trade secret, particularly when considered in the context of the direct-to-consumer mortgage-lending industry, which is an industry characterized by high turnover and where each mortgage company must conform to uniform government regulations and utilize similar software processes. In addition to claiming that they are entitled to summary judgment on the claims against them, the Individual Defendants assert counterclaims. Florez, Price, Collins, and Harrison counterclaim for unpaid compensation. Each of the Individual Defendants seek indemnification for the costs of litigation as well as for any liability that they may suffer.

{8} In the RMC Motion, RMC contends that each of the counterclaims should be dismissed.

## II. PROCEDURAL HISTORY

**\*2** {9} RMC filed its original Complaint on May 13, 2013.

{10} Florez and Price filed a notice of designation on May 30, 2013, pursuant to which this case was designated a complex business case on May 31, 2013, and then assigned to the Honorable Calvin E. Murphy on June 5, 2013.

{11} RMC amended its Complaint on June 11, 2013, making the following claims: (1) breach of fiduciary duty against Florez; (2) misappropriation of trade secrets against all Defendants; (3) common law misappropriation of trade secrets against all Defendants; (4) breach of a confidentiality and proprietary agreement against Price and the CBH Defendants; (5) conversion against all Defendants; (6) civil conspiracy against all Defendants; (7) vicarious liability against Cardinal; and (8) unfair and deceptive trade practices ("UDTP") against all Defendants.

{12} The Individual Defendants brought counterclaims seeking indemnification. Additionally, Florez seeks unpaid incentive compensation for the portion of the last quarter he worked for RMC. Price, Collins, and Harrison sought, but have now abandoned, claims for unpaid compensation.[2]

{13} On September 25, 2013, RMC sought a preliminary injunction to prohibit Defendants' disclosure of RMC's confidential or proprietary information, use of Encompass, and further solicitation of RMC's employees. Judge Murphy denied the motion, concluding that RMC had not shown a sufficient likelihood of proving that it possessed a protectable

trade secret or that RMC would suffer irreparable harm, and further noting significant questions regarding whether RMC could prove that the contracts on which it relies are enforceable. Order at 1–2, *RoundPoint Mortg. Co. v. Florez,* No. 13–CVS–8803 (N.C.Super.Ct. Nov. 21, 2013).

{14} The case was reassigned to the undersigned on July 2, 2014, following Judge Murphy's retirement.

{15} After completion of discovery, each party moved for summary judgment on all claims or counterclaims made against them. The motions have been fully briefed and argued, and are ripe for ruling.

## III. FURTHER DETAIL REGARDING THE PARTIES

{16} RMC is a subsidiary of RoundPoint Financial Group, Inc. ("RFG"). RMC is a Florida corporation with its principal place of business in Charlotte, North Carolina, and other offices in Henderson, Nevada, and Rockville, Maryland. Prior to suspending its direct-to-consumer mortgage-lending operations in 2014, RMC specialized in originating direct-to-consumer residential mortgage loans, and was licensed in forty-nine states.

{17} Florez is currently a Mecklenburg County, North Carolina, resident. He joined RFG from Meridias in 2008. Florez and Price relocated to RFG's Charlotte, North Carolina office in 2010. Florez later became RMC's president and a director. Florez left RMC, effective February 15, 2013. He is currently the president of Sebonic.

{18} Price is currently a Mecklenburg County, North Carolina, resident. Price joined RMC from Meridias on December 3, 2009, as production manager, was promoted to vice president for mortgage operations, and later became RMC's chief of staff. She remained in that position until her resignation without notice on April 8, 2013. She is currently Cardinal's chief operating officer.

**\*3** {19} Cardinal is a Pennsylvania limited partnership created in May 2013. Cardinal is a direct-to-consumer mortgage company with offices around the United States, including in Henderson, Nevada, and Charlotte, North Carolina. It employs several former RMC employees.

{20} Collins is a Nevada resident. Collins joined RMC's Henderson, Nevada, office from Meridias on August 9, 2010,

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.                                                                         2

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

as a loan officer, later serving as branch manager of the Nevada office. She resigned from RMC on April 22, 2013. She is currently a loan officer at Cardinal.

{21} Beckelman is a Nevada resident. Beckelman joined RMC's Henderson, Nevada, office on November 15, 2010, and left RMC on April 19, 2013, when she was RMC's vice president of customer relations. She has been working at Cardinal since May 1, 2013, as vice president of mortgage operations.

{22} Harrison is a Nevada resident. Harrison joined RMC's Henderson, Nevada, office from Meridias on May 17, 2010, and in April 2012 was promoted to processing manager. She resigned her employment on April 22, 2013, effective on May 1, 2013. She is currently a processing manager at Cardinal.

{23} Price, Collins, Beckelman, and Harrison have never been RMC officers or directors. RMC has not alleged that any of them owed it a fiduciary duty.


## IV. FURTHER FACTUAL BACKGROUND

{24} The Court does not make findings of fact in deciding a motion for summary judgment under Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.,* 26 N.C.App. 138, 142, 215 S.E.2d 162, 164–65 (1975). The Court here summarizes facts, noting both the facts that it believes are undisputed and others that it believes are contested, in order to provide context for the claims and the motions. *See id.* In ruling on a motion under Rule 56, all evidence is construed in the light most favorable to the nonmoving party. *Anderson v. Demolition Dynamics, Inc.,* 136 N.C.App. 603, 605, 525 S.E.2d 471, 472 (2000).


### A. *The Direct–to–Consumer Mortgage–Lending Industry*

{25} The direct-to-consumer mortgage-lending industry is heavily regulated, requiring all industry participants to use similar underwriting guidelines. Certain steps in the underwriting process are, necessarily, standardized to comply with those guidelines.

{26} Most direct-to-consumer mortgage companies sell their loans shortly after the loans close, either to government-sponsored agencies such as Fannie Mae or Freddie Mac or

to large lending institutions. There are few purchasers of residential mortgages. As such, the primary goal of mortgage originators is to generate as many loans as possible at the lowest cost possible. And, again, the loans generated by the various companies that sell their loans are similar so as to facilitate those sales.

{27} Most direct-to-consumer lenders use software to assist in their processing of loans. Although the goal of the software is substantially the same across each mortgage lender, the manner in which that software is customized can vary between lenders. Encompass is used industry-wide by thousands of mortgage industry professionals.

**\*4** {28} The industry is characterized by substantial employee turnover, with employees frequently moving from one mortgage company to another.


### B. *RMC's Mortgage Operations*

{29} Florez started Meridias as a direct-to-consumer mortgage-lending company in 2002. After Florez moved to RMC's Henderson, Nevada, office in 2010, Meridias ceased operation and then dissolved in 2013. Florez owned the Henderson, Nevada, real estate and building in which Meridias maintained its office. After Meridias ceased operation, Florez leased the office to RMC. Most Meridias employees became RMC employees. RMC used portions of Meridias's processes, software, and documents. Some of the forms or documents were modified solely by replacing the Meridias logo with RMC's logo.


#### 1. *Restrictions on Access to RMC's Information*

{30} Many RMC forms, documents, and processes were available to all or almost all RMC employees without any special protections or access limitations. Several RMC employees routinely worked remotely and used cloud-based storage and personal e-mail accounts to transfer work-related documents.

{31} However, RMC had some policies in place that were designed to protect its information. On-site access to RMC's system was protected by a username and password, and off-site users also needed RMC's remote-connection software. RMC's "Employee Use of Electronic Media Agreement" required employees to have any use of file-sharing applications approved by the IT director. RMC restricted employees' access in other ways, as well, such as by disabling access to USB drives, restricting access to

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

personal e-mail accounts, and limiting administrator rights on workstations.

{32} In late 2012, when RMC became aware that Florez was considering resigning to form his own company, RMC shut down employee access to Dropbox, an application that facilitates working remotely.

**2. *The 2012 Confidentiality and Proprietary Agreement***

{33} RFG's parent company, the Tavistock Group ("Tavistock"), required all of RMC's employees to sign a "Confidentiality and Proprietary Agreement" ("2012 Agreement(s)"). RMC's breach of contract claim against Price and the CBH Defendants is based on the 2012 Agreement. Florez did not sign the 2012 Agreement. Price and the CBH Defendants were already RMC employees when they were asked to sign the 2012 Agreement.

{34} The 2012 Agreement was intended to restrict an RMC employee's ability, both during and after employment, to transmit, disclose, or make use of trade secrets, nonpublic information, or confidential information. Among other terms, the 2012 Agreement contains a two-year nonsolicitation clause that prohibits the recruitment of certain types of RMC employees for two years after the employee's resignation or termination.

{35} The 2012 Agreement broadly defines trade secrets, nonpublic information, and confidential information. For example, "Confidential Information" is defined as encompassing virtually all information internal to RMC, including

> **\*5** information regarding RoundPoint Mortgage's activities ... that is not generally available, disclosed, or known to persons not employed or otherwise engaged by RoundPoint, or that otherwise does not rise to the level of a Trade Secret, but that is generally not disclosed by company practice or authority to persons not employed by RoundPoint Mortgage.

(Pl.'s Ex. 4 ("2012 Agreement"), at 1.)

{36} The 2012 Agreement recites that it is being executed "in consideration of Employee's employment, the disclosure of Trade Secrets and Confidential Information to Employee during employment, and the compensation and benefits being paid and to be paid by [RMC] ." (2012 Agreement 2.)

{37} RMC has not contended that the 2012 Agreement was supported by any consideration besides the promise of continued at-will employment. There is no evidence that Price or the CBH Defendants received any change in compensation or that they were given access to categories of confidential information to which they did not already have access before signing the 2012 Agreement.

**3. *RMC's Encompass Software***

{38} RMC used and Cardinal now uses an operational software named Encompass, as did Meridias previously. Encompass is a customizable software system sold by Ellie Mae, Inc., and used by 89,000 mortgage professionals and many other companies in the mortgage-lending industry. Encompass provides its licensees with a limited ability to automate certain functions, develop quality controls, and create customized input forms. RMC used Encompass as its primary system for loan origination, disclosures, processing, underwriting, closing, post-closing, and secondary functions.

{39} Although Encompass's user-interface screens were well known within RMC, Encompass's internal code, settings, and customizations were accessible only to select users. Eugene Travis had set Encompass up at Meridias. He later became an Encompass administrator at RMC. He subsequently helped Florez set up Encompass for use at Cardinal.

{40} Although certain screens within a company's software system will necessarily be similar to others in the industry because of government guidelines and standardized forms, other screens or data displays may depend on individualized settings that a company develops based on its own uses and approach. Viewing the evidence most favorably to RMC, Cardinal's Encompass internal code settings are substantially similar to RMC's. RMC's expert witness provided examples of identical or similar e-mail templates, code, variable naming, and other Encompass settings. He opined that Cardinal either copied RMC's code verbatim or used RMC's Encompass system as a model when developing its own system. Cardinal employees who had previously worked for RMC noted substantial similarities in the operation and appearance of the two systems.

Case 3:21-cv-00072-RJC-DSC Document 43-1 Filed 07/18/22 Page 4 of 22

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

**4.** *RMC's Relevant Bylaws Regarding Indemnification*

{41} RMC's bylaws provide that RMC shall indemnify and hold harmless, to the fullest extent allowed under the law, any person in a civil action who was made party to that action by reason of the fact that he or she "is or was a director or officer of the Corporation ... against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person." (Pepe Aff. Ex. C § 44, Nov. 24, 2014.) RMC's bylaws do not provide for indemnification for employees who are not officers or directors.

**\*6** {42} As discussed below, the bylaws are to be interpreted and enforced pursuant to Florida law.

**C.** *Claims Against and Counterclaims of the Individual Defendants*

**1.** *Florez*

{43} RMC's allegations against Florez overlap the time periods before and after the time during which Florez was an RMC officer, director, and employee, charged with fiduciary duties. Florez began his association with RMC in Nevada, but relocated to Charlotte, North Carolina, in 2010. Florez was an at-will employee with no written employment agreement. He became president and a director of RMC on August 16, 2011.

{44} Florez's compensation consisted of a base salary plus an incentive bonus equal to three basis points of RMC's total funded loan volume. The bonus was paid quarterly and represented the majority of Florez's overall compensation.

{45} Florez considered leaving RMC at least as early as mid–2012, at which time he discussed his intentions with Joseph Pepe ("Pepe"), who was then RMC's chief revenue officer and Florez's subordinate. Florez tendered his initial resignation on December 10, 2012; however, he stayed at RMC for several more weeks while he and RMC attempted to negotiate a new compensation agreement. Although Florez remained a director and officer after December 10, 2012, Tavistock asked Florez not to come to the office during this period of negotiations, and most of Florez's duties were delegated to Pepe and Price.

{46} RMC paid Florez's salary throughout that period, but he performed no actual work for RMC. Florez tendered a second resignation on February 5, 2013, which became effective on February 15, 2013.

{47} RMC paid Florez his base salary and quarterly incentive compensation through the end of 2012 but paid him his salary without incentive compensation for the partial first quarter of 2013. The terms providing for Florez's incentive compensation were not in writing. Kevin Brungardt ("Brungardt"), RFG's president, referred to RMC's agreement with Florez regarding incentive compensation as more of a "gentlemen's agreement" that required that Florez remained employed for the entire quarter in order to receive any incentive bonus payment for that quarter. (Brungardt Dep. 170:8–171:19.) Florez denies that there was any such condition.

{48} Between December 10, 2012, and February 15, 2013, Florez requested that Ed Powell ("Powell"), another RMC employee, compile RMC's loan officer training materials so that Florez could use them "if [he] needed them at another enterprise that [he] was creating." (Florez Dep. 166:5–172:14.) RMC had developed those materials to educate its new loan officers and train them on RMC's processes and systems. Florez admits the allegation but asserts that Cardinal has not used the materials.

{49} During that same period, Florez downloaded approximately 250 pages of documents that detailed the employment performance of RMC employees. He also asked RMC employees to document RMC's processes and lending workflow. He e-mailed spreadsheets containing RMC's Encompass settings and processes to his personal e-mail address. RMC alleges that, before his final resignation, Florez undertook these and other actions to facilitate Cardinal's competition against RMC, including establishing and using Cardinal e-mail addresses, developing a new website, purchasing advertisements, leasing office space, and interviewing potential employees. On the day Florez left RMC, he downloaded and reviewed the training materials that Powell had compiled for him.

**\*7** {50} In March 2013, after Florez had left RMC but while Price remained an RMC employee, Florez and Price hosted a lunch for RMC's top loan officers in Henderson, Nevada, at which Florez discussed possible employment at Cardinal for those loan officers.

{51} On April 13, 2013, Florez requested certain custom reports from Ronald Stevenson ("Stevenson"), who was then an RMC employee. Stevenson created those reports, at least

Case 3:21-cv-00072-RJC-DSC Document 43-1 Filed 07/18/22 Page 5 of 22

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

in part, by copying pieces of information directly from RMC's customized version of Encompass.

{52} Florez continued thereafter to ask for and receive documents from RMC employees, including RMC's Encompass customizations, lead-generation information, commission information, and workflow documents. Florez or other Defendants, at Florez's direction, used some of these documents to set up Cardinal, recruit RMC employees, and calculate prospective employee compensation. With the help of Beckelman while she was still employed at RMC, Florez hosted a conference call with several RMC employees where he indicated that Cardinal would hire them if they decided to leave RMC.

{53} On April 30, 2013, RMC's counsel sent Florez a letter to notify him of RMC's intent to file this action and to demand that Florez return all RMC documents in Florez's possession.

{54} Florez became employed by Cardinal in May 2013, when Cardinal began its operations.

### 2. *Price*

{55} Price began working at RMC in November 2009 as a production manager and moved to Charlotte in 2010 with Florez. She was promoted to vice president of mortgage operations and then to chief of staff.

{56} At all times during her employment at RMC, Price was an at-will employee. Price signed the 2012 Agreement.

{57} On February 12, 2013, Price notified Pepe that she was not ready to leave RMC, although there is some evidence suggesting that Price had begun preparations to leave by that point. While Price was negotiating a possible retention agreement with RMC, Pepe tasked her with reducing RMC's dependency on its Henderson office, because of his concern that Florez's departure would lead to an exodus of Henderson employees.

{58} Price resigned on April 8, 2013, effective immediately.

{59} After Price left RMC, Stevenson e-mailed Price RMC's Departmental Organization manual and a loan officer training tool. Price also obtained Beckelman's and other RMC employees' assistance to contact or identify RMC employees to be recruited by Cardinal. She sent Beckelman e-mails noting those RMC employees for whom she was missing applications for employment at Cardinal and instructing

Beckelman to set up meetings with certain team members so they could discuss potential employment at Cardinal. Price and Florez used the compensation and performance documentation that they took from RMC to calculate the employment offers they made to RMC employees and to help ensure that those employees were offered a level of income commensurate with their RMC income.

**\*8** {60} Price became employed by Cardinal in May 2013 at around the same time that Cardinal began its operations.

### 3. *Collins*

{61} RMC hired Collins as an at-will employee in August 2010. She started as a loan officer and later became the branch manager of licensing in RMC's Henderson office. Collins signed the 2012 Agreement on October 29, 2012.

{62} While she was employed at RMC, Collins encouraged another RMC employee, Brandon Jewkes ("Jewkes"), to join Cardinal.

{63} One hour before Collins submitted her letter of resignation to RMC, Collins extracted from Encompass and e-mailed to her personal e-mail address a report containing information regarding thousands of RMC's loan customers, including each customer's name, loan amount, and contact information. Collins claims that she had the permission of her supervisor, Stevenson, to take this information. RMC has not demanded that Collins return the information.

{64} Collins resigned from RMC on April 22, 2013, effective immediately. She began working at Cardinal on May 13, 2013.

### 4. *Beckelman*

{65} Beckelman began working as a senior loan processor at RMC in November 2010. She was as an at-will employee. She signed the 2012 Agreement on October 26, 2012.

{66} At Price's request, Beckelman either contacted or met individually with certain RMC employees, advising them that she was leaving RMC to work for Cardinal. With help from Price and Shannon Curtis, Cardinal's director of human resources, Beckelman set up a conference call with RMC employees on April 18, 2013, during which Florez solicited RMC employees to move to Cardinal.

Case 3:21-cv-00072-RJC-DSC Document 43-1 Filed 07/18/22 Page 6 of 22

{67} Prior to her resignation from RMC, Beckelman sent to her personal email address hundreds of RMC documents with the intention of transferring the documents onto Cardinal's letterhead, including "(a) documents collected from third-party sources; (b) routine checklists and workflow documents; (c) training documents; (d) job descriptions; and (e) templates for communications with borrowers." (Br. Defs. Deanna Collins, Julia Beckelman, & Maria Harrison Supp. Mot. Summ. J. ("CBH Br. Supp.") 10.) She notified Florez that she had the documents, and Florez instructed her to convert them all to Microsoft Word format so they could be more easily assimilated.

{68} Beckelman asserts that the documents were never assimilated, that she has now deleted the documents, and that she no longer possesses them.

{69} RMC has never demanded that Beckelman return the documents.

{70} Beckelman resigned from her position as RMC's vice president of customer relations on April 16, 2013, effective April 19, 2013. Harrison began working at Cardinal in May 2013.

### 5. *Harrison*

{71} Harrison began working at RMC on May 12, 2010, and was promoted to processing manager in April 2012. She was an at-will employee. Harrison signed the 2012 Agreement on October 31, 2012.

**\*9** {72} Before resigning from RMC but after having decided to move to Cardinal, Harrison sent Cardinal's website information to her team members to facilitate their application for employment with Cardinal.

{73} On April 25, 2013, Price e-mailed Harrison and several other RMC employees to ask them to print out a report of the hire dates of Harrison's team members so that Price could more easily onboard them to Cardinal. Harrison then sent this information to her personal e-mail address, later forwarding it to Price. Price also asked Harrison to ensure that Harrison's team members had a user ID and password to FHA Connection, a system of the Department of Housing and Urban Development used by mortgage-loan originators, so that Price would not have to set up the employees in that system once they joined Cardinal.

{74} Harrison resigned from RMC on April 22, 2013, effective May 1, 2013. She began working at Cardinal in May 2013.

{75} RMC never demanded that Harrison return RMC's information.

### D. *Cardinal*

{76} Cardinal entered into a letter of intent on February 5, 2013, whereby two investment companies would purchase Cardinal, anticipating that Cardinal would establish a direct-to-consumer mortgage-lending division, to be managed by Florez.

{77} Cardinal launched its direct-to-consumer mortgage division in May 2013. Within six months of its launch, that division closed and funded more than $150 million per month in loans.

{78} Cardinal established a policy that no new employees could bring with them any proprietary or confidential material or violate any obligations to prior employees. Each of the Individual Defendants signed agreements acknowledging this policy.

{79} There is no direct evidence in the record that Cardinal, either before or after beginning operations in May 2013, instructed Florez to use RMC documents or to solicit or hire RMC employees.

### V. STANDARD OF REVIEW

{80} Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). "Summary judgment is improper if any material fact is subject to dispute." *Culler v. Hamlett,* 148 N.C.App. 389, 391, 559 S.E.2d 192, 194 (2002). The movant bears the burden of proving the lack of a triable issue. *Dalton v. Camp,* 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Once the movant has met that burden, the burden shifts to the nonmoving party to produce a forecast of evidence that demonstrates facts showing that it can establish a prima facie case at trial. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.,* 224 N.C.App. 401, 407, 742 S.E.2d 535, 540 (2012). The Court must view

Case 3:21-cv-00072-RJC-DSC Document 43-1 Filed 07/18/22 Page 7 of 22

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

all of the presented evidence in the light most favorable to the nonmoving party. *Dalton,* 353 N.C. at 651, 548 S.E.2d at 707.

## VI. ANALYSIS

**\*10** {81} The Court will first address Defendants' Motions and then the RMC Motion.

### A. *Defendants' Motions*

#### 1. *RMC Forecasts Sufficient Evidence to Support Its Claim for Breach of Fiduciary Duty Against Florez.*

{82} The parties do not dispute that Florez owed RMC a fiduciary duty while he was RMC's officer and director. RMC contends that he breached that duty by taking improper steps to facilitate Cardinal's competition and entry into the industry, in the process taking unfair advantage of RMC. Florez contends that his actions were no more than permissible efforts to prepare for competition that would begin after his fiduciary relationship with RMC ended.

{83} Under North Carolina law, directors typically owe a fiduciary duty to the corporation on whose board they sit. *See Green v. Freeman,* 222 N.C.App. 652, 662, 733 S.E.2d 542, 550 (2012), *rev'd on other grounds,* 367 N.C. 136, 749 S.E.2d 262 (2013). Section 55–8–30(a) of the North Carolina General Statutes describes that duty and requires that

> [a] director shall discharge his duties ... [i]n good faith[,] ... [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances[,] and ... [i]n a manner he reasonably believes to be in the best interests of the corporation.

N.C. Gen.Stat. § 55–8–30(a) (2015). A fiduciary may "never paramount their personal interest over the interest of those for whom they have assumed to act." *Miller v. McLean,* 252 N.C. 171, 174, 113 S.E.2d 359, 362 (1960).

{84} However, merely making plans to compete with an employer before leaving the company, without more, does not necessarily constitute a breach of fiduciary duty. *See Fletcher, Barnhardt & White, Inc. v. Matthews,* 100 N.C.App. 436, 441–42, 397 S.E.2d 81, 84 (1990); *see also Austin Maint. & Constr., Inc.,* 224 N.C.App. at 416, 742 S.E.2d at 546 (noting that an at-will employee is under no obligation to inform his employer of his desire to quit or his discussions with coworkers about quitting). This Court has previously discussed that the Court must "focus its attention on *actions* taken in furtherance of such a plan to compete while defendants were employed ... rather than preparations to compete ." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC,* No. 00–CVS–10358, 2002 NCBC LEXIS 2, 2002 WL 31002955 at \*25 (N.C.Super.Ct. July 10, 2002).

{85} The Court concludes that the evidence, viewed most favorably to RMC, would allow a finding that actions Florez took while he was subject to a fiduciary duty transcended mere preparation, and that the competing positions must be resolved by a jury. In part, this is because RMC's fiduciary duty claim is intertwined with the disputed issue of whether information taken either by Florez or at his direction qualifies as protectable trade secrets. *See Fletcher,* 100 N.C.App. at 441, 397 S.E.2d at 84 (implying that successfully stating a claim of misappropriation of trade secrets may be sufficient to state a claim of breach of fiduciary duty); *see also Md. Metals, Inc. v. Metzner,* 282 A.2d 564, 568–70 (Md.1978) (finding that the right of an employee to make arrangements to compete is defeated by misconduct such as misappropriation of trade secrets, misuse of confidential information, solicitation of an employer's customers prior to cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, and usurpation of employer's business opportunity).

**\*11** {86} Accordingly, Florez's motion that the breach of fiduciary duty claim against him be dismissed must be denied.

#### 2. *RMC Forecasts Sufficient Evidence to Support Its Trade Secrets Claim.*

{87} There is record evidence that Florez and Price took or directed others to take various RMC files, documents, settings, and other materials for the purpose of using them at Cardinal. Defendants, however, challenge that no such information can be protected as a trade secret, because the information did not have independent actual or potential commercial value from not being either generally known or readily ascertainable by independent development. Alternatively and additionally, Defendants contend that RMC lost any potential trade secret protection by failing to safeguard its information, for example, by publicly filing some of its information. Finally, Defendants contend that

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)**

2016 NCBC 17

RMC cannot demonstrate that any potential misappropriation was the proximate cause of an injury to RMC.

{88} Collins individually offers an additional affirmative defense that she had RMC's permission to take the information that she is accused of misappropriating.

{89} In resolving these issues, the Court must view the evidence in the light most favorable to RMC. *Dalton,* 353 N.C. at 651, 548 S.E.2d at 707.

{90} A trade secret is defined under North Carolina law as any

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> The existence of a trade secret shall not be negated merely because the information comprising the trade secret has also been developed, used, or owned independently by more than one person, or licensed to other persons.

N.C. Gen.Stat. § 66–152(3).

{91} Our appellate courts have listed factors that the Court should apply to determine whether information is properly classified as a trade secret, which include

> (1) the extent to which information is known outside the business;
>
> (2) the extent to which it is known to employees and others involved in the business;
>
> (3) the extent of measures taken to guard secrecy of the information;
>
> (4) the value of information to the business and its competitors;
>
> (5) the amount of effort or money expended in developing the information; and

> (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Horner Int'l Co. v. McKoy,* —— N.C.App. ——, 754 S.E.2d 852, 858 (2014) (quoting *Area Landscaping, LLC v. Glaxo–Wellcome, Inc.,* 160 N.C.App. 520, 525, 586 S.E.2d 507, 511 (2003)).

### a. *RMC Has Alleged Its Trade Secrets with Sufficient Particularity.*

**\*12** {92} The Court first examined the threshold issue of whether RMC has alleged its trade secrets with sufficient particularity to proceed with determining whether the information deserves trade secret status. *See Analog Devices, Inc. v. Michalski,* 157 N.C.App. 462, 468, 579 S.E.2d 449, 453 (2003). "[A] plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Id.* To meet this standard, RMC need not "define every minute detail of its trade secrets down to the finest detail." *Prolifiq Software Inc. v. Veeva Sys., Inc.,* No. C 13–03644 SI, 2014 U.S. Dist. LEXIS 77493, 2014 WL 2527148 at \*6 (N.D. Cal. June 4, 2014). RMC may satisfy its burden by actually producing the information that it claims deserves protection. *Static Control Components, Inc. v. Darkprint Imaging, Inc.,* 200 F.Supp.2d 541, 544–45 (M.D.N.C.2002).

{93} RMC describes its trade secrets as consisting of the following categories of information:

> (a) RMC's proprietary customizations to its loan origination and lending workflow software, including but not limited to Business Rules, Customized Borrower Documents, Custom Input Forms, and Custom Reports contained in its Encompass 360 software and the lending workflow customized in its Encompass 360 and Leads 360 software;
>
> (b) documents containing RMC's operating procedures that reflect the use of RMC's proprietary customizations to its software;
>
> (c) RMC customer information;
>
> (d) RMC's proprietary personnel data; and
>
> (e) RMC's proprietary business and financial performance information.

Case 3:21-cv-00072-RJC-DSC Document 43-1 Filed 07/18/22 Page 9 of 22

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

(Pl. RoundPoint Mortgage Company's Third Suppl. Resp. Def. Cardinal Financial Company, Limited Partnership's First Set Interrogs. 2.)

{94} RMC further specified by Bates number approximately 600 documents that it contends fall within these categories, and supplements its identification with screenshots, affidavits, expert testimony, and deposition testimony.

{95} The Court concludes that RMC has met its burden of describing its trade secrets with sufficient particularity.

    **b. *There Is an Issue of Material Fact as to Whether the Information Taken from RMC Derives Independent Actual or Potential Commercial Value from Not Being Generally Known or Readily Ascertainable by Persons Who Can Obtain Economic Value from Its Disclosure or Use.***

{96} Defendants have mounted a strong defense that there are few, if any, true secrets in the competitive direct-to-consumer mortgage-lending industry. Defendants argue that RMC particularly deserves no trade secret protection, not only because of the nature of the industry but also because RMC itself entered the industry by taking substantial advantage of materials and systems that Florez had developed at Meridias. Although this defense may ultimately prevail, the Court's proper inquiry is limited to whether RMC forecasts sufficient evidence to support a jury finding in its favor. RMC claims that it has done so because the value of its information and processes is shown by the fact that RMC took them and by evidence that RMC spent much time and effort developing and customizing its information and processes, even if some of that information may be available publicly. After an exhaustive review of the record, the Court concludes that RMC's trade secrets claim is adequate to be submitted to a jury.

 **\*13** {97} Trade secret protection is generally precluded for information that is widely available or generally known in the relevant industry. *See Analog Devices, Inc.,* 157 N.C.App. at 470, 579 S.E.2d at 454; *see also Combs & Assocs., Inc. v. Kennedy,* 147 N.C.App. 362, 370–71, 555 S.E.2d 634, 640 (2001). A party must meet a high burden to prove that a compilation or process based on public information is a trade secret. *See Byrd's Lawn & Landscaping, Inc. v. Smith,* 142 N.C.App. 371, 376, 542 S.E.2d 689, 692 (2001); *Wilmington Star–News v. New Hanover Reg'l Med. Ctr., Inc.,* 125 N.C.App. 174, 181–82, 480 S.E.2d 53, 56–57

(1997) (noting as relevant to trade-secret analysis, *inter alia,* the level of economic benefit to competitors, the effect on competition in the industry, and the level of difficulty for a competitor to generate the information on its own); *Safety Test & Equip. Co. v. Am. Safety Util. Corp.,* No. 13–CVS–1037, 2015 NCBC LEXIS 40, 2015 WL 1880769 at \*26 (N.C.Super.Ct. Apr. 23, 2015). However, in some instances, a trade secret can be found if the information or process has particular value as a compilation or manipulation of information, even if the underlying information is otherwise publicly available. Whether a compilation or manipulation of information deserves trade secret protection depends on several factors, including the difficulty with which the information could be gathered, compiled, or manipulated. *See Byrd's Lawn & Landscaping, Inc.,* 142 N.C.App. at 376, 542 S.E.2d at 692 (finding that, even though similar information could be acquired by anyone in the relevant industry, the difficulty of its acquisition nevertheless allowed the court to find a protectable trade secret).

{98} Section 66–152 does not provide a bright-line evidentiary standard to guide the Court's inquiry into whether information has independent actual or potential commercial value from not being generally known or readily ascertainable. *See* N.C. Gen.Stat. § 66–152(3)(a). On the contrary, the terms of the statute invite an individualized fact inquiry.

{99} The statute also suggests that a measure of information's commercial value may include a consideration of the value that could be obtained by the specific user that is accused of misappropriation. *See id.* Subsection 66–152(3)(a) speaks of value being derived by "persons who can obtain economic value from [the information's] disclosure or use." *Id.; see also Glaxo Inc. v. Novopharm Ltd.,* 931 F.Supp. 1280, 1299 (E.D.N.C.1996) (noting that a trade secret can consist of "data that would give a person skilled in the art a competitive advantage he might not otherwise enjoy but for the knowledge gleaned from the owner's research investment"). The Court construes the particular facts of this case in RMC's favor, as it must, including the quantity and content of the information taken by Defendants when Cardinal was only a newly-formed company and Cardinal's prompt and substantial revenues, and holds that RMC has produced a sufficient forecast of evidence to allow a jury to find that its information had independent commercial value from not being generally known or readily ascertainable to those who could obtain economic value from the information's disclosure or use. RMC's misappropriation claim should then proceed to trial.

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

**\*14** {100} This ruling does not forecast how a jury might view the substantial record that Defendants have developed in their effort to prove that RMC's information and processes have no commercial value because they are widely known within the industry. Defendants' expert, Michael McAuley, opines that there is no meaningful difference among the methods by which lenders process their loans. Dione Thompson ("Thompson"), Price's replacement at RMC, admits that both RMC and Cardinal use mortgage-processing templates that are standardized throughout the industry.

{101} But, RMC forecasts evidence that its customer information was collected and developed by its loan originators and could be useful for future prospects, that RMC developed valuable and unique internal metrics and reports with which to analyze its performance, relationship with third parties, and other aspects of its business, and that the specifics of RMC employees' commissions, salaries, benefits, and other personnel data were all unique to RMC and could not easily be discerned by industry competitors. RMC also points to variations among lenders' approaches, including differences in "the types of loans they originate, the size of their operation and number of employees, the source of their loan leads, pricing strategies and the types of software and electronic resources they use." (Brungardt Aff. ¶ 8.) A jury could be persuaded that Florez might have recognized that RMC's information had commercial value. When speaking to potential investors, Florez championed that RMC's systems had "[m]atured as a result of [having] thousands of loans running through them." (Florez Dep. 146:25–147:4.) Florez also admits that he used RMC's information to guarantee the salaries of certain of the employees that left RMC to join Cardinal, and that Price used RMC's personnel information to determine the recruitment priority of RMC's employees.

{102} In sum, the evidence is contested. Defendants are not entitled to a determination as a matter of law that RMC cannot claim trade secret protection for the information that Defendants are accused of misappropriating. However, Defendants further contend that a jury need not resolve that issue, because RMC lost any trade secret protection when it failed to take adequate steps to protect its information. The Court then turns to an inquiry regarding whether the record mandates a finding that RMC has failed to provide such protection.

**c.** *There Is an Issue of Material Fact as to Whether RMC Undertook Reasonable Efforts to Maintain the Secrecy of Its Alleged Trade Secrets*

{103} To qualify for trade secret protection, information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen.Stat. § 66–152(3)(b). Again, the statute calls for a fact-specific inquiry regarding whether efforts were "reasonable."

{104} The Court begins by examining RMC's corporate policies. *See Edgewater Servs., Inc. v. Epic Logistics, Inc.,* No. 05–CVS–1971, 2009 NCBC LEXIS 21, 2009 WL 2456868 at \*12–14 (N.C.Super.Ct. Aug. 11, 2009) (reviewing a company's safeguards, protocols, and procedures to determine whether the company has made reasonable efforts to safeguard its trade secrets), *aff'd,* No.COA11–176, 2011 N.C.App. LEXIS 2494 (Sept. 14, 2011); *see also Static Control Components, Inc.,* 200 F.Supp.2d at 546 (focusing on a company's overall efforts to ensure the confidentiality of its trade secrets). RMC's evidence indicates that RMC's computer systems are only accessible at RMC locations by using usernames and passwords and are only accessible outside of the office with a username, password, and RMC's remote-connection software. Certain files, "including training and education materials, financial reports, personnel information, and business strategy [are] accessible only to specified employees of RMC through restricted shared network drives or by email to specified individuals who have a legitimate business need for the information." (Pepe Aff. ¶ 34, Dec. 22, 2014.) Access to RMC's settings and customizations to its Encompass software is limited to administrators, and administrator status is tightly controlled. RMC has implemented a company-wide confidentiality agreement. [3] Also, RMC's employee handbook recites that all RMC information should be considered confidential, and RMC requires employees to sign its Employee Use of Electronic Media Agreement, which purports to prohibit the use of third-party e-mail accounts and the uploading of RMC's information to the Internet without approval from the "supervisor and the IT Director." (*See, e.g.,* Collins Dep. Ex. 1.)

**\*15** {105} Admittedly, Defendants have produced evidence that could lead a jury to doubt the adequacy of RMC's policies, particularly given the ease with which Defendants were able obtain the information they are accused of misappropriating, even in the face of Pepe having specifically recognized the potential impact of Florez's departure. But again, the question

Case 3:21-cv-00072-RJC-DSC Document 43-1 Filed 07/18/22 Page 11 of 22

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

is whether RMC is entitled to ask the jury to undertake an analysis of the reasonableness of RMC's efforts to maintain the confidentiality of the information. The Court concludes that the jury must make such a determination, except for as to those items for which RMC has waived any trade secret protection by public disclosure.

### d. *RMC Has Waived Trade Secrets Protection for Items that It Publicly Filed.*

{106} RMC appears to have publicly filed several of the documents for which it has claimed trade secret protection. As to these, any trade secret protection has been lost. Particularly, Defendants claim that RMC has waived any protection of its trade secrets due to the following:

- RMC did not designate as confidential the Long Report, Long's Deposition, or Thompson's deposition, in which RMC's specific Encompass settings were discussed at length.

- RMC publicly filed the Long Affidavit and the Long Report, which included discussion and screenshots of RMC's version of Encompass and its input forms, business rules, and underlying code.

- RMC publicly filed Collins's "LC Scorecard" as an exhibit to Plaintiff's Motion for Partial Summary Judgment. In contrast, RMC filed an LC Scorecard under seal, stating that RMC regards the information as "confidential and proprietary." (*See* Pepe Aff. ¶ 45, Ex. B, Dec. 22, 2014.)

- RMC publicly filed its "Nevada Branch Loan Officer Compensation Schedule" and a document detailing its "Operations Manager Bonus Pool," both having been stamped "Confidential." (Pepe Aff. Exs. A, B, Nov. 24, 2014.)

- RMC publicly filed Jewkes's Loan Officer Commission Statement as an attachment to the Affidavit of Kathryn Lewis (Lewis Aff. Ex. A, Dec. 19, 2014), even though RMC listed this document as a trade secret, and Lewis testified in her affidavit that RMC considers this type of personnel information to be confidential.

{107} Information for which a claimant asserts trade secret protection can lose the benefit of protection if it has been disclosed, publicly released, or publicly filed during litigation. *See Area Landscaping,* 160 N.C.App. at 526, 586 S.E.2d at 512 (finding that giving a customer the discretion

to distribute bid information at its own discretion precluded trade secret protection over that information); *see also Glaxo,* 931 F.Supp. at 1301 (noting that the release of information during open trial is a publication of that information and waives any right a party had to restrict its use). However, a release of some information does not necessarily constitute a comprehensive waiver of trade secret protection for other information. *SCR–Tech LLC v. Evonik Energy Servs., LLC,* No. 08–CVS–16632, 2011 NCBC LEXIS 27, 2011 WL 3209080 at *41–42 (N.C.Super.Ct. July 22, 2011) (allowing a trade secret claim to survive after patent application was filed).

 **\*16** {108} The Court agrees with Defendants that RMC, even if it has claimed trade secret protection in the first instance, has waived that protection for at least the following: (1) Collins's LC Scorecard (GILMORE–DROPBOX–000116); (2) the Loan Officer Commission Statement of Brandon Jewkes (FP005157); (3) any RMC borrower forms that have been publicly distributed; and (4) the visual formatting and appearance of software forms or screenshots.

{109} RMC has stated that any waiver argument is not appropriate as to some information, such as the publicly filed Encompass screenshots, because it has not sought trade secret protection for them, as its claim is instead based on "the compilation of underlying electronic forms for the communications, which contain unique programming and customized triggers." (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 34–35.) RMC states that it seeks to protect "the underlying code and settings for its customizations, none of which were fully disclosed in the documents and depositions." (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 35.)

{110} The Court is not positioned to prepare a comprehensive list of every document for which Defendants claim that RMC has waived any trade secrets claim. The Court can address such a list as an evidentiary matter as the case proceeds toward trial.

### e. *A Jury Must Determine Whether Collins Had a Reasonable Belief that She Had Permission to Take Loan Information.*

{111} Collins does not dispute that she e-mailed to her personal e-mail account a customer pipeline list containing the contact and loan information of most or all of her RMC customers. However, she claims that she had permission to do so because Stevenson, her supervisor, gave her

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

authorization to take RMC's customer information. A party may defeat a claim of misappropriation if the party obtained the information "from another person with a right to disclose the trade secret." N.C. Gen.Stat. § 66–155. This assertion is effectively an affirmative defense upon which Collins bears the initial burden of showing that RMC's claim is barred. *See Strickland v. Hedrick,* 194 N.C.App. 1, 9, 669 S.E.2d 61, 67 (2008) (noting that a summary judgment movant may meet its initial burden by showing that the nonmovant "cannot surmount an affirmative defense which would bar the claim" (quoting *Bernick v. Jurden,* 306 N.C. 435, 441, 293 S.E.2d 405, 409 (1982)).

{112} This raises the issue of whether Collins, "in the exercise of reasonable care[,] was justified in believing that [RMC] had, under the circumstances, conferred" upon Stevenson the authority to allow Collins to take the information. *Zimmerman v. Hogg & Allen, Prof'l Ass'n,* 286 N.C. 24, 31, 209 S.E.2d 795, 799 (1974); *see also id.* at 30–31, 209 S.E.2d 795, 204 S.E.2d at 799 ("The rights and liabilities which exist between a principal and a third party dealing with that principal's agent may be governed by the apparent scope of the agent's authority, which is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses...."); *Edgewood Knoll Apartments, Inc. v. Braswell,* 239 N.C. 560, 571, 80 S.E.2d 653, 661 (1954) (noting that an employee—agent's authority may be judged by looking at the scope of his duties as an employee).

 **\*17** {113} Although admittedly a close call, the Court finds that Collins's forecast of evidence is not adequate to mandate summary judgment in her favor. The record contains evidence that Stevenson began telling his employees that RMC was shutting down and that they were no longer wanted at RMC. He testified that he had told several employees who were leaving RMC to take their pipeline reports with them. Jewkes and Gary Jackson ("Jackson"), two employees who quit RMC to work at Cardinal, testified that Stevenson instructed all of the Henderson, Nevada, loan originators to take the RMC pipeline reports so the loan originators could use those reports to solicit borrowers once they started working at Cardinal. Jackson further testified that Stevenson was openly recruiting on behalf of Cardinal while still working at RMC, and frequently held meetings during which he would recommend working for Cardinal, also describing a plan for the Henderson office's management team to resign from RMC to work at Cardinal. It is then not clear that Collins could have reasonably concluded that Stevenson was

acting within the scope of his authority for RMC in granting permission for departing employees to take the documents to use competitively against RMC.

### 3. *RMC's Common Law Misappropriation Claim Should Be Dismissed.*

{114} RMC pleads a claim of common law misappropriation of trade secrets against all Defendants. No North Carolina court has acknowledged the existence of such a claim. *See Edgewater Servs., Inc. v. Epic Logistics, Inc.,* No. COA11–176, 2011 N.C.App. LEXIS 2494, 2011 WL 6035918 at *7 n. 2 (Dec. 6, 2011)* (noting that a common law misappropriation claim has not been established by North Carolina appellate courts); *see also Battleground Veterinary Hosp., P.C. v. McGeough,* No. 05–CVS–18918, 2007 NCBC LEXIS 33, 2007 WL 3071618 at *22 n. 10 (N.C.Super.Ct. Oct. 19, 2007).* This Court gives this claim no further consideration, and concludes that it should be dismissed.

### 4. *RMC's Breach of Contract Claims Fail Because, as to Price and the CBH Defendants, the 2012 Agreement Was Not Supported by Consideration.*

{115} RMC asserts breach of contract claims against the Price and the CBH Defendants based on the 2012 Agreements. [4] Those Defendants contend that the claims must be dismissed because the promise of mere continued at-will employment could not constitute consideration for the 2012 Agreement.

{116} It is undisputed that the 2012 Agreements were each consummated well after the Price and the CBH Defendants began their employment. RMC has offered no consideration for the agreement other than the promise of continued at-will employment. There is no evidence that Price and the CBH Defendants were provided additional compensation in exchange for their signatures, or that they were granted access to any new category of confidential information after signing their agreements. [5]

{117} The 2012 Agreement is, by its express terms, governed by North Carolina law. The 2012 Agreement has several distinct terms, but because of its severability clause, the Court may examine and interpret the nondisclosure and nonsolicitation covenants as separate contractual undertakings. *See Turner v. Atl. Mortg. & Inv. Co.,* 32 N.C.App. 565, 570–72, 233 S.E.2d 80, 83–84 (1977) (noting that each promise in a divisible contract must be supported by consideration). Although Price's and the CBH Defendants'

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

arguments draw heavily upon cases involving restrictive covenants against competitive employment, RMC does not seek to enforce such a covenant.

**\*18** {118} The Court must be guided by general contract principles. It is well-settled in North Carolina that every contract must be supported by consideration, and that "a mere promise, without more, is unenforceable." *Inv. Props. of Asheville, Inc. v. Norburn,* 281 N.C. 191, 195, 188 S.E.2d 342, 245 (1972). Likewise, any modification to an existing contract must be supported by consideration. *See Sessler v. Marsh,* 144 N.C.App. 623, 634, 551 S.E.2d 160, 166–67 (2001).

{119} The idea of consideration in an employment agreement has received substantial attention in reported decisions. It is settled that when an employee makes a promise as a part of the initial employment terms, the employment itself may serve as consideration for the promise. *See Robins & Weill, Inc. v. Mason,* 70 N.C.App. 537, 542, 320 S.E.2d 693, 697 (1984). However, a later modification of the employment contract must be supported by other consideration. *Sessler,* 144 N.C.App. at 634, 551 S.E.2d at 166–67; *see also James C. Greene Co. v. Kelley,* 261 N.C. 166, 168, 134 S.E.2d 166, 167 (1964). The specific question here is whether a promise of continued at-will employment can constitute such consideration for the 2012 Agreement.

{120} The "new consideration" principle is well-settled as applied to covenants against competition, and it is clear that the promise of continued at-will employment may not serve as consideration for a covenant not to compete that was not a part of the initial employment terms. *See James C. Greene Co.,* 261 N.C. at 168, 134 S.E.2d at 167. It is less clear whether that principle controls for any modification of the employment contract, particularly the addition of a nondisclosure or nonsolicitation covenant.

{121} The Court has confronted a potential conflict between a decision from the North Carolina Supreme Court and one from the North Carolina Court of Appeals on the issue of whether the promise of continued at-will employment can constitute consideration for a modification to an employment contract. The North Carolina Supreme Court, when addressing a restrictive covenant against competition entered into long after the initiation of employment, used language that is not by its express limited to a noncompetition agreement, but rather addresses the concept of whether a promise of continued at-will employment is a meaningful promise at all. The court held:

> A consideration cannot be constituted out of something that is given and taken in the same breath—of an employment which need not last longer than the ink is dry upon the signature of the employee, and where the performance of the promise is under the definite threat of discharge.
>
> ...
>
> We think that the observation of [the trial court judge] in rendering his judgment is pertinent: "The ... contract ... was not based upon a valuable consideration moving to the defendant ... as it in no particular whatever, in the opinion of the Court, increased, expanded or enlarged or in any way modified the obligations of the plaintiff ... in respect to the defendant, and does not modify the obligation of defendant to plaintiff, or operate to change the status of the parties on their contractual relationship in any matter, as employer and employee, as the same theretofore existed."

**\*19** *Kadis v. Britt,* 224 N.C. 154, 161–63, 29 S.E.2d 543, 547–49 (1944) (second and third alterations in original); *see also Eng'g Assocs., Inc. v. Pankow,* 268 N.C. 137, 139, 150 S.E.2d 56, 58 (1966) (analyzing a noncompetition agreement offered as a condition of continued employment, and finding a "complete lack of consideration").

{122} Other courts have also described consideration of the type discussed in *Kadis* as illusory and found that it cannot constitute consideration. *See, e.g., Henley Paper Co. v. McAllister,* 253 N.C. 529, 533, 117 S.E.2d 431, 433 (1960); *McLamb v. T.P. Inc.,* 173 N.C.App. 586, 591, 619 S.E.2d 577, 581 (2005) (citing *Kadis* in support of the proposition that "consideration which may be withdrawn on a whim is illusory consideration which is insufficient to support a contract"); see also E. Allan Farnsworth, Farnsworth on Contracts § 2.13, at 126–27 (2d ed. 1998) ("The question [of whether a promise is illusory] arises because the promise appears to be conditional on an event that is entirely within the promisor's control. Such a promise differs from one that is conditional on an event that is beyond the promisor's control and that can therefore be consideration.").

{123} Nevertheless, the North Carolina Court of Appeals has held that "[e]mployment contracts which are terminable at will may be modified at any time by either party with the continuance of the relationship serving as the consideration for the modification." *Fraver v. N.C. Farm Bureau Mut.*

Case 3:21-cv-00072-RJC-DSC   Document 43-1   Filed 07/18/22   Page 14 of 22

**RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)**

2016 NCBC 17

*Ins. Co.,* 69 N.C.App. 733, 738, 318 S.E.2d 340, 344 (1984) (citing 56 C.J.S. *Master and Servant* § 9 (1948)); *see also S. Fastening Sys.,* 2015 NCBC LEXIS 42, at *17 (noting *Fraver,* but finding other consideration to support a confidentiality agreement). One might potentially argue that *Fraver* and *Kadis* can be read harmoniously by restricting *Kadis* to only apply to the question of whether the promise was illusory when first made and that, when an employer subsequently carries out its promise of continued at-will employment, it supplies consideration for the agreement. However, employing this logic runs afoul of the recognized principle that any performance or promise in a contract must have been bargained for or must have induced the return promise contained within the contract. *See Chem. Realty Corp. v. Home Fed. Sav. & Loan Ass'n,* 84 N.C.App. 27, 31, 351 S.E.2d 786, 789 (1987).

{124} The Court cannot find a reasoned basis to confine the supreme court's holding in *Kadis* to apply only to contractual modifications that add restrictive noncompetition covenants, but rather reads the supreme court's holding to be a more general pronouncement as to whether the promise of continued at-will employment may support any contract modification. *See Kadis,* 224 N.C. at 163, 22 S.E.2d at 548–49. A court generally determines the existence, not the adequacy, of consideration. *Hejl v. Hood, Hargett & Assocs., Inc.,* 196 N.C.App. 299, 305, 674 S.E.2d 425, 429 (2009) ("[T]he parties to a contract are the judges of the adequacy of the consideration."); *see also Jewel Box Stores Corp. v. Morrow,* 272 N.C. 659, 666, 158 S.E.2d 840, 845 (1968) (noting that a court generally will not inquire into the adequacy of consideration unless the contract is a fraud on the party sought to be constrained).

**\*20** {125} The Court concludes that it must apply the holding in *Kadis* and settled, general contract principles to hold that the 2012 Agreement required a promise other than mere continued at-will employment to be enforceable against the Price and the CBH Defendants. Because there was no other consideration, as to Price and the CBH Defendants, the 2012 Agreement cannot be enforced and RMC's breach of contract claim must be dismissed.

### 5. *RMC's Conversion Claims Fail.*

{126} Defendants move for summary judgment on RMC's conversion claims.

### a. There Is an Issue of Material Fact as to Whether RMC Owns the Property on Which It Bases Its Conversion Claims.

{127} First, Defendants claim that RMC does not own at least some of the information that it contends was converted, such as any information based on public forms or information that was first developed by Meridias. In North Carolina, the elements of a conversion claim include "(1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the rights of the true owner." *Horner Int'l Co. v. McKoy,* No. 13–CVS–7131, 2014 NCBC LEXIS 68, 2014 WL 7591487 at *6 (N.C.Super.Ct. Dec. 18, 2014) (quoting *Estate of Graham v. Morrison,* 168 N.C.App. 63, 72, 607 S.E.2d 295, 302 (2005)). The North Carolina Court of Appeals set out a comprehensive statement of the tort of conversion in *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.:*

> "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner ... and in consequence it is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from the act." "[T]he general rule is that there is no conversion until some act is done which is a denial or violation of the plaintiff's dominion over or rights in the property ." Therefore, two essential elements are necessary in a claim for conversion: (1) ownership in the plaintiff, and (2) a wrongful conversion by the defendant.

192 N.C.App. 74, 86, 665 S.E.2d 487, 488–89 (2008) (alterations in original) (quoting *Lake Mary L.P. v. Johnston,* 145 N.C.App. 525, 532, 551 S.E.2d 546, 552 (2001)). The claimant must therefore own the property on which its claim is based, and the claim cannot be predicated purely on some benefit that the defendant enjoyed as a result of the alleged conversion.

{128} To obtain summary judgment, Defendants must demonstrate that there is no factual basis on which RMC can assert ownership of the documents that it contends were converted. *See Dalton,* 353 N.C. at 651, 548 S.E.2d at 707. RMC's duty as the nonmoving party is to forecast evidence adequate to support a finding of ownership. *See Austin Maint. & Constr., Inc.,* 224 N.C.App. at 407, 742 S.E.2d at 540.

{129} Defendants claim that RMC does not own Encompass templates or settings, which are copyrighted by Ellie Mae;

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 15

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

that RMC does not own any documents that Meridias created and that RMC appropriated after Meridias shut down; and that RMC does not own any forms created by or merely copied from government entities.

**\*21** {130} At this time, the Court is unable to parse through the record to determine RMC's ownership on a document-by-document or category-by-category basis to evaluate whether RMC's conversion claim as to any particular document fails for lack of ownership. At this stage, the Court concludes that RMC has forecasted sufficient evidence to survive summary judgment on this issue. However, the Court concludes that even if RMC was the owner of the information, its ownership continued even after the information was alleged to have been copied, and the conversion claim nevertheless fails because RMC has not been deprived of its possession of that information.

### b. RMC's Conversion Claims Fail Because RMC Continues to Possess Its Information.

{131} Defendants argue that, even if Defendants otherwise own the information on which the conversion claim is based, RMC has not been deprived of that ownership because RMC still has access to the information, which was in electronic form. "In North Carolina, only goods and personal property are properly the subjects of a claim for conversion...." *Norman v. Nash Johnson & Sons' Farms, Inc.,* 140 N.C.App. 390, 414, 537 S.E.2d 248, 264 (2000). Most, if not all, of the information upon which RMC bases its claims was stored electronically.

{132} Federal courts applying North Carolina law have recently issued contrasting decisions addressing whether electronic information can be the basis of a conversion claim. *Compare Capitol Comm'n, Inc. v. Capitol Ministries,* No. 5:11–cv–00214–BO, 2013 U.S. Dist. LEXIS 142542, 2013 WL 5493013 at \*12–13 (E.D.N.C. Oct. 1, 2013) (holding that data stored in a spreadsheet is intangible as a matter of law, and thus cannot be subject to a conversion claim), *with Bridgetree, Inc. v. Red F. Mktg., LLC,* No. 3:10–cv–00228–FDW–DSC, 2013 U.S. Dist. LEXIS 15372, 2013 WL 443698 at \*45–51 (W.D.N.C. Feb. 5, 2013) (holding that a conversion claim based on the unauthorized taking of electronic information was proper because the taking deprived the original owner of control of that information). The Honorable Gregory P. McGuire of this Court extensively discussed the question of whether electronic information could be subject to a conversion claim in *HCW Retirement & Financial Services, LLC v. HCW Employee Benefit Services, LLC,* and concluded that electronic information stored in a database was subject to a conversion claim when the defendant cut off the plaintiff's ability to access that information. No. 10–CVS–1447, 2015 NCBC LEXIS 73, 2015 WL 4238193 at \*59–62 (N.C.Super.Ct. July 14, 2015); *see also Lake Mary L.P.,* 145 N.C.App. at 531, 551 S.E.2d at 552 (defining conversion as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights" (quoting *Peed v. Burleson's, Inc.,* 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956))).

{133} Here, RMC does not allege that Defendants copied and then deleted the information so as to deprive RMC from its continued use of the information. The Court concludes that, in the absence of a showing that RMC has been deprived of possession or use of the information on which it bases its conversion claim, even if Defendants' acts were wrongful, they are not independently actionable through the tort of conversion. *See Horner Int'l Co.,* 2014 NCBC LEXIS 68, WL 7591487 at \*8 (denying a conversion claim because the plaintiff did not allege to have been deprived of access or excluded from the use of information that it claimed was converted).

**\*22** {134} Accordingly, RMC's conversion claims against all Defendants are dismissed. [6]

### 6. Civil Conspiracy

{135} Defendants argue that summary judgment should be granted on RMC's civil conspiracy claim because it should also be granted on all of RMC's other claims. *See Piraino Bros. v. Atl. Fin. Grp.,* 211 N.C.App. 343, 350, 712 S.E.2d 328, 333–34 (2011) ("It is well established that 'there is not a separate civil action for civil conspiracy in North Carolina.'" (quoting *Dove v. Harvey,* 168 N.C.App. 687, 690, 608 S.E.2d 798, 800 (2005))). Because the Court has found summary judgment in favor of Defendants to be improper on other claims, the conspiracy claims should survive at this juncture. Notwithstanding this holding, RMC may well conclude that it should reevaluate the strength of its conspiracy claim as to one or more of the Defendants.

### 7. Cardinal's Vicarious Liability

{136} Having allowed claims against Defendants to survive, the Court finds it premature to determine whether Cardinal may be held to vicarious liability.

Case 3:21-cv-00072-RJC-DSC Document 43-1 Filed 07/18/22 Page 16 of 22

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

### 8. *UDTP*

#### a. *Choice of Law*

{137} All Defendants attack RMC's UDTP claim on the basis that RMC has not satisfied the elements of a North Carolina UDTP claim. The CBH Defendants raise the separate, threshold argument that, as Nevada residents, North Carolina's UDTP statute does not apply to them. RMC has not pleaded a claim under the Nevada UDTP statute, which does not recognize a private, statutory cause of action of the type allowed in North Carolina. *See* Nev.Rev.Stat. § 598A.060 (2015).

{138} There is a long-standing, unresolved question regarding the proper conflicts-of-law analysis to apply to a claim brought under North Carolina's UDTP statute.[7] North Carolina courts have applied either the *lex loci delicti* ("*lex loci* ") test or the most-significant-relationship test. *See United Dominion Indus., Inc. v. Overhead Door Corp.,* 762 F.Supp. 126, 128 (W.D.N.C.1991). The Court need not further wade into the debate, as it concludes that either test leads to the application of Nevada law to RMC's UDTP claim against the CBH Defendants.

{139} The *lex loci* test mandates that the location of the injury determines which state's law applies. *Andrew Jackson Sales v. Bi–Lo Stores, Inc.,* 68 N.C.App. 222, 224–25, 314 S.E.2d 797, 799 (1984); *see also Boudreau v. Bauman,* 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988). In applying the *lex loci* test, "[t]he plaintiff's injury is considered to be sustained in the state 'where the last act occurred giving rise to [the] injury.' " *Harco Nat'l Ins. Co. v. Grant Thornton LLP,* 206 N.C.App. 687, 694, 698 S.E.2d 719, 724 (2010) (second alteration in original) (quoting *United Va. Bank v. Air–Lift Assocs., Inc.,* 79 N.C.App. 315, 321, 339 S.E.2d 90, 94 (1986)). RMC's allegations against the CBH Defendants consist solely of actions taken by them while they worked and resided in Nevada. There is no issue of material fact that the CBH Defendants did not undertake any actions outside of Nevada that were related to RMC's claims. As such, Nevada law was the location of the last act giving rise to RMC's injury. *Cf. id.* at 697–98, 698 S.E.2d 719, 698 S.E.2d at 725–26.

 **\*23** {140} The most-significant-relationship test requires a fact-specific analysis to determine which state has the most significant relationship to the events that give rise to a UDTP claim. *Andrew Jackson Sales,* 68 N.C.App. at 225, 314 S.E.2d at 799. During the relevant times, although both RMC and Cardinal maintained headquarters in North Carolina and both Florez and Price resided in North Carolina, as to the CBH Defendants, the underlying facts have a closer nexus to Nevada. The CBH Defendants were hired to work in Nevada, spent the entirety of their employment there, and committed the actions of which RMC complains there. The CBH Defendants remained in Nevada after leaving RMC to join Cardinal and continued to reside there when this action was initiated.

{141} In sum, the *lex loci* test and the most-significant-relationship test both weigh in favor of the Court's application of Nevada law to RMC's UDTP claim against the CBH Defendants. Because RMC has not brought a claim pursuant to Nevada's statute and because Nevada does not provide a private cause of action of the type RMC asserts against the CBH Defendants, RMC's UDTP claim against the CBH Defendants should be dismissed.

#### b. *RMC's UDTP Claims Survive in Part Against Cardinal, Florez, and Price.*

{142} Cardinal, Florez, and Price, make several arguments in seeking summary judgment on RMC's UDTP claims: (1) the underlying torts on which the UDTP claim rests should be dismissed; (2) the alleged acts are neither unfair, deceptive, nor egregious; and (3) a UDTP claim cannot be dependent on the conduct of individuals within a single business.

{143} To make a prima facie UDTP claim, a plaintiff must prove that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton,* 353 N.C. at 656, 548 S.E.2d at 712; *see also* N.C. Gen.Stat. § 75–1.1(a) (2015). RMC's UDTP claim is premised on the actions underlying its other claims. In addition to arguing that several of its claims are *per se* unfair or deceptive acts or practices, RMC also argues that the actions underlying its claims, when viewed collectively, rise to the level of a standalone UDTP claim. Defendants assert that a failure of all of RMC's underlying claims would likewise defeat its UDTP claim. *See Area Landscaping,* 160 N.C.App. at 526, 586 S.E.2d at 512 (affirming dismissal of UDTP claim solely because it was reliant on a trade secrets claim that was dismissed). That defense does not prevail, as the Court has allowed some of RMC's claims to survive that could lead to a Chapter 75 violation. *E.g., Compton v. Kirby,* 157 N.C.App. 1, 20, 577 S.E.2d 905, 917 (2003) (noting that conduct that constitutes both constructive fraud and a breach of fiduciary duty satisfies the first element of a UDTP

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

claim); *Drouillard v. Keister Williams Newspaper Servs.,* 108 N.C.App. 169, 173–74, 423 S.E.2d 324, 327 (1992) (finding a misappropriation claim sufficient to support a Chapter 75 claim).

**\*24** {144} Whether conduct found by a jury rises to the level of a UDTP is an issue of law that is generally determined by the Court following the jury's findings of fact. *See United Labs., Inc. v. Kuykendall,* 335 N.C. 183, 187, 437 S.E.2d 374, 377 (1993) (noting that a court must determine as a matter of law whether the jury's findings of fact amount to unfair or deceptive trade practices). However, Defendants argue that the Court can determine that issue on this record in advance of trial, because the acts complained of, even if accepted, do not constitute "immoral, unethical, oppressive, [or] unscrupulous" acts that are sufficient to support a UDTP claim. (CBH Br. Supp. 23 (quoting *Marshall v. Miller,* 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981)).) RMC counters that summary judgment would be inappropriate because Defendants' conduct is comparable to that which this Court and the North Carolina Court of Appeals found to constitute a UDTP violation in *Sunbelt Rentals, Inc. v. Head & Engquist Equipment, LLC,* No. 00–CVS–10358, 2003 NCBC LEXIS 6, 2003 WL 21017456 at \*157 (N.C.Super.Ct. May 2, 2003), *aff'd,* 174 N.C.App. 49, 620 S.E.2d 222 (2005).

{145} The invocation of *Sunbelt Rentals* has become a frequent event, although that case depended upon unusual facts that are not often repeated. The Court certainly does not read the *Sunbelt Rentals* decision to suggest or hold that a UDTP claim always lies when multiple employees move from one company to another, even if their efforts are concerted. The Honorable Ben F. Tennille of this Court based his holding on facts that he found to be particularly egregious. *See generally id.* In particular, Judge Tennille found that the defendants had timed their actions with the intent to cause the harm that their actions inflicted on the plaintiff, ultimately rendering it unable to do business or compete with the defendants' new company. *Id.* at \*165–66. The court of appeals, in affirming Judge Tennille's decision, found it particularly relevant that the effect of the defendants' actions effectively crippled the plaintiff's business. *Sunbelt,* 174 N.C.App. at 59–60, 620 S.E.2d at 230.

{146} Admittedly, RMC alleges facts that present similarities to *Sunbelt Rentals,* but there are also some undisputed, significant differences. For example, here, RMC and Pepe were well aware that Florez was considering establishing his own business, and they attempted for several weeks to negotiate contract modifications to persuade Florez to remain with RMC. RMC knew that Florez's departure might lead to widespread employee losses. Again, it may prove to be significant that RMC depended on Meridias's information when RMC entered the industry.

{147} The Court concludes that it cannot fairly afford summary judgment to either party on these facts. *See Supplee v. Miller–Motte Bus. Coll., Inc.,* —— N.C.App. ——, 768 S.E.2d 582, 598 (2015) ("[W]hether an action is unfair or deceptive is dependent upon the facts of each case and its impact on the marketplace." (quoting *Norman Owen Trucking, Inc. v. Morkoski,* 131 N.C.App. 168, 177, 506 S.E.2d 267, 273 (1998))).

**\*25** {148} In doing so, the Court has considered but rejected the argument that RMC's claim is barred because it involves only actions that occurred within a single business. *See White v. Thompson,* 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010) ("[A]ny unfair or deceptive conduct contained solely within a single business is not covered by the [UDTP] Act."). The evidence that RMC forecasts includes substantial acts by Florez and Price that occurred after they terminated their association with RMC.

{149} In sum, the UDTP claim against Florez, Price, and Cardinal survives summary judgment.

### B. *RMC's Motion for Partial Summary Judgment*

{150} The RMC Motion seeks dismissal first of Florez's, Price's, Collins's, and Harrison's counterclaims for unpaid bonuses and compensation, and secondly of each of the Individual Defendants' counterclaims for indemnification.

#### 1. *Price, Collins, and Harrison Have Abandoned Their Compensation Claims.*

{151} Price, Collins, and Harrison each made claims for unpaid compensation that were largely premised on employment contracts or other agreements they had with RMC.[8] In their responses to the RMC Motion, they each admit that they cannot now prove any such contract and that they do not contest summary judgment against them on those claims.

{152} Those counterclaims will therefore be dismissed.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.   18

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

### 2. *Resolution of Florez's Claim for Unpaid Compensation Depends on Contested Issues of Material Fact.*

{153} Florez admits that RMC paid his base salary for that portion of the first quarter of 2013 before his RMC employment terminated and all salary and incentive compensation for prior periods. The counterclaim is limited to incentive bonus compensation that he claims he is due for the quarter during which he left RMC. RMC contends, and Florez denies, that any such compensation was conditioned on Florez remaining with RMC for the entire quarter.

{154} As the movant for summary judgment, RMC bears the burden of demonstrating that there is no evidence upon which a jury could conclude that Florez is entitled to the incentive compensation he seeks. *See Connor v. Harless,* 176 N.C.App. 402, 405–06, 626 S.E.2d 755, 757–58 (2006) ("[A] valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." (quoting *Maxwell v. Michael P. Doyle, Inc.,* 164 N.C.App. 319, 326, 595 S.E.2d 759, 763 (2004)) (alteration in original)). Ultimately, a jury will have to determine whether the parties had reached an agreement that would entitle Florez to the incentive compensation that he claims.

{155} Florez negotiated his compensation with Brungardt. Brungardt testified that there was an unwritten gentlemen's agreement that Florez would receive his incentive compensation "as long as he was there past the quarter, if he stayed a full quarter—you had to be there for the full quarter and you got your bonus piece of it, but to my knowledge he got the full 2012 compensation." (Brungardt Dep. 170:15–:19.) Florez testified that "we never agreed or even discussed any requirement that I would have to be employed for the full duration of any quarter or on the payment date in order to receive incentive compensation for the period of time that I was employed." (Florez Aff. ¶ 5, Dec. 29, 2014.)

**\*26** {156} The Court concludes that the disputed testimony and the course of RMC's prior conduct regarding the payment of incentive compensation are adequate to present Florez's claim to a jury. *See Anderson v. Hollifield,* 345 N.C. 480, 483, 480 S.E.2d 661, 664 (1997) ("It is the jury's function to weigh the evidence and to determine the credibility of witnesses.").

{157} RMC further contends that Florez must be barred from recovery even if the contractual understanding was as he contends, because the actions that RMC alleges were material breaches of his employment contract. *See Ball v. Maynard,* 184 N.C.App. 99, 108, 645 S.E.2d 890, 898 (2007) ("It is well settled that where one party breaches a contract, the other party is relieved from the obligation to perform."). However, that position assumes that RMC will succeed in proving its primary claims.

{158} In sum, Florez's counterclaim for unpaid incentive compensation survives summary judgment.

### 3. *The Indemnification Counterclaims Fail Because the Individual Defendants Were Not Sued Solely Because of Their Capacity as RMC Officers, Directors, or Employees.*

{159} The Individual Defendants argue that RMC must indemnify them for the costs that they incur by defending against RMC's claims. Their claims depend on RMC's bylaws and on Florida law, which applies pursuant to the internal affairs doctrine because RMC is a Florida corporation. *See Bluebird Corp. v. Aubin,* 188 N.C.App. 671, 680, 657 S.E.2d 55, 63 (2008). The counterclaims raise questions of both mandatory indemnification and permissive indemnification.

{160} The applicable Florida statute requires mandatory indemnification by a corporation of any director, officer, employee, or agent who "has been successful on the merits or otherwise," Fla. Stat. § 607.0850(3) (2014), in defense of a proceeding where that person was made a party to that proceeding "*by reason of the fact that* the person is or was a director, officer, employee, or agent of the corporation," *id.* § 607.0850(2) (emphasis added). Florida also provides for permissive indemnification for the cost of litigation, allowing a corporation to indemnify a person for certain expenses of litigation if that person was made "a party to any proceeding by ... the corporation to procure a judgment in its favor *by reason of the fact that* the person is or was a director, officer, employee, or agent of the corporation." *Id.* (emphasis added). This permissive indemnification is only authorized if that person "acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the corporation." *Id.* The statute allows, but does not require, a corporation to advance the expenses of defending the litigation.

{161} RMC's bylaws allow indemnification of officers and directors to the full extent authorized by Florida's statute. The bylaws allow an officer or director to demand indemnification and to file suit for payment of expenses sixty days after making a demand on the corporation for payment. RMC's bylaws do not provide for permissive indemnification of

Case 3:21-cv-00072-RJC-DSC   Document 43-1   Filed 07/18/22   Page 19 of 22

**RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)**

2016 NCBC 17

employees who are not also a director or officer. Both the statute and the bylaws depend on whether the party seeking indemnification was made a party to the litigation by reason of the fact that the person was a director, officer, employee, or agent of the corporation, and only if they are successful in the litigation.

 **\*27**  {162} The Court must apply the Florida statutes as they have been interpreted by the Florida Supreme Court. The parties' primary dispute involves the holding and effect of *Banco Industrial de Venezuela C.A., Miami Agency v. De Saad,* 68 So.3d 895 (Fla.2011). In *De Saad,* a former officer of a foreign bank sued the bank for indemnification after she successfully defended against criminal claims of money laundering and conspiracy that arose as a result of the officer's having allegedly funneled drug money into accounts held at the bank. *Id.* at 896–97. The Florida Supreme Court first held that the officer's reliance on section 607.0850 was improper because the foreign bank was regulated by the laws of Venezuela, rather than Florida. *Id.* at 898–99. Having so held, the court also applied section 607.0850, noting that the officer

> was not prosecuted "by reason of the fact" that she was a corporate officer. Although [the officer] may have had access to the laundered funds due to her position as a corporate officer, she was prosecuted for her conduct, not on account of her position. This conduct was not required by her position as a corporate officer and was, in fact, contrary to corporate policy.

*Id.* at 900 (internal citations omitted). [9]

{163} *De Saad'* must be read in connection with the lower court's holding that the Florida Supreme Court overturned. The Florida District Court of Appeals relied on a Delaware case to determine that a corporate officer's right to indemnification stemmed solely from that officer's status as a corporate officer, and that, "[i]f the conduct resulting in the prosecution was done in his capacity as a corporate officer, without regard to what his motivation may have been, then the ensuing prosecution was 'by reason of the fact that' he was a corporate officer." *Banco Indus. de Venez., C.A., Miami v. De Saad,* 21 So.3d 46 (Fla.Dist.Ct.App.2009) (quoting

*Perconti v. Thornton Oil Corp.,* C.A. No. 18630–NC, 2002 Del. Ch. LEXIS 51, 2002 WL 982419 at \*16 (May 3, 2002)), *overturned by* 68 So.3d 895. The Florida Supreme Court then expressly rejected this broad view of indemnification, instead indicating that a court analyzing an indemnification claim under section 607.0850 should evaluate whether the individual has been made a party because of their conduct, rather than solely because of their position in the company. *De Saad,* 68 So.3d at 900. Put another way, if the individual's corporate position was incidental to the conduct that formed the claim, indemnification is not permitted.

{164} Based on the Court's reading of *De Saad* as controlling precedent, section 607.0850 neither requires nor permits indemnification by a corporation of an individual who was made a party to a litigation on the basis of conduct found to be outside the scope of their employment. Here, RMC's claims did not arise solely by reason of any Defendant's status as an officer, director, or employee.

 **\*28**  {165} The indemnification counterclaims should be dismissed. This dismissal is without prejudice to the imposition of costs, including attorneys' fees, that may be warranted on a basis other than indemnification.

## VII. CONCLUSION

{166} Based on the foregoing, the Court holds and orders as follows:

### A. *Defendants' Motions*

a. Summary judgment is DENIED on RMC's breach of fiduciary duty claim against Florez.

> b. Summary judgment is DENIED on RMC's misappropriation of trade secrets claim against all Defendants, subject to the exception that no such claim can be premised on documents that RMC has publicly filed or otherwise publicly presented.

> c. Summary judgment is GRANTED in favor of all Defendants on RMC's common law misappropriation of trade secrets claim, and this claim is DISMISSED WITH PREJUDICE.

> d. Summary judgment is GRANTED in favor of Defendants Price, Collins, Beckelman, and

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.   20

RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)

2016 NCBC 17

Harrison on RMC's breach of contract claim based on the 2012 Agreement, and this claim as to those defendants is DISMISSED WITH PREJUDICE.

e. Summary judgment is GRANTED on RMC's conversion claim against all Defendants, and this claim is DISMISSED WITH PREJUDICE.

f. Summary judgment is DENIED on RMC's civil conspiracy claim against all Defendants.

g. Summary judgment is DENIED on RMC's vicarious liability claim against Cardinal.

h. Summary judgment is DENIED on RMC's UDTP claim against Cardinal, Florez, and Price.

i. Summary judgment is GRANTED on RMC's UDTP claim against Defendants Collins, Beckelman, and Harrison, and RMC's UDTP claim as to those Defendants is DISMISSED WITH PREJUDICE.

**B.** *Plaintiff's Motion for Partial Summary Judgment*

a. Summary judgment is GRANTED in favor of RMC on Collins's and Harrison's breach of contract counterclaims, and these claims are DISMISSED WITH PREJUDICE.

b. Summary judgment is GRANTED in favor of RMC on Price's, Collins's, and Harrison's unpaid compensation counterclaims, and these claims are DISMISSED WITH PREJUDICE.

c. Summary judgment is DENIED on Florez's unpaid compensation counterclaim.

d. Summary judgment is GRANTED in favor of RMC on all counterclaims for indemnification, and those claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

**All Citations**

Not Reported in S.E.2d, 2016 WL 687629, 2016 NCBC 17

---

### Footnotes

1      For simplicity, the Court refers to the new business and Sebonic jointly as "Cardinal," except as specifically noted.

2      Specifically, Collins and Harrison seek unpaid compensation through separately pleaded counterclaims for breach of contract and violations of section 608.040 of the Nevada Revised Statutes. Florez and Price seek unpaid compensation based on several arguments, but each list only one counterclaim.

3      Efforts to secure these contractual protections are relevant to the Court's analysis of RMC's trade secrets claims, even though for reasons stated below, the Court has concluded that the contract cannot be enforced, at least not against Price and the CBH Defendants.

4      Although not alleged in its First Amended Complaint, RMC has argued in its briefs that the CBH Defendants each executed contracts when they began their employment at RMC ("2010 Agreements") that were substantially similar to the 2012 Agreements. RMC has not filed a motion to amend its pleadings to assert a claim based on the 2010 Agreements. Should RMC elect to do so, Beckelman and Harrison would be expected to assert the forum-selection clauses in those agreements, which provide for an exclusive Nevada forum.

5      The 2012 Agreement states the following as consideration: "Employee's employment, the disclosure of Trade Secrets and Confidential Information to Employee during employment, and the compensation and benefits being paid and to be paid by RoundPoint Mortgage...." (2012 Agreement 2.) Although this Court has previously found that the disclosure of new confidential information is consideration for a nondisclosure agreement, RMC does not point the Court to any additional confidential information to which Price and the

Case 3:21-cv-00072-RJC-DSC Document 43-1 Filed 07/18/22 Page 21 of 22

**RoundPoint Mortg. Co. v. Florez, Not Reported in S.E.2d (2016)**

2016 NCBC 17

CBH Defendants were given access after executing the 2012 Agreement that they did not already have access to. *See S. Fastening Sys., Inc. v. Grabber Constr. Prods.,* No. 14–CVS–4260, 2015 NCBC LEXIS 42, 2015 WL 2031007 at *17–18 (N.C.Super.Ct. Apr. 28, 2015) (finding additional consideration when all of the confidential information was only disclosed after a nondisclosure agreement was signed). Although not dispositive to this Court's ruling, RMC noted as much in its briefing in support of an earlier preliminary injunction motion: "It is undisputed that ... the consideration supplied for [Price's and the CBH Defendants'] consent to the [2012 Agreement] was continued employment." (Reply Supp. Mot. Prelim. Inj. 17.).

6    This holding makes it unnecessary for the Court to address the CBH Defendants' argument that the conversion claims against them must be dismissed because of RMC's failure to make a demand on them to return the information.

7    For an exhaustive review of the cases interpreting North Carolina law with respect to the correct conflicts-of-law analysis, see Noel L. Allen, *North Carolina Unfair Business Practice* §§ 5.01–.05, at 5–1 to –27 (3d ed.2015).

8    Price made a standalone counterclaim for unpaid compensation, while Collins and Harrison sought unpaid compensation through separately pleaded counterclaims for breach of contract and violations of section 608.040 of the Nevada Revised Statutes.

9    The Individual Defendants argue that the Florida Supreme Court's alternative analysis of section 607.0850 is nonbinding dicta. Although the Florida Supreme Court's holding in *De Saad* rests on several grounds, none are properly considered to be nonbinding dicta. *See Tricam Indus., Inc. v. Coba,* 100 So.3d 105, 115 n. 4 (Fla.Dist.Ct.App.2012), *rev'd on other grounds,* 164 So.3d 637 (Fla.2015).

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.